Kenneth B. Wilson (SBN 130009)
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, California 94019
Telephone:  (650) 440-4211
    ken@coastsidelegal.com

Joshua M. Masur  (SBN 203510)
ZUBER LAWLER & DEL DUCA LLP
2000 Broadway Street, Suite 154
Redwood City, California 94063
Telephone: (650) 434-8538
Facsimile:  (213) 596-5621
    jmasur@zuberlaw.com

Attorneys for Defendant
REDBUBBLE INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LTTB LLC, a California limited liability company, | Case No. 3:18-cv-00509-RS |
| Plaintiff, | **NOTICE OF MOTION AND MOTION OF DEFENDANT REDBUBBLE INC. FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| REDBUBBLE INC., | |
| Defendant. | **[Filed concurrently with Declarations and [Proposed] Order]** |

Judge:    Hon. Richard Seeborg
Date:      June 13, 2019
Time:      1:30 p.m.
Crtrm.:    3

**TO PLAINTIFF LTTB LLC AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on June 13, 2019, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Richard Seeborg, located in the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Redbubble Inc. ("Redbubble") will and hereby does move this Court for entry of Summary Judgment on plaintiff LTTB LLC's Complaint. The Motion is made on the grounds that there is no genuine issue of any material fact and that Redbubble is entitled to judgment on LTTB's Complaint as a matter of law. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the supporting Declarations of Anuj Luthra, Arnaud Deshais, James Toy, Ayaire Cantil-Voorhees, and Kenneth B. Wilson  filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

By this motion, Redbubble seeks an Order granting summary judgment and directing entry of final judgment in favor of Redbubble on LTTB's Complaint.

Dated:  April 29, 2019

COASTSIDE LEGAL
KENNETH B. WILSON

ZUBER LAWLER & DEL DUCA LLP
JOSHUA M. MASUR

By:    */s/ Kenneth B. Wilson*
KENNETH B. WILSON

Attorneys for Defendant
REDBUBBLE INC.

# <u>TABLE OF CONTENTS</u>

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.     INTRODUCTION................................................................................................................1

II.    STATEMENT OF FACTS..................................................................................................2

       A.     Background of Defendant Redbubble ................................................................2

       B.     Redbubble Does Not Design or Upload Content Sold on the Marketplace ..............3

       C.     Redbubble Did Not Sell or Offer to Sell the Accused Products ................................4

       D.     Redbubble Does Not Print or Otherwise Manufacture Products ................................5

       E.     Redbubble Does Not Maintain Inventory of or Ship Finished Products..................6

       F.     Redbubble's Substantial Efforts to Combat Piracy ....................................................6

       G.     Background of This Dispute ......................................................................................10

III.    ARGUMENT ...................................................................................................................13

       A.     LTTB Cannot Attribute Liability to Redbubble on Any of Its Claims ...................13

              1.     Direct Trademark Infringement and Unfair Competition. ..........................13

              2.     Trademark Counterfeiting ........................................................................16

              3.     Contributory Trademark Infringement ......................................................18

       B.     The Statute of Limitations Bars the Vast Majority of LTTB's Claims...................19

       C.     LTTB Cannot Show That Any of the Accused Products Violate Its Trademark Rights ......................................................................................................19

       D.     LTTB Cannot Recover Damages on Its Claims.......................................................23

               1.     LTTB Cannot Recover Redbubble's Profits or Statutory Damages Because There Is No Evidence of Willful Infringement.............................23

              2.     LTTB Cannot Recover Actual Damages Because It Has No Admissible Evidence.........................................................................24

IV.    CONCLUSION ...............................................................................................................25

2911-1002 / 1438467.2

DEFENDANT REDBUBBLE INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## CASES

*Academy of Motion Picture Arts & Sciences v. GoDaddy, Inc.,*
2015 WL 5311085 (C.D. Cal. 2015) ................................................................. 18

*Align Tech., Inc. v. Strauss Diamond Insts., Inc.,*
No. 18-CV-06663-TSH, 2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) .................... 16, 17

*American Auto. Ass'n v. General Motors LLC,*
No. 17-CV-03874-LHK, ___ F.Supp.3d. ____, 2019 WL 1304309
(N.D. Cal., March 21, 2019) ........................................................................ 23

*Brookfield Commc'n, Inc., v. West Coast Enter. Corp.,*
174 F.3d 1036 (9th Cir. 1999) ...................................................................... 14

*Evergreen Safety Council v. RSA Network, Inc.,*
697 F.3d 1221 (9th Cir. 2012) ...................................................................... 24

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.,*
925 F. Supp. 2d. 1067 (C.D. Cal. 2012) ...................................................... 20, 21

*Greater Anchorage, Inc. v. Nowell,*
974 F.2d 1342 (9th Cir. 1992) ...................................................................... 20

*Greg Young Publishing v. Zazzle, Inc.,*
No. 2:16-CV-04587-SVW-KS, 2017 WL 5004719
(C.D. Cal. Oct. 27, 2017) ........................................................................ 23, 24

*International Order of Job's Daughters v. Lindeburg & Co.,*
633 F.2d 910 (9th Cir. 1980) ...................................................................... 21, 22

*Int'l Olympic Comm. v. San Francisco Arts & Athletics,*
781 F.2d 733 (9th Cir. 1986) ........................................................................ 23

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,*
456 U.S. 844 (1982) ..................................................................................... 18

*Jarrow Formulas, Inc. v. Nutrition Now Inc.*
304 F.3d 829 (9th Cir. 2002) ........................................................................ 19

*Ketab Corp. v. Mesriani Law Group,*
2015 WL 2084469 (C.D. Cal. May 5, 2015) ..................................................... 16

*Lockheed Martin Corp. v. Network Solutions, Inc.,*
194 F.3d 980 (9th Cir. 1999) ........................................................................ 18

*Lockheed Martin Corp. v. Networks Solutions, Inc.,*
985 F. Supp. 949 (C.D. Cal 1997) ................................................................. 18

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
    693 F. App'x 879 (Fed. Cir. 2017) ........................................................... 15

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
    2015 WL 4394673 (W.D. Wash. July 16, 2015)
    *aff'd* 693 F. App'x 879 (Fed. Cir. 2017) ............................................... 15

*Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*,
    894 F.3d 1015 (9th Cir. 2018) ................................................................ 19

*Schiappa v. Charityusa.com, LLC*,
    No. 16-CV-81617, 2017 WL 2210274
    (S.D. Fla. May 18, 2017) ........................................................................ 20

*Spy Phone Labs LLC v. Google Inc.*,
    2016 WL 6025469 (N.D. Cal. 2016) ....................................................... 18

*State of Idaho Potato Commission v. G&T Terminal Pack, Inc.*,
    425 F.3d 708 (9th Cir. 2005) ............................................................ 16, 17

*The Ohio State University v. Redbubble Inc.*,
    ___ F.Supp.3d ___, 2019 WL 1429255 (S.D. Ohio March 29, 2019) ..................... 1, 14, 16

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F. 3d 93 (2nd Cir. 2010) ....................................................... 14, 18, 19

*Tre Milano, LLC v. Amazon.com, Inc.*,
    No. B234753, 2012 WL 3594380 (Cal. App. 2012) ............................ 14, 15, 16

*VHT, Inc. v. Zillow Group, Inc.*,
    918 F.3d 723 (9th Cir. 2019) ................................................................ 24


## STATUTES

15 U.S.C. § 1114(1) ........................................................................ 14

15 U.S.C. § 1117(c)(2) .................................................................... 23

Digital Millennium Copyright Act, 17 U.S.C. § 512 ................................ 7


## OTHER AUTHORITIES

4 J. Thomas McCarthy, McCarthy on Trademarks and
    Unfair Competition § 31.33 (4th ed. 2001) ........................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff LTTB LLC has mistakenly alleged that defendant Redbubble Inc. is liable for willful trademark infringement and counterfeiting because independent third-party sellers have uploaded designs and sold products displaying the pun "Lettuce Turnip the Beet" through Redbubble's online marketplace. But as another court recently held as a matter of law, Redbubble cannot be liable for direct trademark infringement or counterfeiting with respect to products offered or sold via the Redbubble marketplace because Redbubble does not make or sell those products or otherwise use the marks in question. *See The Ohio State University v. Redbubble Inc.,* ___ F.Supp.3d ___, 2019 WL 1429255 (S.D. Ohio March 29, 2019) (granting summary judgment on direct trademark infringement and unfair competition claims). Redbubble cannot be liable for contributory trademark infringement because it has uniformly removed allegedly infringing content promptly upon receiving notice of alleged infringement. And Redbubble cannot as a matter of law be liable for counterfeiting or willful trademark infringement for the third-party sale of products that are not identical to those sold by LTTB, that Redbubble never handles or even sees, by sellers who have represented that they own all rights to sell the designs.

LTTB's claims are otherwise barred as a matter of law. Trademark law does not prohibit the types of "ornamental" uses of the Lettuce Turnip the Beet pun that are at issue in the Accused Products[1] (e.g., as a slogan prominently displayed on the front of a T-shirt or a sticker), since such uses do not perform a source-identifying function. LTTB admits that consumers do not associate the phrase with LTTB. Indeed, the Trademark Office explicitly determined as much in rejecting LTTB's original trademark application. The bulk of allegedly infringing sales are also barred by the statute of limitations because they occurred and LTTB complained about them more than four years before suit was filed. Finally, LTTB cannot recover damages because it does not have any admissible evidence that it has been damaged, and any claim for recovery of profits or statutory damages is barred as a matter of law because LTTB cannot prove the requisite willfulness.

---

[1] "Accused Products" refers to the products LTTB has accused of infringement in its Complaint and discovery responses.

1   The undisputed dispositive facts demonstrate that Redbubble cannot be held liable for

2   violating the Lanham Act as a matter of law. Accordingly, Redbubble requests entry of summary

3   judgment in its favor on LTTB's Complaint.

4   **II.**   **STATEMENT OF FACTS**

5       **A.**   **Background of Defendant Redbubble**

6       Much like the Amazon Marketplace and eBay, Redbubble is a global online marketplace

7   platform, hosted at redbubble.com (the "Redbubble Marketplace"). [Toy Decl. Exh. A] Founded in

8   2006, and publicly traded on the Australian Securities Exchange since May 2016, Redbubble was

9   formed with the goal to "[g]ive independent artists a meaningful new way to sell their creations), and

10  it operates under the stated mission of "bringing more creativity into the world." [Toy Decl. Exhs.

11  A-B] The community of independent artists who use the Redbubble platform upload and sell their

12  creative designs on high-quality, everyday products such as apparel, phone cases, stickers, bags, wall

13  art and so on. [Toy Decl. Exh. A] Through the Redbubble Marketplace, independent artists are able

14  to profit from their creativity by selling their products to a new universe of fans, who in turn benefit

15  by being able to purchase products that provide them with "[a] simple but meaningful way to show

16  the world who they are and what they care about." [*Id.*]

17      Currently, there are more than 960,000 independent third-party artists (hereinafter referred to

18  as the "Sellers" or "Third-Party Sellers") offering products for sale via the Redbubble Marketplace.

19  [Cantil-Vorhees Decl. ¶ 2] Purchasers can browse through more than 18 million designs uploaded by

20  these Sellers to the Marketplace, and more than 400 million products bearing these designs are

21  currently offered for sale by these Sellers. [Cantil-Vorhees Decl. ¶ 3].

22      The Redbubble Marketplace not only provides a platform through which products can be

23  listed and sold, but the Marketplace software also automatically performs various online services to

24  facilitate the transactions that occur through the Marketplace. In particular, the Marketplace software

25  connects Sellers automatically to third-party manufacturers who print and pack the products before

26  third-party shippers pick up the products and deliver them to customers. [Luthra Decl. ¶ 3 and

27  Deshais Decl. ¶ 3] The platform also provides Sellers access to third-party payment processors who

28  collect and process customer payments. [Luthra Decl. ¶ 4] This transaction process is entirely Seller-

DEFENDANT REDBUBBLE INC.'S MOTION FOR SUMMARY JUDGMENT

directed and automated by the Redbubble Marketplace software. [Luthra Decl. ¶ 4] Put simply, no Redbubble personnel designed or uploaded, manufactured, offered for sale, sold, handled, distributed, or for that matter even viewed any of the Accused Products prior to their sale. [Deshais Decl. ¶ 11]

### B.   Redbubble Does Not Design or Upload Content Sold on the Marketplace

Redbubble did not design or upload any of the designs for the Accused Products. Rather, all of the content offered for sale on the Redbubble Marketplace, including the designs on the Accused Products, was designed and uploaded solely by third-party Sellers, without any action by Redbubble. [Deshais Decl. ¶ 11] Redbubble was unaware of the content of those listings prior to their upload, and it had no involvement with the decision to offer the Accused Products. [*Id.*]

A third-party Seller must register as a user before uploading and selling creative products on the Redbubble Marketplace. [Luthra Decl. ¶ 5] All registered users are required to comply with the Redbubble User Agreement and various published policies that specify that (1) Sellers using the Marketplace must possess the applicable rights to upload and sell their content on the Marketplace; (2) the Sellers, not Redbubble, are responsible for such content; and (3) the third-party artists, not Redbubble, are in fact the sellers of the products offered. [Toy Decl. Exh. C]

A third-party Seller uploading a design to sell through the Redbubble Marketplace has exclusive control over the design and must (among other things) specify the physical product type(s) to which the design may be applied, set the price, and if desired by the Seller, input a title, one or more keyword "tags" and a description.  [Luthra Decl. ¶ 7] Potential customers may use the Marketplace software's search function to search for listings containing content of interest to them, and search results are based on these keyword tags and title, which are created solely by the uploading Seller – not Redbubble. [Luthra Decl. ¶ 8]

Once a third-party Seller uploads content (and in doing so affirmatively represents for each design that the Seller has the right to upload the design), the uploaded content generally is displayed automatically for sale on the Marketplace.  [Luthra Decl. ¶ 9] All of the designs for the Accused Products were displayed automatically for sale on the Marketplace following their upload by Sellers, without any knowledge or involvement by Redbubble. [Deshais Decl. ¶ 11]

C.      Redbubble Did Not Sell or Offer to Sell the Accused Products

The agreements between Redbubble and Sellers using the Redbubble Marketplace platform make clear that it is the third-party Seller, not Redbubble, that offers to sell and sells the products listed on the Marketplace. For example, Redbubble's User Agreement describes how the Redbubble Marketplace enables third-party Sellers "to publish, sell, discuss and purchase art," among other things. The section of the User Agreement entitled "Offering your art for sale on a physical product" describes how a Seller "may offer their art for sale on a physical product on the website by appointing Redbubble to facilitate the transaction…." And there are several references to a Seller offering his/her product for "sale." There is no suggestion in the User Agreement that Redbubble is the seller of the product, or that it offers the product for sale. [See Toy Decl. Exh. C]

Similarly, the Redbubble Services Agreement, which is Appendix A to the User Agreement, begins with the statement that "You wish to use Redbubble's services to facilitate marketing and sale of your art on a physical product. . . ." Section 3 of the Services Agreement, entitled "Sale of your products," goes on to provide that the third-party Seller, not Redbubble, determines the price for products.[2]  Section 5 of the Services Agreement further confirms that the third-party Seller is in fact "the seller of the merchandise."  [*Id.*]

The listing pages where products are offered for sale further confirm that the products sold via the Marketplace are being offered by third-party Sellers, not Redbubble. Each listing on the Redbubble Marketplace contains the Seller's name below the image, followed by a page with the header "More Works by [Seller]" and a selection of additional listings available from that Seller. Some listings also contain to the right of the design the listing's title followed by the phrase "by [Seller]". [Luthra Decl. ¶ 10] These pages confirm what the User Agreement makes clear: all products on the Redbubble Marketplace, including the products accused in this lawsuit, are offered and sold by third-party Sellers, not Redbubble.

---

[2] Specifically, it provides that a Seller is "able to select any percentage markup you wish, greater than or equal to zero, above the base amount but below the automated upper limit set by Redbubble (subject to change from time to time)." The upper limit is five thousand percent (5000%) over the base amount. [Luthra Decl. ¶ 11]

The Redbubble Marketplace software facilitates payment processing of sale proceeds from customers to Sellers (as, for example, Amazon.com does for third-party sellers on the Amazon Marketplace). More specifically, third party payment processors like PayPal, Stripe, or Amazon Payments receive payment directly from customers who purchase products through the Redbubble Marketplace and forward those funds to Redbubble. [Luthra Decl. ¶ 12] The Redbubble platform software then automatically facilitates the payment of the Seller-established margin to the Seller's account, while Redbubble retains a fixed service fee (which varies by product type) for its facilitation services that is independent of the price set by the Seller. [*Id.*; Toy Decl. ¶ 34]

Redbubble never took control of or title to the Accused Products. Rather, as specified in Section 3.5 of Redbubble's Services Agreement, "[a]ll items purchased from the website are manufactured pursuant to arrangements with third party suppliers under your instructions. This means that title and risk for loss for such items pass from you to the customer/purchaser without passing through us . . . ." [Toy Decl. Exh. C]

### D.   Redbubble Does Not Print or Otherwise Manufacture Products

Once an order is placed, the Redbubble Marketplace software automatically routes the order information to a third-party manufacturer or printer (the "Manufacturer") based on certain criteria, such as location of the customer and the product type ordered. [Luthra Decl. ¶ 13] These Manufacturers are independent of Redbubble; they are neither affiliates of Redbubble nor staffed by Redbubble personnel. [Deshais Decl. ¶ 4] Redbubble does not own the facilities where product is manufactured by these third parties, nor does Redbubble own any of the equipment or employ any of the personnel at those facilities. [Deshais Decl. ¶ 5]

Upon receipt of an order from the Marketplace software, the Manufacturer imprints the design onto the product chosen by the customer, without any input or involvement from Redbubble. [Deshais Decl. ¶ 2] No Redbubble personnel reviewed the artwork for the Accused Products prior to printing. [*Id.* ¶ 11] Nor did any Redbubble personnel participate in the manufacturing process, pack or ship the printed products, perform quality control on the printed products, or for that matter even see an Accused Product at any time before it was picked up from the Manufacturer by third-party shippers and delivered to the end customers. [*Id.*]

**E.      Redbubble Does Not Maintain Inventory of or Ship Finished Products**

After a product ordered via the Redbubble Marketplace is manufactured or printed, a third-party shipper picks up the product from the Manufacturer's location and ships the product directly to the customer. [Deshais Decl. ¶ 6] At all times between completion of manufacturing and the time the product is picked up by the shipper, the product remains with the third-party Manufacturer.  [Deshais Decl. ¶ 7] Indeed, at no time during the purchasing process does Redbubble possess or physically handle the finished products. [Deshais Decl. ¶ 9]

**F.      Redbubble's Substantial Efforts to Combat Piracy**

In any marketplace, there is a risk that bad actors will abuse the system by attempting to use it to sell unauthorized or counterfeit products. However, Redbubble has taken significant steps, in excess of its legal obligations, to prevent such abuses, and it continues to direct substantial resources toward eliminating third-party infringement on the Redbubble Marketplace and improving Redbubble's existing anti-piracy measures. [Toy Decl. ¶¶ 8-23]

***Redbubble Agreements and Policies***. As an initial matter, each registered user agrees to comply with the Redbubble User Agreement and related documents that, among other things, reinforce that "[r]especting other people's intellectual property is an essential principle of Redbubble's community." [Toy Decl. Exh. C] To that end, Redbubble's Sellers must confirm that they own or have all rights to use any uploaded content and that the content "will not infringe the intellectual property rights or any other rights of any person or entity. . . ." [Id.]  Sellers are further advised that Redbubble will promptly remove infringing listings, and "disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the . . . rights of others." [Id.]  Each time they upload listings to the Marketplace, Sellers must also check a box affirmatively acknowledging that they "have the right to sell products containing this artwork, including (1) any featured company's name or logo, (2) any featured person's name or face, and (3) any featured words or images created by someone else." [Luthra Decl. ¶ 6]

Redbubble diligently enforces these rules in accordance with a detailed IP/Publicity Rights Policy, which it publishes on its website. [Toy Decl. ¶ 6, Exh. D] That document begins with the following "mission statement":

Redbubble is a community built on respect and recognition of artists. We ask, rather we beg, that you remember this when you are posting work on Redbubble. If you make sure that all the works you upload consist of your very own, original ideas and are not infringing on the intellectual property or publicity rights of another, you will help us foster the supportive and creative environment that is Redbubble. AND, besides being counter to all that Redbubble stands for, stealing other people's work and passing it off as your own is against the law.

[Toy Decl. Exh. D]

The Redbubble IP/Publicity Rights Policy sets forth a "notice and takedown" scheme that largely tracks the provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512. Boiled down to basics, if a content owner like LTTB provides notice that particular listings infringe their intellectual property or publicity rights, Redbubble promptly (i.e., typically within one business day) removes those listings and notifies the third-party Seller who uploaded them. In accordance with that policy, Redbubble will also "disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the copyrights, trademark rights, other intellectual property rights or publicity rights of others." [Toy Decl. ¶ 7, Exh. D]

Between January 1, 2014 and September 30, 2018, Redbubble received over 66,000 takedown requests from content owners, and pursuant to those requests, Redbubble removed almost 600,000 listings. [Cantil-Vorhees Decl. ¶ 4]

***Redbubble's Proactive Policing Efforts***. In addition, for certain content owners, Redbubble's 12-person Marketplace Integrity ("MPI") Team proactively polices the Redbubble Marketplace for potentially infringing content, using screening criteria established by Redbubble. Such screening criteria are based on information from content owners and almost always are created in collaboration with those content owners. [Toy Decl. ¶ 8] Redbubble performs this proactive screening for LTTB, but LTTB has refused to reasonably cooperate in the process, making implementation of effective screening criteria more difficult. [*Id*. ¶ 9]

In Redbubble's proactive policing process, a member of the MPI Team creates a list of search terms that are deemed likely to correspond to potential infringing word marks or listings. [Toy Decl. ¶ 10] This list of search terms is typically based on a list of claimed trademarks and other protected content provided by the content owner, and the content owner sometimes assists in providing common misspellings of its trademarks to make the search keywords more effective. [*Id*.]

It is important that the content owner collaborate with Redbubble by providing it with a complete list of what it believes its protected content is, whether that be logos, trademarks, characters, etc., so that Redbubble can most effectively search for it and remove it from the Marketplace. [Toy Decl. ¶ 11] For content owners like LTTB who do not cooperate with Redbubble in this process, however, Redbubble is forced to use its best judgment as to what terms a content owner might use to identify colorable infringement. [*Id.*]

The search terms are input into a proprietary software tool, which automatically and continuously monitors for changes in a dynamic database of Seller-generated titles, tags and descriptions in the Redbubble Marketplace, and in near real-time (i.e., approximately one minute from design upload to detection) displays the results of its searches in a user interface for the MPI Team to review and access. [Luthra Decl. ¶ 14; Toy Decl. ¶ 12] The MPI Team manually reviews these search results, which include images of the artwork for the listing, to identify content that matches the policing guidelines, and is therefore potentially infringing, based on information provided by the content owner. [Toy Decl. ¶ 12] Like the search terms, these guidelines are typically created in collaboration with the content owner, because policing functions most effectively if Redbubble has a full understanding of what designs a content owner considers infringing and how broadly the content owner wishes to enforce any rights it has in such content, in part because various content owners have different approaches to policing, particularly as it relates to fan art, mashups, and artwork that makes critical commentary on the content owner's brand. [*Id.* ¶ 13] But if (as in the case of LTTB) a content owner refuses to work with Redbubble to create policing guidelines, Redbubble typically attempts to use its best judgment as to what the content owner might consider colorably infringing and therefore might want removed.  [*Id.* ¶ 14]]

If the policing tool displays user-generated content that matches the content contained in policing guidelines, the MPI Team will promptly remove the listing containing such content proactively and without receiving a specific takedown notice from the rightsholder. [Toy Decl. ¶ 15] In addition, the third-party Seller is automatically notified upon removal and is otherwise treated in accordance with the IP/Publicity Rights Policy. [*Id.*]

In 2017, Redbubble began testing a new internally developed tool that allows a limited

number of listings to be screened for potentially infringing titles or tags immediately after upload but before they become publicly visible. [Toy Decl. ¶ 16] This tool, which Redbubble refers to as the "ACE" tool, is still being tested and is under review, and it has inherent limitations because it is keyword based and cannot match images. [*Id*.] As a result, a human must still review each upload prior to removal to determine whether the design matches any of the protected words or images in the policing guidelines created in collaboration with the content owner. [*Id*.] Given the high volume of designs uploaded daily to the Marketplace –nearly 19,000 listings on average – it is logistically impractical for Redbubble employees to perform pre-upload screening of all listings. [*Id*. ¶ 17; Cantil-Vorhees Decl. ¶ 5, ] And even if Redbubble were able to use this technology to attempt to pre-screen all content uploaded to the Marketplace, it would still need information from content owners regarding what content to remove and the scope of their rights.  [Toy Decl. ¶ 17]

Redbubble also uses a combination of proprietary and third-party software tools that seek to identify scaled and/or repeated abusers of the Redbubble user agreement. [Toy Decl. ¶ 20] For instance, Redbubble uses third-party machine learning software called Sift Science to search for user accounts that are linked to other accounts that have already been restricted or deleted for repeat infringement, as the existence of such accounts might indicate that the applicable Sellers have attempted to circumvent Redbubble Policies by simply creating new accounts. [*Id*.] These tools also look for other Seller behavior that may indicate that a Seller is a scaled abuser or repeat infringer, such as high content upload rates, which might indicate that the user is not a legitimate human artist, but rather a software robot designed to upload content in bulk. [Id.] When Sift Science detects a high-risk account, it may automatically disable the account or put it on a watch list to by monitored by the MPI Team.  [*Id*. ¶ 21] When an account is disabled, all listings offered for sale by that account are automatically removed from the Redbubble Marketplace.  [*Id.*]

Redbubble's MPI Team currently conducts proactive policing for marks belonging to LTTB and nearly 200 other content owners, including some of the largest content owners in the world, such as Warner Bros. and Universal Music Group. [Toy Decl. ¶ 22] Many of these companies have a large and diverse portfolio of intellectual property rights (i.e., copyrights, trademarks and publicity rights) in properties like TV shows and individual movies, and some represent a large roster of

1    musical artists. [*Id.*] In total, Redbubble's MPI team proactively policies for more than 1,500

2    individual properties for these content owners, and on any given day, the MPI Team may review

3    roughly 6,000 individual designs and compare them against the policing and removal guidelines

4    established (mostly) in collaboration with these content owners. [Toy Decl. ¶ 22; Cantil-Vorhees

5    Decl. ¶ 6]

6           To date, the proactive policing efforts of the MPI Team have resulted in the disabling or

7    removal of over 850,000 listings from the Redbubble Marketplace, covering more than 20 million

8    products. [Cantil-Vorhees Decl. ¶ 7] If listings in user accounts disabled by Sift Science are

9    included, then proactive policing efforts to date have resulted in the disabling or removal of about

10   2,300,000 listings from the Redbubble Marketplace, covering approximately 66,700,000 products.

11   [*Id.* ¶ 9] And Redbubble has disabled and/or terminated roughly 468,000 Seller accounts for

12   violation of Redbubble policies, including its IP/Publicity Rights Policy.  [*Id.* ¶ 10]

13          Redbubble has disabled or removed approximately 44 listings under its proactive removal

14   guidelines for LTTB, covering around 1,200 products. [Cantil-Vorhees Decl. ¶ 8]

15          **G.      Background of This Dispute**

16          LTTB asserts ownership of the following four federally registered trademarks: 1) a

17   registration for the word mark "Lettuce Turnip the Beet" covering "paper for wrapping and

18   packaging," "tote bags," and "wearable garments and clothing, namely shirts;" 2) a second

19   registration for the word mark "Lettuce Turnip the Beet" covering on-line retail store services

20   featuring clothing, accessories and art; and 3) two stylized versions of the "Lettuce Turnip the Beet"

21   phrase for use with "aprons; headwear; infant wear; shirts for infants, babies, toddlers and children;

22   wearable garments and clothing, namely shirts." [*See* Dkt. No. 1 (Complaint Exhs. A-D)]

23          The Trademark Office initially rejected the original trademark application for "Lettuce

24   Turnip the Beet" (which was submitted by LTTB's principal and predecessor in interest, Elektra

25   Gorski). That application had included as its specimen of trademark use (among other things) the

26   image to the right, of a T-shirt containing the "Lettuce Turnip the Beet" phrase "in a large font

27   across the center of the . . . shirts," much like the shirts and other products LTTB now accuses of

28



1   infringement. [Wilson Decl. Exh. A] The Trademark Office

2   refused to issue a registration based on this specimen on the

3   grounds that the phrase stamped across the middle of the shirt was

4   "merely a decorative or ornamental feature of the goods," and thus

5   "[t]he consumer is likely to assume from this type of usage that

6   the mark is merely a decorative feature of the items and does not

7   indicate the source of each item from those of others." [*Id.* Exh.

8   B] Gorksi did not dispute this determination, but instead submitted

9   a response to the Office Action with new specimens, including a substitute T-shirt specimen

10  showing the phrase on a garment label attached to the back of the shirt and on a hang tag. [*Id.*

11  Exh. C] Only after receiving this response and substitute specimens did the Trademark Office agree

12  to issue the registration.

13      In May 2013, two months after receiving her first trademark registration and nearly five

14  years before filing suit, Gorski sent Redbubble an email complaining about a "trademark infringing

15  shirt" containing the phrase "Let Us Turn Up the Beat." [Toy Decl. Exh. E] Later that same day,

16  Gorski sent two additional emails levelling infringement charges against four listings comprising a

17  shirt design with the phrase "Lettuce Turnip the Beet" in different colors in a large font across the

18  center of the shirts; this design is virtually identical to the Gorski design that the Trademark Office

19  deemed a non-trademark ornamental use. [*Id.*] Gorski admitted that she believed that Redbubble

20  itself was infringing her trademarks at the time she sent this correspondence. [Wilson Decl. Exh. D

21  (Gorski Depo. pp. 19-20)] On May 20, Redbubble advised Gorski that the "Lettuce Turnip the Beet"

22  listings had been independently deleted by the third-party Seller, and that based on Gorski's charges,

23  Redbubble had removed the "Let Us Turn Up the Beat" listing. [Toy Decl. Exh. F]

24      Four days later, Gorski notified Redbubble of the following two new allegedly "infringing

25  products, including one design consisting of an image of a head of lettuce, an image of a turnip, and

26  an image of "The Beets," a fictional band from the Nickelodeon TV show "Doug" that aired from

27  1991-1999. [Toy Decl. Exh. G; *see also* Cantil-Voorhees Decl. Exh. B] Although Gorski's assertions

28  of infringement were questionable, consistent with its practice, Redbubble promptly removed these

1   listings and notified Ms. Gorski of their removal that same day. [Toy Decl. Exh. G]

2        Redbubble next heard from Gorski on January 14, 2014, when she complained that a third-

3   party Seller was offering stickers and T-shirts using the "Lettuce Turnip the Beet" phrase in a large

4   font across the center of the shirts (like the specimen the Trademark Office refused to register). [Toy

5   Decl. Exh. H] Within hours of receiving Gorski's notice, Redbubble removed the identified listing

6   (which at $1,600 AUS in sales comprises the bulk of the sales at issue in this lawsuit) and notified

7   her of its removal. [*Id.*] On January 20, 2014 Ms. Gorski sent a letter demanding that Redbubble

8   remove this a newly uploaded listing from the same Seller containing a different phrase, "Lettuce

9   Turnip the Beets!," but Redbubble was unable to remove this listing because the user had already

10  self-deleted the listing. [*Id.*] All of this conduct occurred more than four years before the filing of

11  this lawsuit.

12       Over the next 4+ years, Gorski sent several letters to Redbubble complaining of various

13  allegedly infringing listings uploaded by third-party Sellers to the Redbubble Marketplace. [Toy

14  Decl. ¶ 28, Exh. I] After receiving the first few letters, in 2014, Redbubble began proactively

15  screening for the Lettuce Turnip the Beet mark. [Toy Decl. ¶ 29] These efforts have been extremely

16  successful. Indeed, from January 23, 2014 (i.e., four years before suit was filed) to the present, there

17  has only been a single third-party sale of a product bearing the phrase "Lettuce Turnip the Beet":[3] a

18  T-shirt uploaded with the description "A healthy play on words" that was only listed for ten hours in

19  February 2015 before it was proactively moderated by Redbubble (the purchase occurred in that nine

20  hour window). [Toy Decl. ¶ 30]

21       The success of these efforts did not stop Gorski from making aggressive demands and threats

22  toward Redbubble. For example, Gorski demanded that Redbubble remove all products containing

23  the allegedly confusing mark, not just products for which Gorski had trademark protection. [*See, e.g.*

24

25  ---
    [3]   During that same period, there were two instances where third-party Sellers "purchased" their

26  own designs; several instances where Gorski or someone acting on her behalf purchased allegedly
    infringing products; one instance where Gorski alleged infringement with respect to a shirt bearing

27  the phrase "Olive a Sweet Beet Lettuce Party"; and instances where purchased products did not
    contain any of the words (lettuce, turnip or beet) contained in LTTB's word mark. [Toy Decl.

28  ¶ 31] There is no colorable argument that any of these designs are actionable.

Toy Decl. Exh. I (October 26, 2014 letter)] She called for Redbubble block its users from using the phrase Lettuce Turnip the Beet. [Toy Decl. Exh. I (Oct. 26, 2014 letter)] She complained about a listing for a T-Shirt with the phrase "Olive a Sweet Beet Lettuce Party," apparently because the third-party Seller applied the search tag "turnip the beet." [Toy Decl. Exh. I (Oct. 30, 2014 letter)] And she insisted that Redbubble "police every single new product listed using the word LETTUCE, TURNIP or BEET, in the title or metatags;" there are currently nearly 10,000 such listings, none of which are accused of infringing LTTB's marks. [Toy Decl. Exh. I (Nov. 10, 2014 Letter)]

On January 23, 2018, more than seven months after the last correspondence and nearly five years after Gorski's first complaint to Redbubble, LTTB filed the Complaint in this action.

## III.   ARGUMENT

### A.   LTTB Cannot Attribute Liability to Redbubble on Any of Its Claims

LTTB has asserted four claims against Redbubble under the federal Lanham Act: 1) trademark counterfeiting; 2) direct trademark infringement; 3) passing off and unfair competition; and 4) contributory trademark infringement. However, the undisputed facts demonstrate that Redbubble itself has not made *any* "use," let alone a potentially infringing trademark use, of the marks at issue as required for LTTB to prevail on its direct infringement and counterfeiting claims. There is also no dispute that when LTTB notified Redbubble of specific alleged infringements, Redbubble promptly and consistently removed those alleged infringements, thereby negating LTTB's contributory infringement claim. And given Redbubble's significant proactive efforts to prevent infringement on its site, there is no colorable argument that Redbubble has engaged in knowing and willful infringement, as required for a counterfeiting claim.

LTTB's inability to establish these core elements is fatal to each of its claims for relief and compels entry of summary judgment in Redbubble's favor on LTTB's Complaint.

### 1.   Direct Trademark Infringement and Unfair Competition.

Redbubble is entitled to judgment as a matter of law on LTTB's Second Cause of Action for Direct Trademark Infringement and Third Cause of Action for Unfair Competition, since LTTB cannot establish that Redbubble used the marks at issue in commerce. Liability for federal trademark infringement requires a "use in commerce" of the mark "in connection with the sale, offering for

1    sale, distribution or advertising of goods. 15 U.S.C. § 1114(1).[4] To the contrary, the undisputed facts

2    establish that Redbubble is merely a transactional intermediary of a type that courts have

3    consistently held immune from direct infringement liability. *See, e.g., Tre Milano, LLC v.*

4    *Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. 2012) (citations omitted) ("it is clear

5    that 'a transactional intermediary is not treated as a seller,' that is, 'parties [who] act as

6    intermediaries for a transaction and do not buy and resell the commodities' are not direct sellers and

7    are not directly liable for infringement under the [Lanham Act].").

8        Indeed, Redbubble recently prevailed on summary judgment on a virtually identical claim

9    asserted by The Ohio State University. In *OSU*, the district court analogized Redbubble's business

10   model to that of the Amazon Marketplace, which the court observed "has generally not been found

11   directly liable for direct trademark or copyright infringement because it merely facilitates sales

12   between other parties." 2019 WL 1429255 at *7. The court held as a matter of law that Redbubble is

13   not the seller of products offered through the Redbubble Marketplace and does not otherwise engage

14   in conduct that could subject it to liability for direct trademark infringement. In so ruling, the court

15   observed that, unlike print-on-demand websites like CafePress and SunFrog who have been held

16   liable for direct infringement because they print and sell the products offered via their marketplaces,

17   "Redbubble essentially offers to 'independent artists' an online platform through which to sell their

18   goods and access to Redbubble's relationships with manufacturers and shippers. Redbubble is not

19   directly producing the goods nor, like SunFrog, is Redbubble maintaining a design database and then

20   placing the designs onto goods that customers order." *Id.* at *9.

21       Other courts have similarly and consistently held that online marketplaces like Redbubble are

22   intermediaries, not "sellers," and do not otherwise "use" the marks sold on their sites for purposes of

23   trademark law. *See, e.g., Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d 93, 103 (2nd Cir. 2010) (affirming

24   a finding of no direct trademark infringement after noting that eBay never took possession of items

25

26   _____
     [4] The elements of LTTB's federal unfair competition claim are essentially the same as those for its
     direct trademark infringement claim. *See Brookfield Commc'n, Inc., v. West Coast Enter. Corp.*,

27   174 F.3d 1036, 1046–47 n.8 (9th Cir. 1999). Accordingly, and for the same reason Redbubble is
     entitled to judgment in its favor on the direct trademark infringement claim, summary judgment is

28   also warranted on LTTB's unfair competition claim.

1 sold through its marketplace and did not directly sell allegedly infringing products to customers);

2 *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015) *aff'd* 693

3 F. App'x 879 (Fed. Cir. 2017) (granting summary judgment that Amazon is not liable for direct

4 trademark infringement based on sale of products listed by third parties on its site); *Tre Milano,*

5 *LLC v. Amazon.com, Inc.*, *supra* (holding that Amazon was not liable for direct infringement

6 because it was not a seller of the accused products).

7       The cases involving the Amazon Marketplace are particularly relevant here, since Amazon

8 plays a similar (and in some ways a more active) role in the operation of its marketplace to

9 Redbubble. For example, in *Milo & Gabby*, the plaintiffs argued that Amazon was liable for direct

10 trademark infringement as the "real seller" of the products at issue, asserting that "(1) the products

11 are advertised on the amazon.com domain; (2) payment is made directly to Amazon; (3) Amazon

12 issues the invoice and tracking information; (4) Amazon ships the products in a box that bears the

13 Amazon logo; and (5) Amazon broadcasts email advertisements from its own account (not the

14 manufacturer's) offering the knockoff." 2015 WL 4394673 at *2 (internal quotations omitted) In

15 addition, there was no dispute that (unlike Redbubble) Amazon itself stored the products and boxed

16 and shipped them upon sale. The court nonetheless rejected these arguments, reasoning that "third-

17 party sellers retain full title to and ownership of the inventory sold by the third party. Plaintiffs have

18 provided no evidence to the contrary with respect to any specific third party involved with the

19 products in this case. Accordingly, the Court concludes that Amazon was not the seller of the

20 products at issue here." *Id.* at 6. *See also Milo & Gabby, LLC v. Amazon.com, Inc.*, 693 F. App'x

21 879 (Fed. Cir. 2017) (affirming summary judgment because "Amazon did not directly sell" the

22 allegedly infringing product, and could not be deemed a seller for purposes of copyright

23 infringement, even though accused product was stored, packaged and shipped by Amazon at and

24 from its warehouse because "Amazon never held title to the accused products").

25       The California Court of Appeal reached a similar conclusion in *Tre Milano, LLC v.*

26 *Amazon.com, Inc.* There, the Court noted in addition to hosting third-party product sales, Amazon

27 sold its own products on its Marketplace (although those products were not at issue); Amazon

28 provided product descriptions and, in some instances, a generic photograph of the item; all payments

DEFENDANT REDBUBBLE INC.'S MOTION FOR SUMMARY JUDGMENT

were handled through Amazon; and some products were stored and shipped by Amazon. Nonetheless, the Court of Appeal held that Amazon was not a direct trademark infringer, explaining that "Amazon is a service provider, not the seller. Amazon did not currently have any [accused products] in its own inventory; those it sold belonged to third party sellers. That Amazon provided the product description and handled the payments did not make it a direct seller of the products." 2012 WL 3594380 at *12.

Redbubble makes even less "use" of trademarks in products sold via its Marketplace than Amazon, because unlike Amazon, Redbubble doesn't store any inventory of the third-party Seller's products or pack or ship such products. [Deshais Decl. ¶¶ 6 and 7] Thus, as the district court specifically held in the *OSU v. Redbubble* case, and the *Amazon* cases confirm, Redbubble did not sell or otherwise "use" the LTTB trademarks at issue in this case, and therefore cannot be liable for direct infringement as a matter of law.

## 2.    <u>Trademark Counterfeiting</u>

A Lanham Act counterfeiting claim is "the 'hard core' or 'first degree' of trademark infringement" with stringent requirements that exceed those for an ordinary trademark infringement claim. *See, e.g.*, *Align Tech., Inc. v. Strauss Diamond Insts., Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *11 (N.D. Cal. Apr. 12, 2019). To prevail on a counterfeiting claim, a plaintiff must prove that "(1) [defendant] intentionally used a counterfeit mark in commerce; (2) knowing the mark was counterfeit; (3) in connection with the sale, offering for sale, or distribution of goods; and (4) its use was likely to confuse or deceive." *State of Idaho Potato Commission v. G&T Terminal Pack, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005).

As an initial matter, to establish trademark counterfeiting, LTTB must establish all of the elements of a garden variety trademark infringement claim. *See Ketab Corp. v. Mesriani Law Group*, 2015 WL 2084469, at *3 n. 6 (C.D. Cal. May 5, 2015) ("a claim for 'counterfeiting' under the Lanham Act must, by necessity, first establish a claim of trademark infringement").  As discussed elsewhere in this brief, LTTB cannot make such a showing.

1    LTTB also cannot show that the Accused Products sold to third-parties since January 23,

2    2014 were "counterfeit."[5] For an accused mark to qualify as counterfeit, a plaintiff must show "it

3    was a non-genuine mark identical to [plaintiff's] mark" *Idaho Potato Commission, supra*. In

4    applying this test, courts in this Circuit have consistently limited the

5    definition of counterfeit to "products that are stitch for stitch copies of those

6    of another brand." *Align Tech.*, 2019 WL 1586776 at *11. Thus, the

7    allegedly counterfeit products must be compared with the plaintiff's

8    **products,** not with the registration. *Id.* The image to the right shows the only

9    product sold to third-parties through the Redbubble Marketplace since

10   January 23, 2014 that bore the phrase "Lettuce Turnip the Beet." LTTB cannot establish that it has



11   sold products that are "stitch for stitch" identical to this design. [Wilson Decl. Exh. E]

12   Finally, LTTB cannot demonstrate that Redbubble "intentionally used a counterfeit mark in

13   commerce knowing the mark was counterfeit."  *State of Idaho, supra.* To the contrary, there is no

14   genuine dispute that Redbubble is generally not aware of specific designs uploaded and listed for

15   sale by third-party Sellers on the Marketplace, including specifically the designs for the Accused

16   Products, absent notification from rightsholders. [*See* Deshais Decl. ¶ 11] Similarly, Redbubble

17   didn't make the Accused Products, or even see those products at any point during the manufacturing,

18   sale and shipping process. [Deshais Decl. ¶ 11] Whenever LTTB notified Redbubble that specific

19   listings infringed LTTB's rights, Redbubble promptly removed them. [Toy Decl. ¶ 29] And

20   Redbubble has implemented numerous proactive measures to prevent content that LTTB might

21   consider infringing from being offered for sale on the Redbubble Marketplace, despite LTTB's

22   unwillingness to cooperate with that process. [Toy Decl. ¶¶ 8-23] Thus, even in the unlikely event

23   that Redbubble could be found to have "used" LTTB's trademarks, no reasonable trier of fact could

24   conclude that Redbubble has "intentionally" made or sold any product "knowing it was a

25   counterfeit" of an LTTB trademark. LTTB cannot prevail on the First Cause of Action for

26   Counterfeiting.

27   _____

28   [5] As discussed in more detail in Section III.B below, there is no colorable argument that LTTB can obtain relief with respect to products sold more than four years before suit was filed.

### 3.   **Contributory Trademark Infringement**

To prevail on its Fourth Cause of Action for contributory trademark infringement, LTTB has the burden of proving that Redbubble continued to provide products or services "to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982). Because Redbubble provides services to the alleged direct infringers, LTTB must also show that Redbubble had "direct control and monitoring of the instrumentality used by a third party to infringe . . . ." *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir. 1999). LTTB cannot satisfy its burden.

In the context of online marketplaces, courts have held that "[s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." *Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 108-09 (2nd Cir. 2010). The mere assertion of infringement in a notice letter "is not sufficient to impute knowledge of infringement to [a defendant]," and use of an identical or similar mark does not necessary constitute infringement." *Lockheed Martin Corp. v. Networks Solutions, Inc.,* 985 F. Supp. 949, 963 (C.D. Cal 1997).

The Second Circuit's opinion in *Tiffany v. eBay* is particularly instructive, and its rationale has been consistently followed by courts in this Circuit. *See, e.g, Spy Phone Labs LLC v. Google Inc.*, 2016 WL 6025469 (N.D. Cal. 2016) (applying *Tiffany* analysis); *Academy of Motion Picture Arts & Sciences v. GoDaddy, Inc.,* 2015 WL 5311085 (C.D. Cal. 2015) (offering several page analysis and application of the *Tiffany* opinion). In *Tiffany*, defendant eBay, like Redbubble, had a policy of removing allegedly infringing product listings upon receipt of a takedown notice, and had adopted extensive proactive policing measures designed to minimize infringement on its marketplace. Nonetheless, plaintiff Tiffany argued that eBay was liable for contributory infringement because plaintiff had sent thousands of notices of claimed infringement, yet infringing listings continued to appear for sale on the marketplace. The district court rejected plaintiff's argument, reasoning that eBay had only generalized knowledge of infringement, and that to prevail, plaintiff would have to show that eBay "knew or had reason to know of specific instances of actual infringement beyond those that it addressed upon learning of them." 600 F.3d at 107. The Court of Appeals affirmed, holding that "[f]or contributory trademark infringement liability to lie, a service

1    provider must have more than a general knowledge or reason to know that its service is being used to

2    sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or

3    will infringe in the future is necessary." *Id.* at 107.

4         Here, the undisputed evidence shows that Redbubble uniformly removed allegedly infringing

5    listings promptly upon receiving a notice of claimed infringement from LTTB. There is no evidence

6    that Redbubble ever knew of an infringing listing and failed to promptly act to remove it. Redbubble

7    also implemented proactive procedures to prevent allegedly infringing content from being sold,

8    although as discussed later in this motion, there are real questions as to whether any of this content

9    actually violates LTTB's legitimate trademark rights. And Redbubble applied its repeat infringer

10   policy to third-party sellers who listed the content in question.

11        Redbubble cannot be liable for contributory trademark infringement as a matter of law.

12   **B.      The Statute of Limitations Bars the Vast Majority of LTTB's Claims.**

13        While the Lanham Act does not have its own statute of limitations, the Ninth Circuit has

14   repeatedly held that courts in this Circuit should "borrow the most analogous statute of limitations

15   from state law." The longest limitations period applied to federal trademark infringement claim by

16   federal courts in California is four years. *See Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*,

17   894 F.3d 1015, 1025 (9th Cir. 2018) (applying four-year state law trademark infringement period).

18        There is no dispute that the vast majority of the allegedly infringing sales here occurred more

19   than four years before filing this lawsuit. [*See* Toy Decl. ¶ 31] And LTTB was clearly aware of its

20   claims more than four years before suit was filed. [Wilson Decl. Exh. D (LTTB Depo at 19-20)]

21   Redbubble is therefore entitled to judgment as a matter of law that LTTB is barred from recovering

22   damages with respect to any such alleged infringements. *See Jarrow,* 304 F.3d at 838 (quoting 4 J.

23   Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.33 (4th ed. 2001) (statute

24   of limitations is an absolute bar "as to damages beyond the statutory period").

25   **C.      LTTB Cannot Show That Any of the Accused Products Violate Its Trademark**

26   **Rights**

27        Setting aside Redbubble's role in the alleged infringement, LTTB cannot as a matter of law

28   establish that the products offered and sold through the Redbubble site over the past four years have

1   created a likelihood of confusion with LTTB's "Lettuce Turnip the Beet" trademark under the

2   doctrine referred to interchangeably as "ornamental use" or "aesthetic functionality."

3          The core purpose of a trademark is to "function as a designation of source or origin."

4   *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d. 1067 (C.D. Cal. 2012). Put another way,

5   "the Lanham Act does not protect an enterprise's use of a mark that does not have a source

6   identifying function. 'If the use of a mark serves only a functional purpose, there is not a likelihood

7   of confusion.'" *Schiappa v. Charityusa.com, LLC*, No. 16-CV-81617, 2017 WL 2210274, at *7

8   (S.D. Fla. May 18, 2017) (quoting *Greater Anchorage, Inc. v. Nowell*, 974 F.2d 1342 at *3 (9th Cir.

9   1992) (Table)).

10          The U.S. Trademark Office's illustration of the "ornamental use" principle on its

11  "'Ornamental' Refusal and How to Overcome this Refusal" web page might have been written with

12  this case in mind: "a slogan prominently displayed on the front of a t-shirt may be considered merely

13  ornamental use and not trademark use. That is, ***most purchasers of the t-shirts would not***

14  ***automatically think the slogan identified the source of the goods but would view the slogan only***

15  ***as a decoration on the goods*.**"  [Wilson Decl. Exh. G (emphasis added)] That page continues:

16          A small, neat, and discrete wording/design located on the pocket or breast portion
        of a garment (for example, a small design of an animal) may create the commercial
17          impression of a trademark, whereas ***a larger depiction of the same wording/design***
        ***prominently displayed across the front of a garment may be more likely to be***
18          ***seen as a purely decorative or ornamental feature of the goods*.** The size, location,
        dominance, and significance of your mark as applied to the goods are factors used
19          to determine whether your mark functions as a trademark to identify the source of
        your goods or is merely ornamental.
20

21  *Id.* (emphasis added). Indeed, the "Lettuce Turnip the Beet" trademark application was initially

22  rejected on precisely this basis. The examiner observed that the phrase "Lettuce Turnip the Beet"

23  stamped across the middle of the shirt was "merely a decorative or ornamental feature of the

24  goods," and thus "[t]he consumer is likely to assume from this type of usage that the mark is

25  merely a decorative feature of the items and does not indicate the source of each item from those

26  of others." [Wilson Decl., Ex. B] Only after submitting a substitute T-shirt specimen showing the

27  phrase on a garment label attached to the back of the shirt and on a hang tag did the Trademark

28  Office agree to issue the registration.

1   Consistent with this Trademark Office directive, court in this Circuit have held that where an

2 allegedly infringing product feature has a purely or primarily decorative function rather than a

3 source-identifying function, the use of that feature does not comprise a trademark use that can trigger

4 liability for infringement. Thus, in *International Order of Job's Daughters v. Lindeburg & Co.*, 633

5 F.2d 910 (9th Cir. 1980), the Ninth Circuit reversed a finding of infringement against a seller of

6 jewelry bearing the Job's Daughter insignia, holding that "in the context of this case, the name and

7 emblem are functional aesthetic components of the jewelry, in that they are being merchandised on

8 the basis of their intrinsic value, not as a designation of origin or sponsorship." In performing this

9 analysis, the Ninth Circuit observed that "a court must closely examine the articles themselves, the

10 defendant's merchandising practices, and any evidence that consumers have actually inferred a

11 connection between the defendant's product and the trademark owner."

12   Similarly, in *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d. 1067, 1073-75 (C.D.

13 Cal. 2012), the district court held as a matter of law on summary judgment that defendant did not

14 infringe plaintiff's "Betty Boop" word mark, despite using the mark "as a prominent feature on their

15 product, including t-shirts bearing movie poster images," because such use was aesthetically

16 functional. In so holding, the court applied the *Job's Daughters* test, reasoning that the phrase "Betty

17 Boop" on the t-shirts:

18    is a decorative component: it is part and parcel of the aesthetic design of those
    goods. As for Defendants' merchandising practices, Defendants never designated
19    their merchandise as "official" or otherwise indicated sponsorship by Plaintiff;
    rather, Defendants' products all identify one of Defendants as their source.
20    Considering that Defendants use the words Betty Boop as an artistic design element
    and identify themselves as the source of the goods, their use of the words Betty
21    Boop simply cannot be viewed as source identifying. Indeed, Plaintiff has not
    presented a single instance of a consumer who was misled about the origin or
22    sponsorship of Defendants' products.

23 *Id.* at 1074.

24   Here, an examination of the allegedly infringing products reveals that the phrase "Lettuce

25 Turnip the Beet" is being used for its message or as an artistic design element, not a source

26 identifier.  The only true third-party sale of a product bearing the phrase "Lettuce Turnip the Beet"

27 since January 23, 2014 involved a T-shirt that contained the phrase "Lettuce Turnip the Beet" and

28

some surrounding artwork "prominently displayed on the front of the T-shirt, as depicted to the right. [Toy Decl. ¶ 31; Cantil-Vorhees Exh. B] All of the other allegedly infringing designs are similar in character: rather than "[a] small, neat, and discrete wording/design located on the pocket or breast portion of a garment" of the type the Trademark Office says connotes a source-identifying function," the Accused Products use "a larger depiction of the . . . wording/design prominently displayed across the front of a garment" or other product, which the Trademark Office asserts is "more likely to be seen as a purely decorative or ornamental feature of the goods." [Wilson Decl. Exh. G] These are the very types of uses that the Trademark Office cited as non-trademark or ornamental uses in denying LTTB's initial trademark application.



It is also undisputed that third-party Sellers have uploaded "Lettuce Turnip the Beet" designs and consumers have purchased "Lettuce Turnip the Beet" products, not because they associate the products with LTTB, but because they like the pun. The only third-party sale of a product bearing the phrase "Lettuce Turnip the Beet" since January 23, 2014 was uploaded with the description "A healthy play on words", indicating that the product's selling point was its message, not the brand. Other allegedly infringing listings are tagged with terms like "pun", "hilarious," "fun", and "vegetables"; not a single tag or description references Gorski or LTTB. There is also no reference to LTTB, Gorski or even "Lettuce Turnip the Beet" on the product tags, labels or packaging; rather, those labels and the listings on the Redbubble Marketplace clearly specify that the source of the design is an "independent artist." And consistent with the Sellers' reasons for creating and selling the designs, LTTB testified that to its knowledge, consumers purchase products with the "Lettuce Turnip the Beet" phrase because they like the message; for example, they like or connect with the phrase, or because they think the double entendre is witty, or because they view the phrase as "safe humor." [Wilson Decl. Exh. D (LTTB Depo. at 50-55, 262-63)] These are precisely the types of non-source-identifying uses that courts have held to be "ornamental" or "aesthetically functional" uses that do not subject the user to liability for trademark infringement. *See Job's Daughters, supra.*

Finally, and critically, there is no admissible evidence that consumers associate the "Lettuce Turnip the Beet" phrase or brand with the plaintiff, or that the design has any source-identifying

1   function. Indeed, plaintiff admitted as much in deposition, testifying that "nobody associates the

2   brand with [LTTB] LLC," and later softening the testimony to a confirmation that LTTB could not

3   identify "any evidence that consumers or purchasers associate" the phrase or mark "Lettuce Turnip

4   the Beet" with LTTB. [Wilson Decl. Exh. D (LTTB Depo. at 82:15-21; *see generally id.* at 78-83)]

5   LTTB has also repeatedly verified that it is unaware of any actual confusion as to the source of

6   "Lettuce Turnip the Beet" products purchased through the Redbubble Marketplace. [*Id.* (LTTB

7   Depo. at 77); Wilson Decl. Exh. E (Response to Interrogatory No. 3)]

8          Given these circumstances, no reasonable trier of fact could conclude that the Accused

9   Products use the phrase "Lettuce Turnip the Beet" in a source-identifying manner. Thus, summary

10   judgment on Redbubble's ornamental use defense is appropriate.

11          **D.     LTTB Cannot Recover Damages on Its Claims.**

12               1.     **LTTB Cannot Recover Redbubble's Profits or Statutory Damages**

13                      **Because There Is No Evidence of Willful Infringement.**

14          "In the Ninth Circuit, a plaintiff seeking disgorgement of a defendant's profits in a trademark

15   infringement case must demonstrate that the defendant willfully infringed the plaintiff's trademark."

16   *American Auto. Ass'n v. General Motors LLC,* No. 17-CV-03874-LHK, ___ F.Supp.3d. ____, 2019

17   WL 1304309, at *20 (N.D. Cal., March 21, 2019). Similarly, a plaintiff seeking enhanced statutory

18   damages must show "that the use of the counterfeit mark was willful." 15 U.S.C. § 1117(c)(2).

19   "Courts have routinely granted summary judgment against plaintiff's request for disgorgement when

20   the plaintiff has failed to raise a genuine dispute about willfulness." *American Auto., supra,* at *20.

21          Courts have consistently held that infringement is not willful if the defendant reasonably

22   believes that its usage of a trademark is not barred by law. *Int'l Olympic Comm. v. San Francisco*

23   *Arts & Athletics*, 781 F.2d 733, 738-39 (9th Cir. 1986).  "And with respect to online service

24   providers that host large volumes of user-uploaded content, receiving a takedown request for a

25   specific unauthorized copy of a copyrighted work does not, without more, impute an objective

26   suspicion that other instances of that same work exist on the service and are likewise unauthorized."

27   *Greg Young Publishing v. Zazzle, Inc.*, 2017 WL 5004719, at *3 (C.D. Cal. Oct. 27, 2017) (granting

28   JMOL of no willfulness brought by defendant online marketplace); *see also VHT, Inc. v. Zillow*

DEFENDANT REDBUBBLE INC.'S MOTION FOR SUMMARY JUDGMENT

1   *Group, Inc.,* 918 F.3d 723, 749 (9th Cir. 2019) (reversing denial of JMOL of no willfulness where

2   users who uploaded allegedly infringing content represented that they had the legal right to do so,

3   and website operator was not "'actually aware' of its infringing activity"); *Evergreen Safety*

4   *Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012) ("Continued use of a work even

5   after one has been notified of his or her alleged infringement does not constitute willfulness so long

6   as one believes reasonably, and in good faith, that he or she is not infringing.")

7          As discussed above, no reasonable trier of fact could conclude that Redbubble has engaged in

8   intentional or willful misconduct. Like the defendants in the *Zazzle* and *Zillow* cases, Redbubble was

9   entitled to and did in fact reasonably rely on representations made by its users that they had the right

10  to use the designs at issue. And like those defendants, there is no evidence that Redbubble was

11  "actually aware" of specific, ongoing infringing activity; when Redbubble learned of such activity, it

12  has swiftly put an end to it. Using the language from *Evergreen*, Redbubble "believes reasonably,

13  and in good faith, that [it] is not infringing." Accordingly, Redbubble is entitled to a determination

14  of no willfulness (and a concomitant ruling that Redbubble cannot be liable for disgorgement of

15  profits or statutory damages) as a matter of law.

16          2.      **LTTB Cannot Recover Actual Damages Because It Has No Admissible**

17                  **Evidence.**

18          Finally, LTTB cannot recover "actual damages" because it does not have any admissible

19  evidence to support an actual damages claim. In response to Redbubble's Interrogatory No. 9, which

20  required that LTTB identify all facts supporting its damages claims, LTTB responded:

21          The decline in LTTB's revenue since 2015 is due to the widespread counterfeiting
            of the LTTB Brand, especially by multi-million dollar corporations with vast
22          resources to distribute counterfeit goods faster to every global region. This includes
            Cotton On Group (2016-2017 lawsuits in Australia and USA) and most on-demand
23          printers with global distribution centers in the same global jurisdictions where
            LTTB retains rights. LTTB's evidence shows Redbubble.com is the biggest United
24          States repeat infringer of all of the so-called "on-demand printers," including but
            not limited to Zazzle, Cafepress, Society6, Teespring, Spreadshirt, Skreened,
25          Sunfrog, CustomInk, and Teepublic. A graph comparing the number of legal
            notices submitted to the aforementioned sites since 2013 would clearly show
26          Redbubble is the biggest repeat offender, causing damage to the LTTB Brand in the
            same online market channels where it has existed since 2011.

27

28  [Wilson Decl Exh. E (LTTB Am. Interrog. Resps.) at 7-8]. At deposition, LTTB reiterated that it

1  "do[es]n't have any direct evidence" of actual damages. [Wilson Decl. Exh. D (LTTB Depo. at

2  195:14-196:3)] And LTTB further admitted, in response to questioning regarding the speculation in

3  the interrogatory response that comparative graphs "would clearly show Redbubble is the biggest

4  repeat offender," that the data regarding the other purported infringers was in its possession (unless

5  they had been lost through drive failure or the like), but that "those data have not been produced."

6  [*Id.* at 200:5-15, 201:3-10; *see also* Wilson Decl. Exh. H (LTTB Initial Disclosures) at 3

7  (representing that LTTB possesses "Documents evidencing damages to LTTB from Redbubble's

8  infringement and counterfeiting" but providing no computation).

9       In short, LTTB has explicitly admitted that it "do[es]n]t have any direct evidence" of actual

10  damages. Although LTTB speculates that the decline in its revenue is the result of "widespread

11  counterfeiting," it admits that it has not produced any evidence – which is uniquely in its possession

12  – that might allow comparison of alleged infringements of its marks in the Redbubble Marketplace

13  with other markets. As this is an issue on which LTTB bears the burden of proof, the Court should,

14  at the very least, grant partial summary judgment that LTTB can recover no damages.

15  **IV.**   **CONCLUSION**

16       The legal issues in this lawsuit go far beyond the instant trademark dispute between LTTB

17  and Redbubble. Indeed, the resolution of this motion could impact the very viability of online

18  marketplaces like the Amazon Marketplace, Craigslist, and AirBNB. Fortunately, the case law

19  involving Internet marketplaces in general, and Redbubble in particular, overwhelmingly supports

20  granting Redbubble's Motion for Summary Judgment. The Court should enter judgment in favor of

21  Redbubble on LTTB's Complaint and of each cause of action therein accordingly.

22  Dated:  April 29, 2019              COASTSIDE LEGAL
                                       KENNETH B. WILSON
23
24                                     ZUBER LAWLER & DEL DUCA LLP
                                       JOSHUA M. MASUR
25
                                       By:   _/s/ Kenneth B. Wilson_____
26                                           KENNETH B. WILSON
27                                     Attorneys for Defendant
                                       REDBUBBLE INC.
28

2911-1002 / 1438467.2