# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   LTTB LLC,                 )
                              )
6            Plaintiff,       )
                              )
7   vs.                       )
                              )   No.  3:18-cv-00509-RS
8   REDBUBBLE INC.,           )
                              )
9            Defendant.       )
                              )
10                            )
                              )
11

12                     - - - -

13                     VIDEOTAPED

14                     30(b)(6)

15        DEPOSITION OF ELEKTRA PRINTZ GORSKI

16

17   Held at the Offices of Barkley Court Reporters

18      201 California, San Francisco, California

19      Thursday, February 28, 2019, 10:13 a.m.

20                     - - - -

21

22  REPORTED BY:  ELAINA BULDA-JONES, CSR #11720

23

24

25

                          1

BARKLEY
Court Reporters

```
 1                    APPEARANCES

 2

 3   For the Plaintiff:

 4        BY: JEFFREY E. FAUCETTE, ESQ.
          Skaggs Faucette LLP
 5        One Embarcadero Center, Suite 500
          San Francisco, California 94111
 6        415.315.1669
          Jeff@skaggsfaucette.com
 7

 8
     For the Defendant:
 9
          BY: JOSHUA M. MASUR, ESQ.
10        Zuber, Lawler & Del Duca LLP
          350 S. Grand Avenue, 32nd Floor
11        Los Angeles, California 90071
          213.596.5620
12        Jmasur@zuberlaw.com

13        BY: KENNETH B. WILSON, ESQ.
          Coastside Legal
14        455 1st Avenue
          Half Moon Bay, California 94019
15        650.440.4211
          Ken@CoastsideLegal.com
16

17
     Also present:
18
          Eric Parker, videographer
19

20

21

22

23

24

25


                         2
```

BARKLEY
Court Reporters

```
1                    INDEX OF EXAMINATIONS

2

3    EXAMINATIONS                                      PAGE

4     MR. MASUR                                         6

5

6

7

8                     INDEX OF EXHIBITS

9       NO.              DESCRIPTION           PAGE

10   Exhibit 1      Defendant's Second Amended     7
                    Notice of Deposition of
11                  Elektra Printz Gorski

12   Exhibit 2      Defendant's Second Amended     7
                    Notice of 30(b)(6) Deposition
13                  of Plaintiff LTTB LLC

14   Exhibit 3      Complaint for Trademark        60
                    Counterfeiting, Trademark
15                  Infringement, Unfair
                    Competition and False
16                  Designation of Origin, and
                    Contributory Trademark
17                  Infringement

18   Exhibit 4      Plaintiff LTTB LLC's Amended   75
                    Responses to Defendant
19                  Redbubble Inc.'s First Set of
                    Interrogatories
20
     Exhibit 5      Monthly statements, LTTB000149  84
21                  through LTTB000155

22   Exhibit 6      Monthly statements, LTTB000801  84
                    through LTTB000803
23
     Exhibit 7      Spreadsheets, BATES004267      144
24                  through BATES004302

25
```

**BARKLEY**
*Court Reporters*

1   Exhibit 8          Listings, LTTB000752 through      230
                       LTTB000800
2
    Exhibit 9          Trademark Assignment              236
3                      Agreement, 11/8/2017

4   Exhibit 10         Etsy Stats, LTTB000825            244

5   Exhibit 11         Spreadsheet of law firms,         264
                       LTTB000746 through LTTB000747
6
    Exhibit 12         Moonshine Ink, Tahoe Summer       275
7                      Annual, Sunday, August 15,
                       2010, Turnip the Beet
8
    Exhibit 13         Moonshine Ink, Tahoe Summer       275
9                      Annual, Sunday, August 15,
                       2010, Lettuce Turnip the Beet
10
    Exhibit 14         Moonshine Ink, November 16,       280
11                     2010, Inspiration on Quail
                       Lane

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1    A.   -- I personally -- I personally would

2  consider the ongoing willful nature of this

3  infringement to have begun after receipt of my first

4  legal notice in May 2013.

10:28    5         According to my records, there was one

6  significant first notice of my rights via e-mail to

7  Redbubble, and there were probably two additional

8  notices in that same month in -- on related topics.

9         The first one was about counterfeits I had

10:28  10  seen on the site that were almost exact copies of my

11  now-registered design works, my logos for the brand.

12  And then there were other -- I think there were two

13  or -- two additional e-mails about complaints about

14  Redbubble using my marks in online Google ads.  It

10:28  15  was like the ad was coming before the ads for my

16  actual brand at the time.

17         So there were -- in my opinion, there are

18  almost three notices of my rights in one month.

19    Q.   Okay.

10:28  20    A.   And then because the infringement

21  continued after that, that's when it shifted from

22  trademark infringement to trademark counterfeiting.

23    Q.   Okay.  So when did you first believe that

24  Redbubble was infringing your trademarks?

10:29  25    A.   I first believed it when my -- my first --


19

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1  well, my -- I first believed it in May 2013, because

2  my trademark for Lettuce Turnip The Beet, my

3  wordmark for Classes 16, 18, and 25, registered in

4  March 2013, I had already been doing significant

10:29  5  online enforcement since 2012.

6          And actually, I didn't pull up Redbubble,

7  and I didn't -- wasn't do -- like I was doing it,

8  but I wasn't doing it on a daily basis.  Like I had

9  a system, that I don't totally recall, because the

10:29  10  business was explosive, and I was single-handedly

11  printing tens of thousands of -- I don't know,

12  thousands of pieces of goods without a machine,

13  basically, and selling them and shipping them and

14  finishing them and -- and then I was also doing an

10:30  15  enforcement.

16          But after the marks registered in -- well,

17  the mark, the first mark for -- that I described,

18  after that registered in March 2013, I did a

19  significant internet sweep.  March, April, May.  And

10:30  20  I mean, at that point, the internet was flush.  Like

21  when I had looked years earlier, there was nothing.

22  And everything -- it had just exploded, which I

23  already knew because people were telling me.

24          But it was -- I mean, Redbubble, I pulled

10:30  25  up in probably -- I mean, I don't recall the exact

20

BARKLEY
Court Reporters

1    to a Starbucks to use the restroom, and they were

2    like, he was just here at the Starbucks too.  And

3    then he passed away.  And I literally just found

4    recently -- like I still had it in Maryland, the

11:05  5    note I had written to him that he never got, which

6    is kind of nostalgic for me because I love him.  So

7    I missed him.

8            But there's a bunch of people where I

9    succeeded.  I went to Macy's one night when I knew

11:05  10   this famous DJ, Smith Aronson (phonetic), was going

11   to be there.  And I like put it in her hand and then

12   she ended up giving it -- and like wearing it at a

13   bunch of DJ events.  And then people in L.A. were

14   like -- she took it to L.A., and then all of these

11:05  15   people in L.A. wanted it.

16           So it's just honestly -- and then she

17   maybe wore it to spin class.  And then SoulCycle had

18   just been developed around that year and then all

19   these people at SoulCycle wanted it.

11:06  20           And I'm trying to think of all the

21   other -- there are a lot of -- in Soho you have a

22   ton of celebrities and you -- I'm trying to think.

23   There was a bunch of food people.  Because it -- the

24   brand hits multiple demographics.  It hits people

11:06  25   interested in food, music -- food and music

50

BARKLEY
Court Reporters

1    primarily.  And fitness.  So it just hits every

2    demographic.  So I had so many celebrities that were

3    either in food, music, entertainment, and they'd all

4    love it.  I had -- it's -- I can't describe to

11:06  5    you -- like the most interesting thing about selling

6    it in person is hearing from every demographic what

7    they love about it.

8         Q.    So you said the primary demographics that

9    it appeals to.  And "it" being the Lettuce Turnip

11:06  10   The Beet --

11        A.    Brand.

12        Q.    -- brand, or works, appeal to food, music,

13   and fitness?

14        A.    Those are core demographics.  But because

11:07  15   of the double entendre -- I mean, the immediate

16   impression is foodies love it.  Vegans, vegetarians,

17   anybody related to food, chefs, the culinary world.

18            Then you have all of the clean eaters, the

19   paleo, the -- this, that, and the other that tie

11:07  20   into the food as well, and they're into fitness.

21            And then, like I said, the music, the

22   choreographers, Madonna, the choreography, the --

23   the performers, the tide of music, turning up the

24   beat and turning up the music, they love it.

11:07  25            But there are also -- I had an elderly guy



1    from Soho who -- I don't know who he was.  He could

2    have been famous.  He -- people would come back

3    every week and they'd say, I just love this shirt, I

4    wear this all day.  And I'm like -- and I was a, you

11:07  5    know, Ph.D. professor, and he was like some

6    literature guy.  And he loved it because it tied

7    into literature.

8            And then I had a girl from the Bronx who,

9    low income, she loved it because it tied into music,

11:07 10    and she's a teen.  So wide, wide array of

11    demographics.

12      Q.   Are you a vegetarian or a vegan?

13      A.   I'm not.

14      Q.   Okay.  Just curious.

11:08 15      A.   I have been at times but not now.

16           MR. MASUR:  So, let's see, why don't we...

17           (Whereupon, a brief discussion off the

18    record.)

19           MR. MASUR:  So let's mark as Exhibit 3 the

11:08 20    complaint in this case.  Which I thought was

21    attached.  Maybe I'll wait until after a break to do

22    that.  Let's -- we'll hold that for now.

23      Q.   So can you just explain a little bit more

24    about what you think appealed to the fitness people

11:09 25    about the message of Lettuce Turnip The Beet.

52

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1      A.    What appealed to the fitness people.  It's

2  hugely popular with the fitness community.  In fact,

3  turning up the beat, turning up the music, the fact

4  that the music is integrated, the fact that --

11:09  5  sorry, sorry.

6            Lettuce Turnip The Beet, there's a

7  movement to the words.  Beyond the fact that there's

8  a movement to the words, the interesting thing is

9  that for the first -- the first summer I was

11:09 10  describing of 2011, when I was -- started selling

11  it, I had a technical issue.  I never really

12  printed -- I started printing it probably straight

13  the first couple samples.

14            And so my point to you is, I printed it

11:10 15  straight on a shirt, but then it would kind of arch.

16  And like I could never -- it just never looked quite

17  straight and I was anal so that's when I decided to

18  kind of turn it and I created my angled logo.  So I

19  kind of angled the logo and then it gave it

11:10 20  movement.

21            And then it became even more popular with

22  the fitness community because they're like, trap the

23  beat and the logo's titled and it's angled.  And

24  it's like, really, the music is going up.  So

11:10 25  literally, just the stylization of the logo, it was

53

BARKLEY
Court Reporters

1    super-popular in Soho, as I recall, for like -- the

2    initial logo that took off was more the angle,

3    really is the technical issue of mine because I

4    decided, I can't print it straight and it keeps

11:10 5    bowing like a rainbow when I print it, I'll just

6    purposely tilt it.

7          And then like I said, it took off more

8    with the fitness community because it just had that

9    vibe and like people loved it on -- and the other

11:11 10    thing is, it was summer.  It's hot as heck in

11    New York City.  I was printing mostly tank tops.

12    And so all of these people were taking it to their

13    gyms.  And then it really spread across the fitness

14    community.

11:11 15          And I even had people who wanted to

16    wholesale for me back then to sell at like maybe

17    gyms.  I remember there was somebody at the very

18    beginning who wanted -- who -- they were part of

19    some kind of gym franchise and they wanted it and I

11:11 20    just never cut a deal because I was like making --

21    you know, I was just selling so much on the street

22    and I was loving the vibe and I didn't have time to

23    print enough to wholesale.  So I didn't go in -- I

24    didn't start distributing.

11:11 25          I was just purposely only selling it

54

BARKLEY
Court Reporters

1    myself so that I could control the quality, do

2    quality control, and continue to sell on the street

3    and -- it's hard to describe.  There were -- like,

4    again, there were many variables.  Like if I had

11:11  5    wanted to do wholesale, I would have to step away

6    from street vending and I would have to focus on

7    that and I just didn't.

8         Q.    So you were basically at your capacity?

9         A.    Yes.  I've almost always been over my

11:12  10   capacity because I was doing the full-time

11   production for the brand.  Then I was also doing --

12   at that point, in the early days, I wasn't doing

13   enforcement yet but -- I mean, the business kind of

14   grew, you know, and required more work in more

11:12  15   areas.

16        Q.    And the angled and tilted version --

17        A.    Uh-huh.

18        Q.    -- of the shirts, that started, you said,

19   in the summer of 2011?

11:12  20        A.    The photo that I have from -- like photos

21   I look back from the horse show that I referred to

22   that was like my first use in commerce in Maryland,

23   the equestrian show where I sold it, it looks like

24   from the pictures I had that are in the creation of

11:12  25   the brand I had -- I had it tilted and I also had it

55

BARKLEY
Court Reporters

1    whether any goods originate from or are affiliated

2    with, sponsored by, licensed by, or endorsed by LTTB

3    by any use of an LTTB mark by Redbubble or by others

4    using the mark on the Redbubble marketplace,

11:54  5    including, but not limited to, the infringing works

6    listing and/or URL, how you became aware" -- excuse

7    me -- looks like we left out a word there -- it

8    should read, "how you became aware of the instance,

9    when the instance occurred, all persons with

11:55  10   original of such instance, and the identity of any

11   documents and things supporting such conclusion."

12        A.   Uh-huh.

13        Q.   And your response to that starts that LTTB

14   has not been contacted yet by any person expressing

11:55  15  confusion.

16             Is that still the case?

17        A.   Yes.

18        Q.   Are you aware of any instances of actual

19   confusion that have occurred between any goods sold

11:55  20  on the Redbubble marketplace or any listings for

21   goods on the Redbubble marketplace and LTTB?

22        A.   I'm not aware as of today.

23        Q.   Okay.  So you have no evidence that anyone

24   has actually been confused?

11:56  25       A.   Not as of today.


77

BARKLEY
Court Reporters

1          Q.   Do you have any evidence that purchasers

2     or consumers generally associate Lettuce Turnip The

3     Beet with Lettuce Turnip The Beet LLC or with you?

4          A.   Can you please repeat the question?

11:56  5          MR. MASUR:  Actually, can you repeat it

6     back.   Thanks.

7          (Whereupon, the reporter read the record

8     as follows:

9          "Question:  Do you have any evidence that

11:56 10     purchasers or consumers generally associate Lettuce

11     Turnip The Beet with Lettuce Turnip The Beet LLC or

12     with you?")

13          THE WITNESS:  Do I have any evidence that

14     they associate with me or the LLC?

11:56 15          There was a certain contingent of people

16     who associate -- who I would say get e-mails who

17     associate me with the brand because I am the founder

18     of the brand.  And I mean, in fact, just this week,

19     I got an e-mail from a woman saying, I'm wearing

11:57 20     your shirt now, I bought it from you in Soho, I need

21     to get another one.  So she associates the brand

22     with me.  She met me on the street.  She bought it

23     from me before I left for New York.

24          So, yes, there's a certain contingent who

11:57 25     associate the actual Lettuce Turnip The Beet with me

78

BARKLEY
Court Reporters

1   as the founder.  I don't know how they

2   distinguish -- I don't -- and then there are other

3   people, nobody associates the brand with the LLC,

4   the legal entity.  Well, I -- actually, correction.

11:58   5          I don't know, actually, how people

6   associated -- I haven't done a survey and -- I mean,

7   I became -- you know, I formed the LLC in the fall

8   of 2017.  So after that, I changed a lot of the

9   online branding from -- to say Lettuce Turnip The

11:58  10   Beet LLC.  So, actually, I don't know.  I haven't

11   done a survey.  I wouldn't know.

12   BY MR. MASUR:

13          Q.   So you said that the e-mail you received

14   from a woman this week you think associates the

11:58  15   brands with you?

16          A.   She is one instance of somebody because

17   she purchased it from me face to face.

18          Q.   So you think that that says that she

19   associates the brand with you or the piece -- I

11:58  20   assume it's a t-shirt?

21          A.   Uh-huh.  Yes.

22          Q.   Or the t-shirt that she purchased with

23   you?

24          A.   That's a good question.  I mean, she loves

11:59  25   the brand.  She wants another one.  She remembers

79

BARKLEY
Court Reporters

1    me.  It's hard to say.  I don't know.

2        Q.   But she reached out to you because she

3    purchased a t-shirt?

4        A.   From me, for the brand, yes.  So she loves

11:59  5    the brand because she has gotten compliments from

6    people, ostensibly.  She -- she didn't say.  She

7    just -- she wants another one.  She doesn't --

8    actually, you know what, she didn't remember me.

9    She didn't remember me as a person.

11:59  10       She just said, I bought one in Soho,

11   something to that degree.  You know, I want to buy

12   another one.  Do you have it in green?  So, yes, she

13   actually didn't even -- she didn't even know she had

14   bought it from me.  So, correction.  I mean...

11:59  15       But there are a contingent of people who

16   remember me.  I would say it's small.  People see

17   the brand as independent of me large -- in large

18   part, I would say.  I mean, it's only -- yeah.

19       Q.   So people see the brand as independent

12:00  20   from you?

21       A.   Yes.

22       Q.   And you also said people don't connect it

23   with the LLC?

24       A.   Well, actually, I don't know.  Because I

12:00  25   just -- I haven't done a survey and I only -- I

80

BARKLEY
Court Reporters

1    updated the, you know, branding online.  It still

2    says, you know, the brand name.  But then like if

3    you want to contact the brand, I believe it says

4    LTTB LLC.  And it ships from, like all the products

12:00   5    ship from LTTB LLC as the return address, so -- I

6    wouldn't know.  I haven't asked people, do you -- I

7    haven't done a survey.

8        Q.   Okay.  So you have no evidence that -- at

9    this point, that people associate the LTTB brand

12:00  10    with either LTTB LLC or with you personally?

11           MR. FAUCETTE:  Objection.  Misstates the

12    testimony.  Lacks foundation.

13    BY MR. MASUR:

14        Q.   You can still answer.

12:01  15        A.   I haven't studied it.  I don't -- I

16    wouldn't say I don't have evidence because I've

17    never been looking for evidence.  I don't -- for

18    this topic.

19        Q.   What evidence do you have that --

12:01  20        A.   I mean, I wouldn't be -- I'm not asking

21    people, do you associate the brand with me?  Do you

22    associate the brand with the LLC?  Do you know that

23    the LLC is the legal entity who retains rights to

24    the brand?  I don't ask people this.

12:01  25        Q.   I understand.  I'm saying, sitting here

81

BARKLEY
Court Reporters

1   today, you do not have any evidence that consumers

2   or purchasers associate the Lettuce Turnip The Beet

3   brand with either you individually or with the LLC,

4   correct?

12:01   5           MR. FAUCETTE:  Objection.  Misstates

6   testimony.  Lacks foundation.

7           THE WITNESS:  I wouldn't know.  Like

8   you're asking me, do I have evidence.  I don't know

9   if I have evidence.  I would have to pore through

12:02   10  e-mails and communications and I would have to

11  ascertain -- I would have to spend more time

12  investigating.  Like I wouldn't tell you -- I

13  couldn't tell you immediately.

14  BY MR. MASUR:

12:02   15      Q.   Sitting here today, you cannot identify

16  any evidence that consumers or purchasers associate

17  the Lettuce Turnip The Beet brand with either the

18  LLC or with you individually?

19          MR. FAUCETTE:  Same objections.

12:02   20          THE WITNESS:  I can't answer this.  I

21  don't know.  I don't recall at this point in time.

22  BY MR. MASUR:

23      Q.   So you can't identify it sitting here?

24  I'm not talking about any other time.

12:02   25      A.   In this moment in time --

82

BARKLEY
Court Reporters

1      Q.   Sitting here today.

2      A.   -- I couldn't --

3           MR. FAUCETTE:  Same objections.

4           THE WITNESS:  I can't respond.

12:02  5  BY MR. MASUR:

6      Q.   You can't respond or you can't identify

7  any?

8           MR. FAUCETTE:  Same objections.

9           THE WITNESS:  Well, I can't identify it

12:02  10  without actually going through and looking for

11  evidence.  Like I'm not -- yeah.

12  BY MR. MASUR:

13     Q.   Okay.  Now, you said that you promoted

14  Lettuce Turnip The Beet in part by donating

12:03  15  products?

16          Let me strike that question.

17          You said that you donated Lettuce Turnip

18  The Beet products to various different organizations

19  and individuals, correct?

12:03  20     A.   Yes.

21     Q.   And you've also given away product with

22  Lettuce Turnip The Beet to either celebrities or

23  intermediaries for celebrities to promote Lettuce

24  Turnip The Beet, correct?

12:03  25     A.   Yes.

83

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1    contention that LTTB has been damaged or harmed by

2    any use of the LTTB marks by Redbubble or by others

3    using an LTTB mark on the Redbubble marketplace,

4    including facts supporting any claim that LTTB has

03:36   5    sustained lost sales and profits or damages to its

6    goodwill."

7            Do you see that?

8        A.   Yes.

9        Q.   And your response, I suppose we could read

03:36  10    it entirely into the record, but -- well, first of

11    all, I should say, you read through your response?

12        A.   Let me look through it now.

13            Uh-huh.  Yes.

14        Q.   Okay.  And you stand by that statement?

03:37  15    That's still your belief?

16        A.   Yes, it's still my belief.

17        Q.   Okay.  Now, do you have any evidence

18    supporting this position?

19        A.   In the Redbubble case, I mean, in my

03:37  20    response, I say, I attribute, yeah, to the -- I

21    attribute a decline to rampant counterfeiting.  So

22    do I have evidence in regards to Redbubble or

23    evidence in regards to on-demand printers?  I'm

24    unclear.

03:37  25        Q.   We can start with to Redbubble

195

BARKLEY
Court Reporters

1    specifically.

2        A.    I don't have any direct evidence.  It's

3    just -- I mean, I'm not sure -- yeah.

4        Q.    Okay.  The last sentence of your response

03:38  5    says, "A graph comparing the number of legal notices

6    submitted to the aforementioned sites since 2013

7    would clearly show Redbubble is the biggest repeat

8    offender causing damage to the LTTB brand in the

9    same online market channels where it has existed

03:38 10    since 2011."

11           Do you see that?

12        A.    Yes.

13        Q.    And the aforementioned sites are Zazzle,

14    CafePress, Society6, Teespring, Spreadshirt,

03:38 15    Skreened, sorry, SunFrog, Custom Ink, and TeePub,

16    correct?

17        A.    Yes.

18        Q.    I think you testified this morning that

19    you haven't graphed that out, correct?

03:38 20        A.    I haven't yet.

21        Q.    And you haven't -- well, and you haven't

22    produced in this litigation the legal notices

23    submitted to any site other than Redbubble, correct?

24        A.    Correct.  I don't recall.  Wait, wait,

03:39 25    wait.  Legal notices.  No.

196

**BARKLEY**
Court Reporters

1    various graphs.  They would all point to the same

2    exact thing.  That Redbubble is the most egregious

3    on-demand printer in terms of repeat counterfeiting

4    of my marks.

03:43  5         Q.    And -- and the data that you would intend

6    to graph there are all data that you have in your

7    possession now, correct?

8         A.    Ostensibly.  I don't know if you mean in

9    my possession now as in my briefcase now?

03:43  10        Q.    No.  Available to you.

11        A.    Oh, okay.  Yeah, assuming my -- assuming

12   I -- I should have, you know, the data has been

13   lost, you know, at some point, like if it was on a

14   drive and it got -- whatever, you know.  Yeah, I

03:44  15   think I have it all -- I mean, I don't know.

16        Q.    And the data as to the -- as to Redbubble

17   that you would be looking to graph is -- has been

18   produced to Redbubble in this litigation, correct?

19        A.    Yes, I think -- yeah, that's -- I mean, I

03:44  20   spent the -- the updated spreadsheet you gave me,

21   which this kept changing in the past 48 hours.  I

22   created -- I cross-compared it with every time I've

23   documented things and so -- yeah, I've given you

24   everything.

03:44  25        Q.    Okay.  As to Redbubble, you've given us

200

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1    everything?

2        A.   Yes.

3        Q.   But as to the other sites --

4        A.   Uh-huh.

03:44  5    Q.   -- those data have not been produced,

6    correct?

7        A.   No, because it's --

8        Q.   "No" is fine.

9        A.   No.

03:44 10    Q.   That was the question I was asking.

11            You don't seem to like Redbubble much.

12   Sorry.  Do you like Redbubble much?  We'll make it a

13   question.

14            MR. FAUCETTE:  Objection.  Vague and

03:45 15   ambiguous.

16            MR. MASUR:  Okay.

17       Q.   You -- you seem to have some antipathy

18   toward Redbubble.  Is that a fair statement?

19       A.   It would be a fairer statement to say that

03:45 20   I have been impacted by the ongoing infringement,

21   the loss of my time and resources, and, you know,

22   it's -- it's been now five to six years.  I mean,

23   I -- in my recollection, I don't know if there are

24   any other companies -- I mean, you'll notice right

03:45 25   now this is the only litigation I'm running.

201

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters

1        A.    Rampant counterfeiting.

2        Q.    I've asked you whether other factors, such

3    as changing fashions and changing tastes or market

4    saturation, namely, that the people who want a

05:12  5    Lettuce Turnip The Beet shirt --

6        A.    Oh, okay.

7        Q.    -- have a Lettuce Turnip The Beet shirt?

8        A.    Okay.  Do I feel that that's impacting it?

9        Q.    Yes.

05:12 10        A.    No.  I don't feel that that's -- I'm glad

11    you asked, is there a market saturation,

12    essentially?  No, there's no market saturation.

13            I use -- I use the example that I tell

14    friends of mine all the time, including my counsel,

05:12 15    recently, but it's not -- I'm not pointing to him in

16    particular, but I say that -- I use the example that

17    my Lettuce Turnip The Beet kid's shirt that is

18    supremely popular, it still remains -- it's a top

19    seller, and I keep hearing from people indefinitely

05:12 20    it's their favorite gift to give to a one-year-old

21    for their first birthday.  They want one every year

22    for their kid.

23            It's not -- the market is not saturated,

24    especially for kids.  And because it's an

05:13 25    extremely -- it's because it's a brand that has very

262

BARKLEY
Court Reporters

        1    safe humor and it's -- there's nothing offensive

        2    about it, it will continue to be extremely popular

        3    with parents who have kids.  So the deal is, it's

        4    not the kids that are five years old that are buying

05:13   5    the shirt.  It's the parents who want their kids to

        6    wear it.

        7              So I've seen a decline in, you know, to

        8    some degree.  I mean, there's -- there's an obvious

        9    decline in sales.  But certain products just

05:13   10   continue to be supremely popular, and I don't think

        11   it's -- there's no saturation, like somebody who

        12   has -- I mean, there's a certain portion of people

        13   who they have one kid shirt and they don't need

        14   another.  But there's a large percentage of people,

05:13   15   repeat customers, who keep coming back, who want

        16   another kid shirt as the kids grow.  I mean, that's

        17   the great thing about kids.  They keep growing.

        18   They need another one, different size.

        19             So I would say there's no market

05:14   20   saturation.  And I also tell people, if I'm not

        21   selling it, somebody else is.

        22        Q.   So there's no other factor that you think

        23   is driving your decline of sales other than --

        24        A.   The decline of sales I attribute, like I

05:14   25   said, to putting too much emphasis on -- potentially

                                  263

ELEKTRA PRINTZ GORSKI - 30(b)(6)

BARKLEY
Court Reporters