JEFFREY E. FAUCETTE (No. 193066)
SKAGGS FAUCETTE LLP
One Embarcadero Center, Suite 500
San Francisco, California 94111
Telephone:  (415) 315-1669
Facsimile:   (415) 433-5994
E-mail:  jeff@skaggsfaucette.com

Attorneys for Plaintiff LTTB LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LTTB LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> REDBUBBLE, INC., a Delaware corporation, <br><br> Defendant. | Case No.: 3:18-cv-509-RS <br><br> **PLAINTIFF LTTB LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT AND IN OPPOSITION TO DEFENDANT REDBUBBLE, INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date Action Filed:  January 23, 2018 <br><br> Hearing: June 13, 2019 <br> Time: 1:30 p.m. <br> Place: Courtroom 3, 17th Floor <br> Judge: Hon. Richard Seeborg |

SKAGGS
FAUCETTE LLP

**NOTICE OF MOTION AND MOTION**

NOTICE IS HEREBY GIVEN that on June 13, 2019 at 1:30 p.m., or as soon thereafter as counsel may be heard, before The Honorable Richard Seeborg, in Courtroom 3, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, CA 94102, Plaintiff LTTB, LLC ("LTTB"). will, and hereby does, move for summary judgment or, in the alternative, summary adjudication of issues pursuant to Federal Rule of Civil Procedure 56, against Defendant Redbubble, Inc.

This motion is based upon this notice of motion and the following memorandum of points and authorities, the declarations of Elektra Printz Gorski and Jeffrey E. Faucette, the declarations submitted by Redbubble in support of its motion, the proposed order submitted herewith, and upon such other matters as may be presented to the Court at or before the time of the hearing.

**RELIEF REQUESTED**

By this motion, LTTB respectfully requests an order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment to LTTB as to each and every claim asserted in the Complaint and an award of statutory damages in an amount to be determined by the Court, or, in the alternative, an award of $200,000 in actual damages.

Dated: May 13, 2019                       SKAGGS FAUCETTE LLP

By: _____/s/_____
                          Jeffrey E. Faucette
                    Attorneys for Plaintiff LTTB LLC

1

# TABLE OF CONTENTS

2 **NOTICE OF MOTION AND MOTION**.................................................................. **2**

3 **RELIEF REQUESTED** .......................................................................................... **2**

4 **STATEMENT OF ISSUES TO BE DECIDED** ..................................................... **1**

5 **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LTTB'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
6 REDBUBBLE'S MOTION FOR SUMMARY JUDGMENT** ......................... **2**

7 **INTRODUCTION AND SUMMARY OF ARGUMENT**...................................... **2**

8 **STATEMENT OF FACTS** ..................................................................................... **3**

9        A.     LTTB And The LETTUCE TURNIP THE BEET Mark .......................... 3

10        B.     Undisputed Infringement And Counterfeiting Of The LTTB Mark On
Redbubble's Online Storefront And The Resulting Injury To LTTB ...................... 5

11 **ARGUMENT** ......................................................................................................... **13**

12 I.     UNDISPUTED INFRINGEMENT AND COUNTERFEITING OF THE LTTB
MARK ON REDBUBBLE'S ONLINE STOREFRONT AND THE RESULTING
13      INJURY TO LTTB ........................................................................................ 13

14 II.     SUMMARY JUDGMENT SHOULD BE GRANTED IN LTTB'S FAVOR ON
ITS TRADEMARK INFRINGEMENT CLAIM................................................ 18

15
16        A.     There Is No Genuine Issue Of Material Fact Regarding The Essential
Elements Of Trademark Infringement ................................................ 18

17        B.     Redbubble's Affirmative Defense Of Aesthetic Functionality Should Be
Rejected ............................................................................................ 20

18
19 III.     SUMMARY JUDGMENT SHOULD BE GRANTED IN LTTB'S FAVOR ON
ITS CLAIM FOR CONTRIBUTORY INFRINGEMENT AND/OR
COUNTERFEITING ..................................................................................... 22

20 IV.     STATUTORY DAMAGES SHOULD BE IMPOSED ON REDBUBBLE ...................... 25

21 CONCLUSION ..................................................................................................... 28

22

23

24

25

26

27

28

SKAGGS
FAUCETTE LLP

1

**TABLE OF AUTHORITIES**

2

<u>**Cases**</u>

3

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) ........................ 23

4

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated in part by Mattel,*
    *Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) ........................... 14, 19, 20

5

6

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062 (9th Cir. 2006) .............. 20, 21

7

*Born to Rock Design Inc. v. CafePress.com, Inc.*, No. 10 Civ. 8588(CM), 2012 WL
    3954518 (S.D.N.Y. Sept. 7, 2012) ...................................................................... 16

8

*Coach, Inc. v. Goodfellow*, 717 F.3d 498 (6th Cir. 2013)................................................ 23

9

*Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426 (S.D.N.Y. 2012) ........................ 26

10

*Coach, Inc. v. Sapatis*, 994 F. Supp. 2d 192 (D.N.H. 2014) ........................................ 25

11

*Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221 (9th Cir. 2012) ........................... 26

12

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067 (C.D. 2012) ........................... 21

13

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ........................................ 25

14

*Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837 (E.D. Mich. 2006) .................................. 25

15

*Greg Young Publishing, Inc. v. Zazzle, Inc.*, No. 2:16—CV-04587-SVW-KS, 2017 WL
    5004719 (C.D. Cal. Oct. 27, 2017) .................................................................. 26

16

17

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284 (S.D.N.Y. 2003)...................... 14

18

*H-D U.S.A., LLC v. SunFrog, LLC,* 311 F. Supp. 3d 1000 (E.D. Wis. 2018)........................ *passim*

19

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982) .......................................... 22

20

*Laukus v. Rio Brands, Inc.*, 391 Fed. Appx. 416 (6th Cir. 2010)...................................... 18

21

*Levi Strauss & Co. v. Shilon,* 121 F.3d 1309 (9th Cir. 1997) ...................................... 14

22

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993) .................................... 28

23

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999)........................ 22

24

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011) 13, 22, 26, 27

*Louis Vuitton S.A. v. Gucci Shops, Inc.*, 875 F.2d 584 (7th Cir. 1989)........................... 27

25

*Marketquest Group, Inc. v. BIC Corporation*, 316 F. Supp. 3d 1234 (S.D. Cal. 2018) ................ 17

26

*Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932RSM, 2015 WL 4394673 (W.D.
    Wash. July 16, 2015)................................................................................... 15

27

28



*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011).......... 18

*Ohio State Univ. v. Redbubble, Inc.*, No. 2:17-cv-1092, 2019 WL 1429255 (S.D. Ohio Mar. 29, 2019) ......................................................................................................................... 16, 17

*Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905 (S.D. Ohio 2014) ............................... 16, 24

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ............................................... 17

*Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067 (C.D. Cal. 2004) ................................. 14

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) ................................................. 18

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012) ............................. 18, 19

*Rexel, Inc. v. Rexel Int'l Trading Corp.*, 540 F. Supp. 2d 1154 (C.D. Cal. 2008) ......................... 18

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) ................................................. 23

*Tiffany (NJ)) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................... 22, 23, 24

*Tommy Bahama Group, Inc. v. Sexton*, No. C 07-06360-EDL, 2009 WL 4673863 (N.D. Cal. Dec. 3, 2009)............................................................................................................... 27

*Tre Milano, LLC v. Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. August 22, 2012)......................................................................................................................... 16

*Under Armour, Inc. v. 51nfljersey.com*, 13-62809-CIV, 2014 WL 1652044 (S.D. Fla. Apr. 23, 2014) ........................................................................................................................... 25

*Versace v. Awada*, No. CV033254, 2010 WL 11515467 (C.D. Cal. Aug. 2, 2010)...................... 25

*Williams-Sonoma, Inc. v. Amazon.com, Inc.*, No. 18-cv-07548-EDL (N.D. Cal. May 2, 2019)....................................................................................................................................... 18

## Statutes

15 U.S.C.
§ 1114 ........................................................................................................................... 1
§ 1114(1) ..................................................................................... 13, 14, 15, 16
§ 1115(a) ............................................................................................................ 14, 18
§ 1115(b) ............................................................................................................ 14, 19
§ 1116(d)(1)(B) ........................................................................................................ 13
§ 1117(a) ............................................................................................................... 28
§ 1117(c) ............................................................................................................... 25
§ 1117(c)(1) ............................................................................................................ 26
§ 1117(c)(2) ............................................................................................................ 26

17 U.S.C. §504(c)............................................................................................................ 26

## Rules

California Rule of Court 8.1115................................................................................................ 16

Civil Local Rule 3-4(e) ............................................................................................................ 16

SKAGGS
FAUCETTE LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Redbubble committed counterfeiting of LTTB's federally-registered trademarks in violation of 15 U.S.C. section 1114.

2. Whether Redbubble committed infringement of LTTB's federally-registered trademarks in violation of 15 U.S.C. section 1114.

3. Whether Redbubble committed contributory infringement and/or counterfeiting of LTTB's federally-registered trademarks.

4. The amount of statutory damages to be awarded to LTTB to remedy Redbubble's counterfeiting (whether direct or contributory) of LTTB's federally-registered trademarks.

5. The amount of actual damages to be awarded to LTTB to remedy Redbubble's infringement and/or counterfeiting (whether direct or contributory) of LTTB's federally-registered trademarks.

SKAGGS
FAUCETTE LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LTTB'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO REDBUBBLE'S MOTION FOR SUMMARY JUDGMENT**

### INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Redbubble, Inc. ("Redbubble") has designed and operated a trademark infringement and counterfeiting service that has generated tens of millions of dollars in profits for Redbubble at the expense of trademark holders around the globe, including Plaintiff LTTB, LLC ("LTTB"). As part of the design of this service, Redbubble "voluntarily" provides a modicum of "policing" of its website and claims that it is merely an agnostic marketplace with no ability to control the rampant use of its services for counterfeiting and infringement. Instead, Redbubble seeks to put the burden on trademark rights holders such as LTTB to play "whack-a-mole" by submitting a myriad of takedown notices in a never-ceasing effort to stop the Redbubble service from performing *just as it was designed to do*. Redbubble, however, could and should be required to prevent these counterfeit and infringing products from ever being offered for sale on its site. And Redbubble should be required to pay significant statutory damages to LTTB both to compensate LTTB and to incentivize Redbubble to clean up its act.

LTTB is a small business that has grown from a single street vendor into a hugely popular online storefront with 10,000 followers and sales of nearly $1 million. LTTB has achieved this success largely due to public fascination with its LETTUCE TURNIP THE BEET trademark and the beautiful and high-quality goods sold under that mark. With this success has come a raft of imitators eager to profit from LTTB's creativity and branding. In the past, these imitators would face significant limitations in their ability to get their counterfeit goods in front of consumers, but Redbubble has solved this problem by offering its trademark infringement and counterfeiting services that handle every aspect of the counterfeiting process—an online storefront, a search feature, product images, product listings, back-end sales, manufacturing and delivery, even sponsored advertising on the internet—all for a healthy service fee of course. The results have been nearly fatal to LTTB's business which has shrunk from over $250,000 in annual sales in 2013 to less than $40,000 last year. Meanwhile, Redbubble's business has boomed, and it made

SKAGGS
FAUCETTE LLP

1  more than $40 million in profit last year.

2       This case represents LTTB's "David and Goliath" effort to put a dent in Redbubble's

3  infringement and counterfeiting machine.  As set out below, Redbubble is guilty of direct

4  trademark counterfeiting in violation of the Lanham Act.  Section I, *infra*.  Redbubble is also

5  guilty of direct trademark infringement, and these infringements are not shielded by the aesthetic

6  functionality doctrine.  Section II, *infra*.  Additionally, Redbubble is guilty of contributory

7  infringement and counterfeiting.  Section III, *infra*.  As much as it would like to be, Redbubble is

8  not Amazon or eBay.  Redbubble is a culpable participant in the rampant trademark infringement

9  and counterfeiting it enables.  Finally, the Court should award a significant amount of statutory

10  damages or an award of actual damages to LTTB to remedy the harm to LTTB and to incentivize

11  Redbubble to change its business model to protect brand owners rather than profit off of them.

12  Section IV, *infra*.

13                                **STATEMENT OF FACTS**

14       **A.**     **LTTB And The LETTUCE TURNIP THE BEET Mark**

15       Elektra Printz Gorski ("Gorski"), the LTTB founder, owner, and predecessor-in-interest,

16  graduated from the Fashion Institute of Technology ("FIT") in New York in 2007, winning the

17  famed Critic's Award as one of the most promising designers in her class.  Declaration of Elektra

18  Printz Gorski ("Gorski Decl.") ¶¶2-4.  She has taken advanced silkscreen classes at FIT and the

19  School of Visual Arts (SVA), and she is a designer and artist who is widely considered a master

20  printer among her industry peers.  *Id.*  Gorski is also a former Peace Corps volunteer in rural West

21  Africa, and the winner of a Rotary World Peace Fellowship to Japan for graduate school.  *Id.*  In

22  2011, she created the LETTUCE TURNIP THE BEET trademark and her first apparel and product

23  designs using the mark as both a source identifier and as a graphic design element.  *Id.*

24       LTTB is the current owner of four United States federal trademark registrations for the

25  mark LETTUCE TURNIP THE BEET (collectively, the "LTTB Mark"): Registration Number

26  4,297,108 for the mark LETTUCE TURNIP THE BEET for the following goods and services:

27  "Paper for wrapping and packaging"; "tote bags"; and "Wearable garments and clothing, namely,

28

**SKAGGS FAUCETTE** LLP

shirts."  Registration Number 4,454,801 for the mark LETTUCE TURNIP THE BEET for the following goods and services: "On-line retail store services featuring clothing, accessories and art."  Registration Number 5,064,226 for the word mark LETTUCE TURNIP THE BEET for the following goods and services: "Tote bags"; and "Aprons; Headwear; Infant wear; Shirts for infants, babies, toddlers and children; Wearable garments and clothing, namely, shirts." Registration Number 5,064,227 for the word mark LETTUCE TURNIP THE BEET for the following goods and services: "Tote bags"; and "Aprons; Headwear; Infant wear; Shirts for infants, babies, toddlers and children; Wearable garments and clothing, namely, shirts."  Gorski Decl. ¶5 & Exs. 1-4.  Registration Nos. 4,297,108 and 4,454,801 are incontestable due to five or more years of consecutive use from the date of registration and the submission to the USPTO of declarations of continued use under section 8 and declarations of incontestability under section 15. *Id.* ¶7.

Since 2011, LTTB has offered for sale, sold, manufactured, advertised and distributed many different goods bearing the LTTB Mark, including apparel, tote bags, art, and paper goods. *Id.* ¶9.  These goods have been offered for sale on LTTB's online storefront on Etsy.com since 2011.  *Id.* ¶9 & Ex. 5.  The LTTB shop on Etsy is currently the "favorite" shop of over 10,000 Etsy users and has a perfect five-star review rating based on favorable reviews from over 5,000 users.  *Id.* ¶10.  LTTB has made more than 35,000 sales through the Etsy online storefront and earned revenue in excess of $950,000.  *Id.*  All of these sales and reviews since 2011 were made under the LETTUCE TURNIP THE BEET brand and mark.  *Id.*

The LTTB Mark and brand have been and are very popular among consumers associated with the food, music, athletic, tech, and art industries.  *Id.* ¶13.  Prominent celebrities have worn LTTB-branded merchandise in public and in various television and social media appearances.  *Id.* ¶14.  LTTB branded goods have also received significant mention in various national publications and on the internet.  *Id.* ¶15.

LTTB has undertaken significant efforts to protect and enforce its trademark rights in the LTTB Mark.  *Id.* ¶16.  Since 2011, LTTB provided notice that the LETTUCE TURNIP THE

SKAGGS
FAUCETTE LLP

BEET design, photos, and text in the online store are copyright protected by using the © or by providing written notification.  *Id.*  From the fall of 2011 until early March 2013, LTTB provided notice that the LETTUCE TURNIP THE BEET Mark was a trademark use by displaying LETTUCE TURNIP THE BEET™ in each online product listing, and/or by providing other written notice that the LETTUCE TURNIP THE BEET mark is trademark and copyright protected.  *Id.*  Since receipt of the first USPTO registration in March 2013, LTTB has provided notice that the LETTUCE TURNIP THE BEET Mark is federally-registered by displaying the letter R enclosed within a circle, thus ®, and/or by providing other written notice that the LETTUCE TURNIP THE BEET Mark is federally-registered.  *Id.*  LTTB has also pursued multiple lawsuits to protect and enforce its rights, including two lawsuits filed in the Northern District of California, one against retailer Gymboree and another against on-demand printer Teespring.  *Id.*  LTTB has also taken action in other jurisdictions against Whole Foods Market and The Cotton On Group for infringement of its trademark rights.  *Id.*

**B.    Undisputed Infringement And Counterfeiting Of The LTTB Mark On Redbubble's Online Storefront And The Resulting Injury To LTTB**

On May 17, 2013, Gorski conducted a search on Google for "lettuce turnip the beet" and saw a counterfeit copy of the LTTB Mark on a t-shirt offered by Redbubble appear as a sponsored advertisement.  Gorski Decl. ¶17.  Gorski immediately went to Redbubble's website where she discovered five t-shirt listings featuring counterfeit copies of the LTTB Mark.  *Id.*  Gorski documented these counterfeit listings in screenshots taken from the Redbubble website, and she submitted takedown notices to Redbubble regarding these counterfeit listings.  *Id.* ¶20 & Ex. 6 at 1-6; Declaration of Jeffrey E. Faucette ("Faucette Decl.") Ex. 2 (BATES004268) & Ex. 3 (BATES003658-62).[1]  One of the listings Gorski found on Redbubble's website was also being

---

[1] Exhibit 6 to Gorski's declaration compiles information received from Redbubble in discovery regarding the infringing listings that Redbubble reports that it has removed from its website between 2013 and 2019 along with Gorski's screenshots of the infringing listings on Redbubble's website, Gorski's screenshots of advertisements Redbubble purchased on the internet where applicable, and photographs of products and packaging Gorski received from Redbubble when she made test purchases of these products (a total of 53 listings that appeared on Redbubble).  Gorski Decl. ¶20.  This information has been compiled in chronological order to make for ease of



1   offered for sale in a sponsored advertisement on Google,[2] and in that ad, the infringing item

2   appeared alongside two listings for genuine LTTB goods.  Gorski Decl. Ex. 6 at 02.  Redbubble

3   responded to Gorski that it had removed the infringing listings, but a week later Gorski found that

4   the listings had not been removed, and she contacted Redbubble again on May 24, 2013.  Faucette

5   Decl. Ex. 3 (BATES003667-73).  In this second round of communications, Gorski again noted

6   that Redbubble's advertisement for the infringing item was still appearing on Google despite three

7   requests from her to have it removed and that she had also contacted Google to have it removed.

8   *Id.* (BATES003671).  Only after this lawsuit had been filed and discovery conducted, did LTTB

9   learn that some of these infringing listings were not deleted from Redbubble until several months

10  later on September 30, 2014, and not because Redbubble had taken action but because the user

11  deleted them.  *Id.* Ex. 2 (BATES004268).  At no point in these communications in 2013 did

12  Redbubble offer to provide any more proactive policing of its website for Gorski.  *Id.* Ex. 3

13  (BATES003658-62 & 3667-73).  Redbubble's records indicate that it received 13 orders for these

14  infringing listings and that Redbubble received service fees of AU$95.75.  *Id.* Ex. 2

15  (BATES004268).[3]

16          On January 14, 2014, Gorski conducted another review of Redbubble's website and found

17  a new counterfeit listing.  Gorski Decl. Ex. 6 at 08.  Gorski again submitted a takedown notice to

18  Redbubble regarding this item.  Faucette Decl. Ex. 3 (BATES003648-50).  Redbubble took down

19  the listing that same day, but as of that date, Redbubble had already received 90 orders for this

20  counterfeit shirt, and Redbubble received AU$643.60 in service fees on these orders.  *Id.* Ex. 2

21  _____

    reference for the Court and parties.  In addition to the 53 listings contained in Exhibit 6,
22  Redbubble's spreadsheet (attached as Exhibit 2 to the Faucette Declaration) contains 21 listings
    that Redbubble states it "moderated" but that LTTB had no record of prior to the information
23  being produced in discovery.  Of these 21 listings, 16 are for products bearing counterfeit and/or
    infringing copies of the LTTB Mark.
24
    [2] Redbubble has admitted that it places internet advertisements for products available for purchase
25  on its website and that when infringing listings are removed, the advertisements continue to appear
    on the internet for some period of time.  Faucette Decl. Ex. 1 at 26:25-27:20 & 173:8-25.
26
    [3] Redbubble has not produced information regarding the first counterfeit shirt listing seen by
27  Gorski and this product listing was not included in the spreadsheet produced by Redbubble in this
    litigation.  *Compare* Gorsk Decl. Ex. 6 at 6 *with* Faucette Decl. Ex. 2 at BATES004268.
28

1  (BATES004268).  The same day Redbubble took this listing down, the same user uploaded a new

2  listing for a counterfeit shirt (adding only "s!" after "Beet").  *Id.*; Gorski Decl. Ex. 6 at 09.  Gorski

3  again submitted a notification to Redbubble and stated that this user was in violation of

4  Redbubble's purported repeat offender policy.  Faucette Decl. Ex. 3 (BATES003649).  Redbubble

5  responded that it had removed the listing, but the document Redbubble produced in discovery in

6  this case does not reflect the removal of this listing.  *Compare* Faucette Decl. Ex. 3

7  (BATES003650) *with* Ex. 2 (BATES004268).  Despite the fact that this user is a repeat offender,

8  the user remained a registered user on Redbubble as of the date of Redbubble's deposition in this

9  lawsuit.  Faucette Decl. Ex. 1 at 155:9-156:17.

10       This same pattern of searches by Gorski, documentation of infringing and counterfeit

11  listings on Redbubble, and notice and takedown communications to Redbubble was repeated on

12  January 27, 2014; April 9, 2014; June 9, 2014; July 14, 2014; August 6, 2014; and August 7, 2014.

13  Gorski Decl. Ex. 6 at 11-16; Faucette Decl. Ex. 2 (BATES004268-4269) & Ex. 3.  Redbubble

14  responded to these communications with its standard response that it was removing the listing.

15  Faucette Decl. Ex. 3.  At no time during these communications with Gorski did Redbubble suggest

16  that it could provide any more proactive response to the rampant counterfeiting on its website.  *Id.*

17       On October 26, 2014, Gorski sent a cease and desist communication to Redbubble based

18  on the repeated infringement and counterfeiting of her trademark on the Redbubble site.

19  Declaration of James Toy ("Toy Decl.") [Dkt 38] Ex. I.  In this communication, Gorski demanded

20  that Redbubble "[p]lace a permanent block on the use of LETTUCE TURNIP THE BEET on

21  [Redbubble's] site and all products to prevent future infringement . . . ."  *Id.*  She also noted that

22  this was not a DMCA notice and that she expected a response from Redbubble's counsel.  *Id.*

23  Four days later, Gorski sent a new takedown notice to Redbubble regarding a product listing that

24  used the LTTB Mark in the "tag_list" associated with the product listing, thereby infringing the

25  LTTB Mark in an effort to drive consumer traffic to the listing.  *Id.*  This takedown notice also

26  described the sponsored search result Redbubble had placed on Google for this listing which

27  appeared in an ad next to another infringing product and three genuine LTTB products.  *Id.*;

28

SKAGGS
FAUCETTE LLP

1  Gorski Decl. Ex. 6 at 17; Faucette Decl. Ex. 3 (BATES003681-82).

2       On October 28, 2014, Gorski received a letter (via email) from Redbubble's general

3  counsel, Corina Davis responding to Gorski's communications and requesting that Gorski identify

4  the content at issue from her perspective and provide guidelines of what Redbubble should look

5  for in responding to the problem.  On November 10, 2014, Gorski responded to Davis, and in the

6  back and forth email that followed, Gorski told Davis that "Redbubble needs to make it a priority

7  to police every single new product listed using the word LETTUCE, TURNIP, or BEET in the

8  title or meta tags."  Toy Decl. Ex. I.  Gorski also noted that this would not be a significant burden

9  given the relatively small number of new designs monthly that used these words, and that the

10  burden should not fall on her to police Redbubble's website.  Id.  Davis responded that Redbubble

11  "will begin a screening process per our policies and procedures."  Id.  Gorski replied and described

12  the significant harm her brand had suffered and the benefits Redbubble had received as a result of

13  the rampant infringement of the LTTB Mark on the site.  Id.

14       Despite Davis' promise that Redbubble would begin a screening process for the LTTB

15  Mark on its site, Gorski went through the same pattern of searches, documentation of infringing

16  and counterfeit listings on Redbubble, and notice and takedown communications to Redbubble on

17  January 26, 2015; February 19, 2105; January 15, 2016; May 4, 2016; August 11, 2016;

18  November 14, 2016; and December 12, 2016.  Gorski Decl. Ex. 6 at 22-28; Faucette Decl. Ex. 2

19  (BATES004269-4271) & Ex. 3.  In this time frame, Gorski also took the additional step of making

20  test purchases of the infringing and counterfeit goods.  Gorski Decl. ¶20.  Gorski also documented

21  the goods and packaging received from Redbubble in connection with these purchases.  Gorski

22  Decl. Ex. 6 at 25, 27.

23       By this stage, Gorski had documented nearly four years of infringement and counterfeiting

24  of the LTTB Mark by Redbubble.  Despite Davis' promise that Redbubble would proactively

25  screen its site for infringing listings, Gorski had documented multiple infringements in the two

26  years that followed this promise.  Thus, on December 16, 2016, Gorski's outside counsel, Samuel

27  Smith, sent a detailed cease and desist letter to Redbubble on behalf of Gorski.  Gorski Decl. Ex.

28

11.  In this letter, Smith demanded, *inter alia*, that Redbubble provide regarding the sales, costs, shipping, advertising, and dates of production of infringing products, and that Redbubble cease all infringements.  *Id.*  On January 13, 2017, Redbubble's Assistant General Counsel James Toy responded to Smith's letter.  *Id.* Ex. 12; Faucette Decl. Ex. 1 at 186:5-187:15.  In this response, Toy stated that Redbubble could not find any infringing items on its website and that this could be due to the fact that Redbubble was screening its site at Gorski's request.  Gorski Decl. Ex. 12.  Toy did not, however, provide any of the information sought by Smith nor did Toy state that Redbubble needed any additional information from Gorski to conduct this screening.  *Id.*

At the time of this letter, Redbubble's policy was that it would provide a response to a rights holder's request for information about the sales of infringing goods on Redbubble's website.  Faucette Decl. Ex. 1 at 176:16-178:13.  In his deposition as Redbubble's corporate designee, Toy could not explain why neither his boss Corina Davis, nor he himself provided any response to Gorski or her counsel that was consistent with Redbubble's stated policy regarding sales of works that had been moderated.  *Id.* at 179:11-181:8 & 184:15-187:15; Gorski Decl. ¶29.  Thus, at the time LTTB filed this lawsuit, Redbubble had never provided LTTB or Gorski with any information regarding the number of infringing works sold by Redbubble.  Additionally, despite Toy's current conclusory allegations that Gorski and LTTB failed to work with Redbubble on proactive policing efforts (Toy Decl. ¶¶9, 11, 14 & 29), nowhere in his letter nor in the prior correspondence is there evidence of such a refusal by Gorski or LTTB.  Gorski Decl. ¶¶30-31.

Following the exchange of correspondence with Toy in January 2017, LTTB determined that further communications with Redbubble were likely to be fruitless, and LTTB focused its efforts on documenting the ongoing infringement and counterfeiting of the LTTB Mark by Redbubble.  Gorski Decl. Ex. 6 at 31-75.  Between January 2017 and the present, LTTB has documented 28 different infringing and/or counterfeit product listings on Redbubble's website.  *Id.*  Of these 28 listings, one was published by Redbubble after the close of discovery, but of the 27 others, Redbubble's spreadsheet of works "moderated" contains only 24, meaning that three of these listings escaped Redbubble's notice.  *Id.*; Faucette Decl. Ex. 2.  LTTB made test purchases

SKAGGS
FAUCETTE LLP

of 16 of these infringing and/or counterfeit listings.  Gorski Decl. Ex. 6 at 30, 32, 34, 37, 40, 43, 45, 47, 49, 51, 56, 58, 65, 67, 72 & 75.  It should also be noted that 15 of these listings appeared even after LTTB filed this lawsuit against Redbubble despite Redbubble's claim that its proactive policing should prevent this from happening.  *Id.* at 53-75.

This chain of events above describes the counterfeiting and infringement that LTTB knew about before discovery took place in this lawsuit.  Discovery has now revealed to LTTB that the scope of the problem on Redbubble was significantly greater.  The spreadsheet of works moderated produced by Redbubble reveals that an additional 16 listings were published on Redbubble using counterfeit and/or infringing copies of the LTTB Mark.  Faucette Decl. Ex 2 at BATES004270-4273.  Six of these listings (in addition to the 28 described above) appeared after Toy sent his letter to LTTB's counsel in January 2017.  *Id.* at BATES004272-4273.

In sum, between 2013 and 2019, Redbubble has offered for sale on its website 69 infringing and/or counterfeit products bearing the LTTB Mark or using the LTTB Mark in some other way in connection with the offering for sale of the products.  *Id.*; Gorski Decl. ¶20 & Ex. 6. LTTB has prepared side-by-side comparisons of some of the most egregious examples with the genuine items produced and sold by LTTB.  *Id.* ¶22 & Ex. 7.  Redbubble has admitted that it has received at least 147 orders for these infringing goods, and that it has received AU$1,183.56 in service fees for Redbubble's sales of these goods.  Faucette Decl. Ex. 2 (BATES004267).

The undisputed evidence compiled by LTTB in Exhibits 6 and 7 indicates the following salient facts about Redbubble's actions:

- The screenshots taken by Gorski of the listings on Redbubble's website show that the LTTB word mark appears over and over again.  These screenshots also show that Redbubble's own mark and logo appear on these same pages.  Any reasonable consumer viewing these pages would understand that the goods are offered for sale by Redbubble.

- Redbubble has purchased numerous internet ads advertising infringing goods for sale on the Redbubble website.

- Many of the goods offered for sale on the Redbubble website are identical or nearly



1   identical copies of genuine LTTB branded goods.

2   •   Test purchases from Redbubble come in Redbubble-branded packaging and with hangtags

3       bearing the Redbubble mark.  Any reasonable consumer would understand that these

4       goods were sold and distributed by Redbubble.

5   •   Redbubble's alleged proactive policing system has been inadequate to stop repeated

6       counterfeiting and infringement of the LTTB Mark.

7   •   The strength and popularity of the LTTB Mark is demonstrated by the repeated

8       counterfeiting and infringement of it.

9       LTTB's experience with Redbubble must also be contrasted with other on-demand

10  printers.  In addition to monitoring Redbubble's website, LTTB has also made it a practice of

11  monitoring the websites of several other on-demand printers, including CafePress, Skreened,

12  Society6, Spreadshirt, SunFrog, Teespring, Teepublic, and Zazzle.  Gorski Decl. ¶24.  From 2013

13  to 2019, LTTB has regularly monitored each of these companies' websites for infringements.  *Id.*

14  From 2016 onward, on each occasion when LTTB encountered a product sold under a counterfeit

15  copy of the LTTB Mark, LTTB made a test purchase of the product.  *Id.*  Some of these on-

16  demand printers have cancelled one or more of these orders prior to fulfilment because they

17  determined that the products were infringing, and LTTB received cancellation notices on such

18  occasions.  *Id.* at ¶24 & Ex. 9 (cancellation notices, two from Teespring and one from Zazzle).

19  Redbubble has never cancelled an order for an infringing and/or counterfeit product, and

20  Redbubble has admitted that it does not cancel orders of infringing products nor that it contacts

21  consumers who have purchased infringing products, even when Redbubble knows that such

22  transactions have occurred.  Faucette Decl. Ex. 1 at 134:1-136:25.  LTTB's tracking of Redbubble

23  and the other on-demand printers over the period 2016-2019 reveals that Redbubble is by far the

24  most egregious infringer of LTTB's mark.  In this three-year time frame, Redbubble has sold

25  nearly 60% of the counterfeit products LTTB has ordered and received (37 of 63).  Gorski Decl.

26  ¶25 & Ex. 10.

27      Redbubble also differs from other on-demand printers in that it does not license trademarks

28

from third party brand owners unlike Zazzle and CafePress for instance.  Gorski Decl. ¶33.

Despite this, tens of thousands of product listings appear on the Redbubble website with famous

trademarks on them.  *Id.* ¶34.  Since March 2019, LTTB has contacted dozens of these famous

brands' legal counsel and asked if they were aware of the infringement and if these uses of their

clients' trademarks were pursuant to a license with Redbubble.  *Id.*  Thirty famous brands' legal

counsel have either responded to say that they have not licensed their marks to Redbubble, or they

appear to have taken steps to have the infringing product listings removed following receipt of

LTTB's communications.  *Id.*  LTTB has verified from its searches on Redbubble.com that,

subsequent to its communications with these famous brands' legal counsel, more than 1,000

counterfeit designs have been removed (representing over 50,000 counterfeit products) since

March 1, 2019.  *Id.*  LTTB believes that consumers assume that Redbubble has extensive licensing

agreements given the tens of thousands of visible counterfeit goods being actively sold on

Redbubble.com for years now.  *Id.* at ¶35.

LTTB has suffered significant injury as a result of Redbubble's infringement and

counterfeiting of the LTTB Mark.  This injury has come in the following ways:

First, LTTB's principal has spent significant time and resources dealing with infringement

and counterfeiting of the LTTB Mark on Redbubble's website, including over 100 hours between

2013 and 2019 searching the Redbubble website for infringements, documenting infringements in

screenshots, placing test product purchases, sending takedown notices and communicating with

Redbubble regarding infringement, plus over 100 hours spent organizing all of the related files and

evidence gathered regarding Redbubble's infringement and communicating with third parties and

outside counsel regarding this infringement prior to filing the lawsuit in this case.  Gorski Decl.

¶36.  LTTB has also spent more than 315 hours dealing with this lawsuit, including two trips to

California from Maryland to attend a mediation and to attend depositions.  *Id.*  These 515 hours of

total time expended have resulted in a loss of income of at least $51,500 had those hours been

spent working on other areas of the LTTB business, such as designing, manufacturing, and

distributing new products for the LTTB brand, strengthening the brand's reach into existing

SKAGGS
FAUCETTE LLP

1  markets through various channels, etc.  *Id.*

2         Second, Redbubble's offers for sale, internet advertising, and sales of infringing and

3  counterfeit products have also cost LTTB a significant amount in lost sales.  Gorski Decl. ¶37.

4  Even if a consumer did not ultimately purchase an infringing product from Redbubble, that

5  consumer's diverted internet traffic likely led to lost income from potential sales to LTTB if the

6  consumer had instead been directed to the real LTTB storefront and seen the 50+ genuine products

7  LTTB offers under the LTTB Mark.  *Id.*  LTTB estimates that 50% of its annual sales are from

8  repeat customers and people who see the product on others, then ask them where they purchased it

9  (i.e. referrals and social media).  *Id.*  In the case of each sale made on Redbubble, that is

10  potentially 10+ lost referrals had the consumer purchased genuine goods, worn them, and/or

11  shared them on social media, referring friends, family, and followers to the real LTTB storefront

12  instead of to Redbubble.  *Id.*  Thus, LTTB estimates that it would have sold an additional 1,000

13  items and generated an estimated $30,000 in additional revenues from these sales but for

14  Redbubble's infringement.  *Id.*  Alternatively, based on LTTB's declining annual revenues during

15  the time of Redbubble's infringement, LTTB estimates that Redbubble has caused damages of at

16  least $200,000.  *Id.* ¶38.

17                                          **ARGUMENT**

18  **I.     SUMMARY JUDGMENT SHOULD BE GRANTED IN LTTB'S FAVOR ON ITS
           COUNTERFEITING CLAIM**
19

20         The essential elements of LTTB's trademark counterfeiting claim are (1) LTTB's

21  ownership of a valid trademark, and (2) Redbubble's use of one or more counterfeits of LTTB's

22  Marks on or in connection with the "sale, offering for sale, distribution, or advertising of any

23  goods or services. . . ."  15 U.S.C. §1114(1).  A counterfeit mark is defined as "a spurious

24  designation that is identical with, or substantially indistinguishable from" a registered mark.  15

25  U.S.C. § 1116(d)(1)(B); *see also Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d

26  936, 946 (9th Cir. 2011) (holding that under the Lanham Act a counterfeit mark is "a non-genuine

27  mark identical to the registered, genuine mark of another, where [ ] the genuine mark was

28

**SKAGGS
FAUCETTE** LLP

registered for use on the same goods to which the infringer applied the mark"). Significantly, section 1114(1) does not require evidence of an actual sale to establish counterfeiting; "[a]n offer to sell [counterfeit goods] without more will suffice to establish liability [under the Lanham Act]." *Levi Strauss & Co. v. Shilon,* 121 F.3d 1309, 1312 (9th Cir. 1997). In cases involving counterfeit marks, "it is unnecessary to perform the step-by-step [*Sleekcraft*] examination . . . because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[C]ounterfeits by their very nature, cause confusion").

First, LTTB's ownership of valid trademarks is not subject to dispute. As noted above, LTTB owns an incontestable United States federal trademark registration for the LTTB Mark: Registration Number 4,297,108 for use of the word mark LETTUCE TURNIP THE BEET on paper for wrapping and packaging, tote bags, and wearable garments and clothing, namely shirts. Gorski Decl. ¶5 & Ex. 1.[4] Registration of a mark on the principal register is "prima facie evidence . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce," (15 U.S.C. §1115(a)), and incontestable registrations are "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. §1115(b). Thus, the two incontestable registrations owned by LTTB provide conclusive evidence of LTTB's ownership and exclusive rights to use the LTTB Mark in connection with the goods and services described in those registrations.

Second, Redbubble's use of counterfeit copies of the LTTB Mark in connection with the sale, offering for sale, distribution or advertising of goods or services is also not subject to dispute. LTTB has submitted evidence that Redbubble offered for sale, advertised, sold and distributed apparel, tote bags and paper goods bearing counterfeit copies of the LTTB Mark. Gorski Decl. ¶¶20, 22 & Exs. 6 & 7; Fauctte Decl. Ex. 2.[5] LTTB has also submitted evidence of the widespread

---

[4] LTTB also owns two additional federal registrations for design marks for the LTTB Mark. Gorski Decl. ¶5 & Exs. 3 & 4.

[5] In reviewing this evidence, the pertinent issue is whether the marks on these goods are


SKAGGS
FAUCETTE LLP

1   and recurring popularity of its LTTB branded goods.  Gorski Decl. ¶¶10-15.  These goods have

2   been worn by celebrities in many different public contexts, and consumers have come to associate

3   the LTTB brand with the quality, hand-printed merchandise produced by LTTB and its

4   predecessor.  *Id.* ¶14.  It should come as no surprise that many of the products offered for sale on

5   Redbubble bear identical or substantially identical copies of the LTTB Mark.  *Id.* Exs. 6 & 7;

6   Faucette Decl. Ex. 2.  Redbubble has also conceded that these items bear counterfeit copies of the

7   LTTB Mark because Redbubble has removed them from its website and stopped offering them for

8   sale.  Declaration of Ayaire Cantil-Voorhees ("Cantil-Voorhees Decl.") [Dkt 39] ¶¶11-12 & Exs.

9   A & B.  If Redbubble believed that it was permissible to offer these items for sale, then it would

10  have no reason to remove them.

11         In its motion, Redbubble contends that it cannot be held liable for LTTB's claim for direct

12  counterfeiting because the counterfeit items on its website are uploaded by third party users, the

13  products are printed by third party printers, and the products are delivered by third party delivery

14  services.  This argument takes an impermissibly narrow view of what constitutes direct "use" of a

15  counterfeit mark under the Lanham Act.  As noted above, "use" in this context means in

16  connection with a "sale, offering for sale, distribution, or advertising of any goods or services . . .

17  ."  15 U.S.C. §1114(1).  Even assuming *arguendo* that Redbubble's elaborately designed business

18  model insulates it from claims that it has sold, produced or distributed goods, the record here still

19  demonstrates that Redbubble has offered for sale counterfeit goods on its website at

20  www.redbubble.com, and that Redbubble has advertised the sale of counterfeit goods on Google.

21  Gorski Decl. ¶¶18, 20-22 & Ex. 6; Faucette Decl. Ex. 1 at 26:25-27:20 & 173:8-25.

22         Most of the cases cited by Redbubble do not support its position.  For example, *Milo &*

23  *Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932RSM, 2015 WL 4394673 (W.D. Wash. July 16,

24  2015), addressed a claim for direct *copyright* infringement, not trademark infringement, when it

25  held that Amazon.com was not directly liable.  *Id.* *4-6.[6]  This court's reasoning under the specific

26  _____

    "substantially identical" to the genuine marks.  *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp.

27  3d 1000, 1027 (E.D. Wis. 2018).

28  [6] While the opinion uses the phrase "trademark infringement" in a single instance in the last



1  requirements of copyright law has little application to the instant question of whether Redbubble

2  has "used" the LTTB Mark as required by section 1114(1) of the Lanham Act.  Redbubble also

3  cites *Tre Milano, LLC v. Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. August

4  22, 2012).  Redbubble MPA [Dkt 36]  at 15.  This case is unpublished and citation to it is

5  prohibited by California Rule of Court 8.1115 and by this Court's Civil Local Rule 3-4(e) since

6  this case is not relevant under the doctrines of law of the case, res judicata or collateral estoppel.

7  LTTB objects to Redbubble's citation to this case, and it should not be considered.  In contrast to

8  cases involving Amazon (which has a very different business model from Redbubble), several

9  cases that are more directly on point have held that on-demand printers such as Redbubble are

10  *directly* liable for trademark infringement.  *E.g.*, *H-D U.S.A., LLC*, 311 F. Supp. 3d at 1030

11  (holding that the defendant's advertisement, offers for sale, printing, and shipping of infringing

12  products were all uses of the plaintiff's marks); *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d

13  905 (S.D. Ohio 2014); *Born to Rock Design Inc. v. CafePress.com, Inc.*, No. 10 Civ. 8588(CM),

14  2012 WL 3954518 (S.D.N.Y. Sept. 7, 2012) (holding that CafePress.com used the plaintiff's

15  marks in commerce when it offered for sale on its website goods which displayed the word mark).

16  　　　Unsurprisingly, Redbubble also cites its recent victory in *Ohio State Univ. v. Redbubble,*

17  *Inc.*, No. 2:17-cv-1092, 2019 WL 1429255 (S.D. Ohio Mar. 29, 2019), wherein the court ruled

18  that Redbubble could not be held liable for direct trademark counterfeiting.  *Id.* at *4-6.[7]  In that

19  case, the court placed Redbubble on a spectrum with "companies that function like auction houses

20  and are not liable for direct infringement" at one end and "companies like CafePress and SunFrog

21  that themselves manufacture and ship infringing products to the customer" and are directly liable

22  for infringement at the other end.  *Id.* at *5.  The court chose to disregard the fact that Redbubble

23  has advertised the infringing goods because it found Ohio State's allegations of this "too

24

25  paragraph of its lengthy discussion of *copyright* infringement, this appears almost certainly to be a
typographical error since the court addresses the claim for trademark infringement at length later
26  in the opinion and dismisses that claim because there was no evidence of an enforceable word
mark.  *Compare* *4-6 *with* *10-13.
27

28  [7] This decision has been appealed to the Sixth Circuit Court of Appeals by Ohio State.



1  conclusory," and it also chose to disregard Redbubble's use of Ohio State's marks on the

2  Redbubble website because it found that Redbubble did not place those marks there.  *Id.* at *6.

3  These distinctions do not hold up here.

4      First, LTTB has provided undisputed evidence and admissions—not just conclusory

5  allegations—that Redbubble has advertised products bearing counterfeit copies of the LTTB Mark

6  on sites such Google and other sponsored internet advertising.  Gorski Decl. ¶¶18, 20-22 & Ex. 6.

7  Redbubble has admitted that it places ads such as these, these ads are not directed by third parties,

8  and Redbubble places these ads to drive traffic to its website and increase sales of the products

9  offered there.  Faucette Decl. Ex. 1 at 26:25-27:20 & 173:8-25.  Thus, Redbubble is *directly* liable

10  for the counterfeiting and infringement in its advertisements.

11      Second, the distinction drawn by the *Ohio State* court regarding the use of marks on

12  Redbubble's website does not withstand scrutiny.  Multiple cases have held that use of a mark on

13  a website constitutes a "use in commerce for goods" when the use indicates that the mark is

14  associated with the goods.  *See, e.g.*, *Marketquest Group, Inc. v. BIC Corporation*, 316 F. Supp.

15  3d 1234, 1287-88 (S.D. Cal. 2018) (citing *In re Sones*, 590 F.3d 1282, 1288 (Fed. Cir. 2009) and

16  other authorities).  This is particularly the case where the website provides the ability for the

17  consumer to order the goods from the same page where the trademark is displayed.  *Id.* at 1288.

18  Here, the evidence demonstrates that the LTTB Mark appeared on the www.redbubble.com

19  website in connection with the offer to sell goods that also bore counterfeit copies of the LTTB

20  Mark.  Gorski Decl. Ex. 6.  This is a use in commerce under the Lanham Act, and a direct use by

21  Redbubble regardless of whether a third party uploaded the information to Redbubble's website.

22      Finally, in addition to the use of counterfeit copies of the LTTB Mark on the goods

23  discussed above, Redbubble has also used LTTB's federally-registered and incontestable *service*

24  mark in connection with the sale, offering for sale, distribution and advertising of counterfeit

25  goods.  This is a separate ground for granting LTTB's summary judgment motion on its

26  counterfeiting claim.  There is no distinction in this regard between a service mark and a

27  trademark.  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 192 n.1 (1985); *see*

28

1    *also Rexel, Inc. v. Rexel Int'l Trading Corp.*, 540 F. Supp. 2d 1154, 1162-63 (C.D. Cal. 2008).

2         LTTB's ownership of a valid service mark is not subject to dispute.  LTTB owns an

3    incontestable United States federal service mark registration for the LTTB Mark:  Registration

4    Number 4,454,801 for use of the mark LETTUCE TURNIP THE BEET in connection with on-

5    line retail store services featuring clothing, accessories and art.  Gorski Decl. ¶5, Ex. 2.  The

6    Lanham Act does not limit counterfeiting claims to trademarks covering goods; these protections

7    also extend to service marks such as the one owned by LTTB.  *See Laukus v. Rio Brands, Inc.*,

8    391 Fed. Appx. 416, 425 (6th Cir. 2010); *Williams-Sonoma, Inc. v. Amazon.com, Inc.*, No. 18-cv-

9    07548-EDL, 4-6 (N.D. Cal. May 2, 2019) (submitted as Faucette Decl. Ex. 4).  It is undisputed

10   that Redbubble has provided the service of allowing the design of infringing apparel and then

11   offering those items for sale on Redbubble's website using the LTTB Mark in URLs, meta tags,

12   product descriptions and on the website itself.  Gorski Decl. ¶20 & Ex. 6.  This is direct

13   counterfeiting of LTTB's service mark registration and an additional ground for granting LTTB's

14   motion for summary judgment on its counterfeiting claim.

15   **II.    SUMMARY JUDGMENT SHOULD BE GRANTED IN LTTB'S FAVOR ON ITS**
16   **        TRADEMARK INFRINGEMENT CLAIM**

17       **A.    There Is No Genuine Issue Of Material Fact Regarding The Essential**
18       **       Elements Of Trademark Infringement**

19         To state a cause of action for trademark infringement under the Lanham Act, a plaintiff

20   "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the

21   defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC v. Rearden*

22   *Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (quoting *Network Automation, Inc. v.*

23   *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011)).  As noted above, registration

24   of a mark on the principal register is "prima facie evidence ... of the registrant's ownership of the

25   mark, and of the registrant's exclusive right to use the registered mark in commerce," (15 U.S.C. §

26   1115(a); *also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014)), and the

27   incontestability of LTTB's trademark registrations provides conclusive evidence of the existence

28

SKAGGS
FAUCETTE LLP

1  and validity of LTTB's rights in the LTTB Mark.  15 U.S.C. §1115(b).

2        In analyzing whether there is a likelihood of confusion between the two marks at issue,

3  courts in the Ninth Circuit typically consider eight factors, known as the "*Sleekcraft* factors."

4  *Rearden LLC*, 683 F.3d at 1209.  These eight factors are: (1) strength of the mark; (2) proximity of

5  the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels

6  used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7)

7  defendant's intent in selecting the mark; and (8) likelihood of expansion of the product

8  lines.  *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated in*

9  *part by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)).  In cases such as

10 this one, "[w]hen the goods produced by the alleged infringer compete for sales with those of

11 the trademark owner, infringement usually will be found if the marks are sufficiently similar that

12 confusion can be expected."  *Sleekcraft*, 599 F.2d at 348.

13       Here, if the Court were to undertake the normal analysis of the relevant *Sleekcraft* factors

14 then it would find that summary judgment in LTTB's favor is warranted.  The LTTB Mark is

15 fanciful and inherently strong when applied to apparel, tote bags, paper goods and online

16 storefront services.  The words "lettuce turnip the beet" have nothing to do with these goods and

17 services.  Moreover, the mark is subject to two incontestable registrations and has been used in

18 commerce continuously for over seven years by LTTB.  Gorski Decl. ¶¶5-16 & Exs. 1 & 2.  LTTB

19 has made over 35,000 sales of goods under the mark, LTTB's storefront on Etsy has a following

20 of over 10,000 users, and LTTB has received a five-star rating based on over 5,000 positive

21 reviews from customers.  *Id.* ¶10.

22       The proximity of the goods and similarity of the marketing channels is clear and obvious—

23 both are available exclusively on the internet, and the undisputed evidence shows them appearing

24 side-by-side in search results and online advertising.  Gorski Decl. ¶¶20-22 & Exs. 6 & 7.  The

25 similarity of the marks is also clear, particularly since the majority of the goods in question bear

26 counterfeit copies of the LTTB Mark.  These types of goods and the prices at which they are

27 offered do not require significant care from consumers.

28

SKAGGS
FAUCETTE LLP

Moreover, the normal *Sleekcraft* analysis is unnecessary here because at bottom, it is undisputed that Redbubble has on nearly every occasion eventually removed the offending products from its online storefront.  Redbubble has not responded to LTTB's takedown notices with the claim that these goods are non-infringing or that it should be allowed to continue to sell them.  Thus, this case is not really about the *Sleekcraft* factors and the usual likelihood of confusion analysis.  If the goods in question were not likely to cause confusion, then Redbubble would not have taken them down.  This case is really about Redbubble being held directly liable for creating a system where such rampant infringement can occur and being required to compensate LTTB for the harm it has caused as discussed below.  Summary judgment should be granted in LTTB's favor on the claim for trademark infringement.

**B.      Redbubble's Affirmative Defense Of Aesthetic Functionality Should Be Rejected**

Redbubble argues in its motion for summary judgment that LTTB cannot prevail in its trademark infringement claim under the doctrine of aesthetic functionality.  Redbubble MPA [Dkt 36] at 20-22.  Aesthetic functionality is an affirmative defense to trademark infringement that allows a defendant to show that its allegedly infringing use copied only a "functional" feature of a product rather than a source-identifying feature.  *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006).  Here, however, Redbubble has attempted to argue that this doctrine is somehow relevant to whether or not LTTB has trademark rights in the LTTB Mark.  As noted above, LTTB's two incontestable federal trademark registrations provide conclusive evidence of the validity of LTTB's marks for use with the goods and services in the registrations.  Thus, the aesthetic functionality doctrine applies only to the issue of whether Redbubble has an affirmative defense for one or more of the infringing items it offered for sale.  The answer to that question is no.

In *Au-Tomotive Gold*, the Ninth Circuit set out a two-part test for aesthetic functionality: (1) whether the alleged "significant non-trademark function" of the mark "[is] essential to the use or purpose of the article," and (2) whether "protection of the feature as a trademark would impose

SKAGGS
FAUCETTE LLP

a significant non-reputation-related competitive disadvantage." *Id.* Thus, aesthetic functionality is "limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function." *Id.* at 1073.

Redbubble relies on *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067 (C.D. 2012), in support of its defense. In *Fleischer*, the court held that the defendant's use of the BETTY BOOP word mark on t-shirts and other goods was aesthetically functional in the context of goods that reproduced images of movie posters with the text "Adolph Zukor presents BETTY BOOP with HENRY the Funniest Living American." *Id.* at 1075. There, the plaintiff claimed no rights to the movie poster images or the other contents of the goods, just the word mark BETTY BOOP. In this context, the court held that the words "Betty Boop" were functional because removing them "from these items would render the textual aspect of the poster reproductions incomplete and the remaining words would be nonsensical." *Id.* Thus, the court held that this particular use was aesthetically functional and not a trademark use.

Here, by contrast, the goods in question use the LTTB word mark accompanied in some instances by artwork, mostly depicting lettuce, turnip(s), and beet(s). Gorski Decl. Ex. 6 at 13, 14, 17, 26, 38, 53, 60, 61-64 & 69.[8] On these goods, the word mark LETTUCE TURNIP THE BEET and substantially similar phrases are not functional. The words could be removed without making the goods incomplete or nonsensical (and LTTB makes no claims as to goods bearing simply artwork of the vegetables with no reference to or use of the word mark).[9] There is no significant non-trademark aspect to the use of the mark on these goods, and protecting the LTTB Mark does not impose any competitive disadvantage on Redbubble or its users. Thus, the aesthetic functionality doctrine does not apply to the goods offered for sale by Redbubble, and this defense

---

[8] As discussed above, articles bearing counterfeit copies of the LTTB Mark are subject to LTTB's counterfeiting claim. LTTB's infringement claim covers articles that infringe the LTTB Mark but do not use a counterfeit copy of it.

[9] Hypothetically, these same goods with these same images and the words "let us turn up the beat" or "let's turn up the beat" would present a different issue of functionality and source-identification, and LTTB would be unlikely to assert its mark against such goods absent some other indicia of consumer confusion.


SKAGGS FAUCETTE LLP

1   provides no basis for the Court to deny LTTB's motion for summary judgment.

2   **III.    SUMMARY JUDGMENT SHOULD BE GRANTED IN LTTB'S FAVOR ON ITS
3             CLAIM FOR CONTRIBUTORY INFRINGEMENT AND/OR COUNTERFEITING**

4           In addition to LTTB's claims for direct counterfeiting and direct infringement, LTTB has

5   also asserted a claim against Redbubble for contributory infringement and/or counterfeiting.  The

6   underlying issues of LTTB's trademark rights and the infringing and/or counterfeit uses of the

7   LTTB Mark are set out above.  As an additional element, LTTB's claim for contributory

8   infringement and/or counterfeiting requires that LTTB show that Redbubble continued to supply

9   its services to third parties who Redbubble "knew or had reason to know" were engaging in

10  trademark infringement or counterfeiting.  *See Louis Vuitton Malletier, S.A.,* 658 F.3d at 942

11  (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982)).  Since Redbubble is

12  providing services rather than a product, LTTB must establish that Redbubble "had '[d]irect

13  control and monitoring of the instrumentality used by a third party to infringe'" the LTTB Mark.

14  *Id.* (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).

15  As the Ninth Circuit expressly held in *Louis Vuitton*, however, "*intent is not required*" so long as

16  Redbubble "provided their services with actual or constructive knowledge that the users of their

17  services were engaging in trademark infringement."  *Id.* at 943 (emphasis added).

18          Redbubble has argued that it cannot be liable for contributory infringement so long as it

19  removes infringing listings after receiving notice of their existence from a rights holder such as

20  LTTB.  Redbubble MPA [Dkt 36] at 18 (citing *Tiffany (NJ)) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d

21  Cir. 2010)).  Redbubble states that "[t]here is no evidence that Redbubble ever knew of an

22  infringing listing and failed to promptly act to remove it."  *Id.* at 19.  This argument fails because

23  it both misstates the law and misstates the record in this case.  As noted above, liability for

24  contributory infringement can exist without Redbubble having "actual knowledge" so long as

25  Redbubble had *a reason to know* of the infringement.  Here, Redbubble's own evidence

26  demonstrates that Redbubble has the ability to know of the contents of product listings in real time

27  as those contents are uploaded to Redbubble's website.  Declaration of Anuj Luthra ("Luthra

28

SKAGGS
FAUCETTE LLP

Decl.") [Dkt 41] ¶¶9, 15; Toy Decl. ¶¶12 & 16.  But the existence of product listings using the phrase "lettuce turnip the beet" on the Redbubble site demonstrates that Redbubble has either chosen not to review these contents prior to offering these product listings for sale on Redbubble's website or it has ignored their contents.  Moreover, the undisputed evidence shows that Redbubble allows infringing and counterfeit products to be sold (and collects its share of the revenues from these sales) even after it has actual knowledge of such listings.  Faucette Decl. Ex. 1 at 133:15-136:25; Gorski Decl. ¶¶24-25.

In *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013), the Tenth Circuit examined the *Tiffany* decision and the related case *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) and compared those decisions to flea market cases such as *Coach, Inc. v. Goodfellow*, 717 F.3d 498 (6th Cir. 2013).  The court acknowledged that the "obvious rationale" behind *Tiffany* and *Rosetta Stone* was to require that the defendant know the identity of the infringer before imposing liability for contributory infringement.  *Id*. at 1254 (noting that "otherwise the defendant could not halt the infringement without also stopping perfectly proper conduct—throwing the baby out with the bath water, so to speak").  But the court then posed the question, "what if . . . the defendant need not know the identity of the infringer to stop the allegedly infringing practice without affecting legitimate conduct?"  *Id.*  As the court noted, "modern technology" could assist the defendant in preventing the infringement in the first place without waiting for the rights holder to identify the perpetrator.  *Id.*  Under such circumstances (and those circumstances existed in the *1-800 Contacts* case), the court held that knowledge of the identity of a particular offender or offense would *not* be required to impose contributory liability.  *Id.*

The same situation applies here.  Redbubble has averred that it can review the written contents of user listings prior to Redbubble offering those listings for sale.  But yet, Redbubble apparently does not or certainly has not at all times exercised this ability.  Instead, Redbubble has allowed user uploaded listings to be offered for sale on Redbubble's website despite those listings

1   containing infringing uses of the LTTB Mark.[10]  Post-offer, Redbubble has responded to takedown

2   notices, and, in some instances, it has proactively removed listings (but only after those listings

3   were on its site long enough for LTTB to document their existence and order test samples).

4   Gorski Decl. ¶20 & Ex. 6.  Thus, it is undisputed that Redbubble has offered infringing and/or

5   counterfeit listings for sale on its website.  Under these circumstances and the relevant caselaw,

6   Redbubble is liable for contributory infringement and/or counterfeiting.  As another district court

7   stated in examining trademark claims against an on-demand printer, "[s]elling knockoffs is selling

8   knockoffs, regardless of who suggested you sell them, regardless of how many other infringing

9   products you decide not to sell, and regardless of how much of a hassle it is to comply with the

10  law."  *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 917 (S.D. Ohio 2014).

11          There are other key distinctions between the instant case and the facts present in the

12  *Tiffany v. eBay* case.  First, eBay faced significant limitations in its ability to determine whether

13  items offered for sale on its website were counterfeit since it could not inspect the items and even

14  if it could have done so, it still might not have been able to determine if they were counterfeit.

15  *Tiffany*, 600 F.3d at 98.  Here, however, Redbubble faces no such difficulties.  Redbubble knows

16  that if a listing offers to sell a product bearing a copy of the LTTB Mark then that listing is for a

17  counterfeit and/or infringing product.  For almost all of the listings in question, Redbubble has all

18  of the information it needs when the user finishes uploading the listing.  Second, the court in

19  *Tiffany* noted that trademark law permitted eBay to use Tiffany's trademarks "to describe

20  accurately the genuine Tiffany goods offered for sale on its website."  *Id.* at 103.  Here again,

21  Redbubble does not share this characteristic.  There are no genuine LTTB goods offered for resale

22  on Redbubble's website, and Redbubble knows this to be the case.  There is no permissible reason

23  for Redbubble to use the LTTB Mark on its website.  Both of these additional distinctions mean

24  that Redbubble should not be able to take refuge in the *Tiffany* holding because this factual

25  situation is materially different from that of eBay.  *Compare H-D U.S.A., LLC*, 311 F. Supp. 3d at

26

27  _____

[10] And Redbubble has allowed tens of thousands of infringing listings using more than 30 famous trademarks to exist on its website.  Gorski Decl. ¶¶32-35.

28



LTTB'S MOTION FOR SUMMARY JUDGMENT:                                CASE NO. 3:18-cv-509-RS

1039-40 (discussing the on-demand printer defendant's "head-in-the-sand approach to infringement"); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996) (holding that contributory trademark infringement can exist where the defendant "is supplying the necessary marketplace" for the sale of infringing goods); *Coach, Inc. v. Sapatis*, 994 F. Supp. 2d 192, 199 (D.N.H. 2014) (noting that the relevant inquiry is "whether the defendant had sufficient control over the individuals directly engaging in . . . infringement").[11]   Summary judgment should be granted in LTTB's favor on its claim for contributory infringement and/or counterfeiting.

## IV.   STATUTORY DAMAGES SHOULD BE IMPOSED ON REDBUBBLE

A trademark owner may elect to recover statutory damages, rather than actual damages and profits, for the use of a counterfeit mark in connection with goods or services "sold, offered for sale, or distributed." 15 U.S.C. § 1117(c).  Statutory damages statutory are not based on the profits earned by the defendant nor on the trademark owner's lost profits.  *See Versace v. Awada*, No. CV033254, 2010 WL 11515467, at *4 (C.D. Cal. Aug. 2, 2010) (rejecting the defendant's argument that "the purported variance between the damage award and various profit figures from [plaintiff] and [defendant]" should affect the award of statutory damages because such "variance" has "no bearing on the validity of the award").  Indeed, statutory damages are the appropriate remedy where the plaintiff's actual damages caused by the defendant's infringement are difficult to prove, nominal, or even nonexistent.  *See Under Armour, Inc. v. 51nfljersey.com*, 13-62809-CIV, 2014 WL 1652044, at *7 (S.D. Fla. Apr. 23, 2014) ("An award of statutory damages is appropriate despite a plaintiff's inability to provide actual damages caused by a defendant's infringement."); *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 852 (E.D. Mich. 2006) ("[A]

---

[11] The *Fonovisa* and *Coach* cases examined contributory liability for trademark counterfeiting in the context of flea markets, but whether the marketplace is physical or virtual, the key issues are the scope of the infringing activity and the degree of control exercised by the marketplace owner. *E.g.*, 994 F. Supp. 2d at 199-200 (examining cases).  Here, the record reveals that counterfeiting on Redbubble's site is rampant and that Redbubble has the tools necessary to prevent listings containing counterfeit word marks from ever being published rather than imposing the burden on brand owners to provide *seriatim* notices for takedown.



1   successful plaintiff in a trademark infringement case is entitled to recover enhanced statutory

2   damages even where its actual damages are nominal or non-existent.").  Statutory damages are

3   available for both direct and contributory infringement and/or counterfeiting.  *Louis Vuitton*

4   *Malletier*, 658 F.3d at 944-45 (noting that "holding a defendant liable for the unauthorized acts of

5   another is a primary purpose of the doctrine of contributory trademark liability").

6          Under section 1117(c)(1), the Court may award statutory damages of "not less than $1,000

7   or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or

8   distributed . . . ."  The statute does not provide further guidelines for the Court to use in

9   determining an appropriate award, and the Court's discretion is limited only by what the Court

10  "considers just."  15 U.S.C. §1117(c)(1).  Some courts have found guidance in the case law of the

11  analogous provision in the Copyright Act, 17 U.S.C. §504(c) and have considered factors such as

12  (1) expenses saved and profits earned; (2) revenues lost by the plaintiff; (3) the value of the

13  copyright; (4) the deterrent effect on others besides the defendant; (5) innocent or willful conduct

14  by the defendant; (6) cooperation by the defendant; and (7) the potential for discouraging the

15  defendant.  *E.g.*, *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 437 (S.D.N.Y.

16  2012) (citing cases).  Moreover, if the Court finds that Redbubble's use was willful, then the Court

17  may award statutory damages of "not more than $2,000,000 per counterfeit mark per type of

18  goods or services sold, offered for sale, or distributed . . . ."  15 U.S.C. §1117(c)(2).

19          On the issue of willfulness, Redbubble has argued that its infringement and counterfeiting

20  of the LTTB Mark cannot be deemed willful because it was "entitled to and did in fact reasonably

21  rely on representations made by its users that they had the right to use the designs at issue."

22  Redbubble MPA [Dkt 36] at 24.[12]  This argument ignores two undisputed facts:  (1) Redbubble

---

[12] The cases cited by Redbubble in this regard are inapposite.  In *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221 (9th Cir. 2012), the defendant had a reasonable basis for believing it had a license to use the work—Redbubble has no basis for such a belief here given LTTB's repeated cease and desist and takedown communications.  In *Greg Young Publishing, Inc. v. Zazzle, Inc.*, No. 2:16—CV-04587-SVW-KS, 2017 WL 5004719 (C.D. Cal. Oct. 27, 2017), the defendant did not have the means to determine pre-publication if a listing violated the plaintiff's copyright whereas Redbubble has admitted that it can determine in real time if a user has uploaded a listing containing the LTTB word mark.  *Id.* at *4.



knows and has known since 2013 that its users do not have the right to use the LTTB Mark, and (2) Redbubble has the ability to identify user listings containing the LTTB word mark before those listings are offered for sale on Redbubble's website.  As other courts examining infringement by on-demand printers have held, "'willful blindness is knowledge enough.'"  *H-D U.S.A., LLC*, 311 F. Supp. 3d at 1045 (quoting *Louis Vuitton S.A. v. Gucci Shops, Inc.*, 875 F.2d 584, 590 (7th Cir. 1989)).[13]  Thus, regardless of what Redbubble's users may have represented to Redbubble, Redbubble is still guilty of *willful* infringement and/or counterfeiting for each listing offered for sale by Redbubble and containing the LTTB work mark in one or more of the listing fields.

Here, LTTB has identified the following three types of goods sold by Redbubble with counterfeit marks (all of which are among the goods covered by LTTB's incontestable registrations):  shirts, tote bags, and paper goods.  Gorski Decl. Exs. 6 & 7.  Thus, the Court may award statutory damages of up to $600,000 or up to $6,000,000 if the Court finds Redbubble's actions were willful.  LTTB has provided evidence of the harm its brand has suffered as the result of the availability of counterfeit items on Redbubble's website.  *Id.* ¶¶36-37.  The record also reflects that Redbubble's website offers a myriad of counterfeit goods for sale and that Redbubble's policing efforts have been grossly inadequate.  *Id.* ¶¶32-35.  Redbubble had gross profits in 2018 of more than AU$63,000,000.  Faucette Decl. Ex. 5 at 4.  For all of these reasons, a significant statutory damage award is necessary to impose any sort of deterrent effect on Redbubble and to compensate LTTB adequately.  *See Louis Vuitton Malletier, S.A.*, 658 F.3d at 947 (affirming award of $10,500,000 in statutory damages for contributory trademark infringement); *H-D U.S.A., LLC*, 311 F. Supp. 3d at 1049 (awarding statutory damages of $300,000 per mark per type of good for a total of $19,200,000); *Tommy Bahama Group, Inc. v. Sexton*, No. C 07-06360-EDL, 2009 WL 4673863, *12 (N.D. Cal. Dec. 3, 2009) (granting summary judgment and awarding statutory damages of $10,000 for the sale of merely five shirts bearing two counterfeit trademarks).[14]

---

[13] Just as in the *SunFrog* case, Redbubble has failed to keep infringing listings off its site even while this case is pending.  Gorski Decl. ¶20 & Ex. 6 at 53-75.

[14] Redbubble has argued in its motion that LTTB may not recover Redbubble's profits, but LTTB



In the event the Court does not award statutory damages, actual damages should be awarded in the amount of $200,000.  Gorski Decl. ¶¶36-38.  Under 15 U.S.C. section 1117(a), "[d]amages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).  LTTB has provided evidence of the time spent by LTTB combating Redbubble's pervasive and repeated counterfeiting and infringement, as well as LTTB's estimates of the losses it has incurred from Redbubble's offers to sell, advertising, and sales of counterfeit and infringing goods based on both sales that LTTB lost as well as significant declines in LTTB's annual revenues from the sales of goods under the LTTB Mark.  Gorski Decl. ¶¶36-38.

## CONCLUSION

For all of the foregoing reasons, LTTB's Motion for Summary Judgment should be granted; the Court should order a significant statutory damage award in LTTB's favor, or, in the alternative, an award of $200,000 in actual damages; and Redbubble's Motion for Summary Judgment should be denied.

Dated: May 13, 2019               SKAGGS FAUCETTE LLP

                                  By: _____/s/_____
                                            Jeffrey E. Faucette
                                  Attorneys for Plaintiff LTTB LLC

---

is not seeking disgorgement of Redbubble's profits from the sales of infringing and/or counterfeit products so this issue is moot.  This form of recovery would not adequately compensate LTTB for the harm it has incurred, nor would they provide Redbubble with any incentive to change its behavior.  Redbubble also argues that the statute of limitations bars some portion of LTTB's recovery.  This issue is moot as it is undisputed that Redbubble has committed counterfeiting, infringement, and/or contributory acts for each of the four years prior to the filing of this lawsuit and has continued to do so after the filing.



LTTB'S MOTION FOR SUMMARY JUDGMENT:                    CASE NO. 3:18-cv-509-RS