JEFFREY E. FAUCETTE (No. 193066)
SKAGGS FAUCETTE LLP
One Embarcadero Center, Suite 500
San Francisco, California 94111
Telephone: (415) 315-1669
Facsimile:  (415) 433-5994
E-mail: jeff@skaggsfaucette.com

Attorneys for Plaintiff LTTB LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LTTB LLC, a California limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>REDBUBBLE, INC., a Delaware corporation,<br><br>    Defendant. | Case No.: 3:18-cv-509-RS<br><br>**DECLARATION OF ELEKTRA PRINTZ GORSKI IN SUPPORT OF PLAINTIFF LTTB LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT REDBUBBLE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date Action Filed: January 23, 2018<br><br>Hearing:    June 13, 2019<br>Time:         1:30 p.m.<br>Place:        Courtroom 3, 17th Floor<br>Judge:       Hon. Richard Seeborg |

I, Elektra Printz Gorski, declare as follows:

1. I am the sole owner and managing member of Plaintiff LTTB, LLC ("LTTB") in the above-captioned action. I make this declaration in support of Plaintiff LTTB, LLC's Motion for Summary Judgment and in opposition to Defendant Redbubble, Inc.'s Motion for Summary Judgment. Unless otherwise stated, I have personal knowledge of the facts stated in this declaration. If called upon to do so, I could and would competently testify to the facts stated herein.

2. I graduated from the Fashion Institute of Technology ("FIT") in New York in 2007, and I won Critic's Award as one of the most promising designers in my class. I also took advanced silkscreen classes at FIT and the School of Visual Arts (SVA) from 2006 to 2013. I am a designer and artist and am widely considered a master printer among my industry peers who have printed for Andy Warhol and Robert Rauschenberg. I also serve now as a Critic for FIT.

3. Prior to attending FIT, I was a Peace Corps volunteer in rural West Africa and a winner of a Rotary World Peace Fellowship during which I completed a graduate degree in Japan.

4. In 2011, I created the LETTUCE TURNIP THE BEET trademark and my first apparel and product designs using the mark as both a source identifier and as a graphic design element.

5. LTTB is the current owner of four United States federal trademark registrations for the mark LETTUCE TURNIP THE BEET (collectively, the "LTTB Mark"): Registration Number 4,297,108 for the word mark LETTUCE TURNIP THE BEET for the following goods and services: "Paper for wrapping and packaging"; "tote bags"; and "Wearable garments and clothing, namely, shirts." Registration Number 4,454,801 for the word mark LETTUCE TURNIP THE BEET for the following goods and services: "On-line retail store services featuring clothing, accessories and art." Registration Number 5,064,226 for the design mark LETTUCE TURNIP THE BEET for the following goods and services: "Tote bags"; and "Aprons; Headwear; Infant wear; Shirts for infants, babies, toddlers and children; Wearable garments and clothing, namely, shirts." Registration Number 5,064,227 for the design mark LETTUCE TURNIP THE BEET for

DECLARATION OF ELEKTRA PRINTZ GORSKI:   CASE NO. 3:18-cv-509-RS

the following goods and services: "Tote bags"; and "Aprons; Headwear; Infant wear; Shirts for infants, babies, toddlers and children; Wearable garments and clothing, namely, shirts."

6. True and correct copies of printouts from the USPTO online database reflecting these registrations are attached hereto as Exhibits 1-4.

7. Registration Nos. 4,297,108 and 4,454,801 are incontestable due to five or more years of consecutive use from the date of registration and the submission to the USPTO of declarations of continued use under section 8 and declarations of incontestability under section 15.

8. Prior to the formation of LTTB, I was a sole proprietor and operator of a business that used the trademark the LTTB Mark in connection with the marketing, sales and distribution of various goods and services. After LTTB was formed, I assigned to LTTB all right, title and interest, along with all goodwill, in the LTTB Mark. Since that time, LTTB has continued to operate the business I founded using the LTTB Mark in connection with the marketing, sales and distribution of various goods and services.

9. Since 2011, LTTB has offered for sale, sold, manufactured, advertised and distributed many different goods bearing the LTTB Mark, including apparel, tote bags, art, and paper goods. These goods have been offered for sale on LTTB's online storefront on Etsy.com since 2011. The current URL for the online storefront is www.etsy.com/shop/lttb or www.lttb.etsy.com. LTTB also owns various related domain names for the brand since 2011, including lettuceturnipthebeet.net, that automatically refresh into the main storefront on Etsy.com. A true and correct copy of a printout of this online storefront as well as photographs of examples of LTTB's goods sold under the LTTB Mark are attached hereto as Exhibit 5.

10. The LTTB shop on Etsy is currently the "favorite" shop of over 10,000 Etsy users and has a perfect five-star review rating based on favorable reviews from over 5,000 users. LTTB has made more than 35,000 sales through the Etsy online storefront and earned revenues in excess of $950,000. All of the sales and reviews since 2011 were made under the LETTUCE TURNIP THE BEET brand and mark.

11. LTTB's goods have been well and favorably known by consumers, including many

well-known celebrities who have worn LTTB-branded apparel in public and during various television appearances.

12. LTTB has expended substantial time, effort and money in developing a brand image based on the LTTB Mark, including distributing goods to influential celebrities and the media for exposure, providing regular financial and product donations to charitable causes, and obtaining global trademark registrations to protect the brand in market channels where LTTB operates (UK, EU, Australia, New Zealand, Philippines, India, Canada).

13. The LTTB Mark and brand have been very popular among consumers associated with the food, music, athletic, tech, and art industries.

14. Some examples of prominent celebrities wearing LTTB branded merchandise include the following: Singer-songwriter Jason Mraz wearing a t-shirt with the LTTB Mark on it while performing live. Madonna posted a photo on her Facebook page showing her choreographer, Rich Talauega, wearing a tank top with the LTTB Mark on it while rehearsing for the 2012 Super Bowl half-time show. Madison Hildebrand wore a t-shirt with the LTTB Mark on it during an episode of a television series on the Bravo channel in 2013. Carole Radziwill wore a tank top with the LTTB Mark on it during an episode of *Real Housewives of New York* on the Bravo channel in 2015.

15. LTTB branded goods have also received significant mention in various publications. In 2013, *Pregnancy and Newborn* magazine featured an infant bodysuit with the LTTB Mark on it as a recommended product of the Executive Editor. Pinterest's 2013 Holiday Gift Guide featured LTTB branded goods as a top product. *DJ Mag* featured LTTB branded shirts as a recommended product in 2015.

16. LTTB has undertaken significant efforts to protect and enforce its trademark rights in the LTTB Mark. Since 2011, LTTB provided notice that the LETTUCE TURNIP THE BEET design, photos, and text in the online store are copyright protected by using the © or by providing written notification in every online listing, on the main landing page for the online store, and in the digital receipt sent to buyers. Between the fall of 2011 until early March 2013, LTTB provided

notice that the LETTUCE TURNIP THE BEET Mark was a trademark use by displaying LETTUCE TURNIP THE BEET™ in each online product listing, and/or by providing other written notice that the LETTUCE TURNIP THE BEET Mark is trademark and copyright protected.  Since March 2013 after receipt of the USPTO registration, LTTB has provided notice that the LETTUCE TURNIP THE BEET Mark is federally-registered by displaying the letter R enclosed within a circle, thus ®, and/or by providing other written notice that the LETTUCE TURNIP THE BEET Mark is federally-registered.  LTTB or its predecessor has also pursued multiple lawsuits to protect and enforce its rights, including two lawsuits filed in Northern District of California against retailer Gymboree and on-demand printer Teespring.  LTTB's predecessor has also taken action in other jurisdictions against Whole Foods Market and The Cotton On Group for infringement of its trademark rights.  All of these prior actions have been resolved on a confidential basis.

17. On May 17, 2013, I was led to Redbubble's website after seeing their counterfeit t-shirt pull up first in Google search results for the LTTB brand.  I immediately discovered five additional counterfeit t-shirt designs being offered at www.redbubble.com.  From that time to the present, I have regularly reviewed the website at www.redbubble.com to look for products offered under infringing and/or counterfeit copies of the LTTB Mark.  Over that time, I have made it a practice of recording the existence of such products by capturing "screenshots" of pages from the www.redbubble.com website displaying products bearing infringing and/or counterfeit copies of the LTTB Mark.  I have maintained copies of these hundreds of screenshots in the ordinary course of business.

18. As part of this practice, I have also captured screenshots of online advertisements by Redbubble for goods bearing infringing and/or counterfeit copies of the LTTB Mark.  I have maintained copies of these screenshots in the ordinary course of business.

19. In this lawsuit, Redbubble produced in discovery a document that purported to show all works Redbubble had discovered on its site that were "moderated," i.e. removed, by Redbubble from January 1, 2013 to February 22, 2019.  I am informed and believe that this

document was produced by Redbubble from information it maintains in the ordinary course of its business. This document was marked as Exhibit 16 in the Deposition of Redbubble's designee James Toy.

20. I have reviewed Exhibit 16 and compared its contents to the records LTTB maintains regarding infringing and/or counterfeit copies of the LTTB Mark on www.redbubble.com. I have created a document that contains 45 of the works identified by Redbubble on Exhibit 16. In addition to these 45 works, there are five works that I found on www.redbubble.com at various times that were not included in Redbubble's exhibit despite the fact that each of them contains an infringing and/or counterfeit copy of the LTTB Mark. I have also recently found a listing on Redbubble for goods bearing infringing and/or counterfeit copies of the LTTB Mark that appeared after the date Exhibit 16 was prepared by Redbubble. For each of this total of 51 infringing and/or counterfeit works, I have added the information from my files regarding the work. This information includes screenshots that I took on the dates indicated in the document from www.redbubble.com which show how the product listing appeared on the Redbubble online storefront. In some instances, my records also contained contemporaneous information I found regarding Redbubble's promotion of various of these items through advertising placed on Google and/or other internet advertising platforms. As part of my enforcement efforts, I, or individuals acting under my direction, also made test purchases of many of the infringing and/or counterfeit items offered for sale by Redbubble from 2016 onward to document more exhaustively the ongoing infringement. For each of these test purchases, I have taken photographs of the goods received from Redbubble, the packaging for the goods, and the documentation that arrived with the goods. All of this information—the work_id and other information from the Redbubble document (where applicable); my screenshots of the product listing on Redbubble's online storefront; my screenshots of online ads placed by Redbubble (where applicable); and my photographs of goods, packaging, and documentation received from Redbubble (where applicable)—is collected in the document attached hereto as Exhibit 6. This exhibit is a true and correct compilation of information from Redbubble's exhibit and information

from LTTB's business records, and it contains images of all of the infringing and/or counterfeit goods at issue in this lawsuit so far as LTTB is currently aware.

21. I found the advertisements by Redbubble included in Exhibit 6 on the following dates: May 24, 2013; October 30, 2014; November 28, 2016; November 29, 2016; and July 18, 2017.

22. I have prepared an exhibit showing examples of my genuine products sold under the LTTB Mark side-by-side with some of the most egregious examples of counterfeit product sold by Redbubble. Attached hereto as Exhibit 7 is this side-by-side comparison.

23. I have also prepared a graph showing the total number of infringing works documented on Redbubble's website by Redbubble (in its exhibit) and by LTTB for each of the years 2013-2019. A true and correct copy of this graph based on documents produced by Redbubble in this lawsuit and on LTTB's business records is attached hereto as Exhibit 8.

24. In addition to monitoring Redbubble's website, I have also made it a practice of monitoring the websites of several other on-demand printers, including CafePress, Skreened, Society6, Spreadshirt, SunFrog, Teespring, Teepublic, and Zazzle. From 2013 to 2019, it has been my practice to review regularly each of these companies' websites for infringements. From 2016 onward, on each occasion when I encountered a product sold under a counterfeit copy of the LTTB Mark, I, or someone acting at my direction, has placed an order for the product. Some of these on-demand printers have cancelled one or more of these orders prior to fulfilment because they determined that the products were infringing, and I have received cancellation notices on such occasions. Attached hereto as Exhibit 9 are three such cancellation notices, two from Teespring and one from Zazzle. In my experience, Redbubble has never cancelled an order for an infringing and/or counterfeit product.

25. I have tracked the counterfeit products I have ordered and received from these on-demand printers over the period 2016-2019, and Redbubble is by far the most egregious offender. In this three-year time-frame, Redbubble has sold nearly 60% of the counterfeit products I have ordered and received (37 of 63). By comparison, Teespring, the second most prolific seller of



counterfeit products, sold only seven.[1] CafePress and the seven remaining companies combined to sell 19 in this period. I have compiled this information in various graphs, and a true and correct copy of these graphs is attached hereto as Exhibit 10.

26. In addition to monitoring these sites, documenting infringements, and purchasing product samples, I have sent multiple takedown notices and cease and desist communications to Redbubble since May 2013.

27. On May 17, 2013, I sent three takedown notices to Redbubble regarding three product listings that infringed the LTTB Mark. As I noted in my communications to Redbubble, one of these listings was appearing at the time as the first result in a search on Google for the LTTB Mark. From May 2013 to March 2019, I or my outside counsel communicated with Redbubble 25 times regarding infringing listings on Redbubble as set out in the table below:

| Date | Contents |
| --- | --- |
| 5/17/13 | Trademark infringing shirt appearing as the #1 Google search result |
| 5/17/13 | Additional links of infringing shirts |
| 5/17/13 | Additional infringing products |
| 5/23/13 | Second notice of additional infringing items including apparel, stickers and use of mark in product description fields. Required additional communications to get a response. |
| 5/24/13 | Third notice of infringing items and advertisements on Google |
| 1/14/14 | Notice re infringing items listed by user David Ayala. Required further follow-up after second infringing listing created. |
| 1/20/14 | Second notice re counterfeit items listed by user David Ayala. |
| 1/27/14 | Third infringement notice in January regarding counterfeit items. |
| 4/9/14 | Notice of infringing design on items including stickers, t-shirts and hoodies. |
| 6/9/14 | Notice of infringing design on items including stickers, t-shirts and hoodies. |
| 7/14/14 | Notice of infringing designs on five different items |

---

[1] LTTB sued Teespring in this district in 2017 for trademark infringement and counterfeiting, and that lawsuit was voluntarily dismissed in 2018.

| Date | Description |
|---|---|
| 8/6/14 | Notice of infringing designs on four different items |
| 8/7/14 | Notice of infringing designs on four different items |
| 10/30/14 | Notice of false and misleading use of metatags on product listing |
| 10/26/14 | Lengthy cease and desist notice to Redbubble of ongoing infringement and counterfeiting problems. |
| 11/10/14 | Notice of multiple infringing listings |
| 1/26/15 | Notice of multiple infringing listings |
| 2/19/15 | Notice of multiple infringing listings |
| 1/15/16 | Notice of multiple infringing listings |
| 5/4/16 | Notice of multiple infringing listings |
| 8/11/16 | Notice of ten infringing listings |
| 11/14/16 | Notice of six infringing listings |
| 12/12/16 | Notice of multiple listings using metatags in a false and misleading way |
| 12/16/16 | Five-page cease and desist letter from outside counsel |
| 1/13/17 | Notice of infringing item |
| 3/28/19 | Notice of infringing item |

28.     In particular, on December 16, 2016, LTTB's predecessor's outside counsel sent a letter to Redbubble regarding the ongoing infringement of the LTTB Mark. As part of this letter, my counsel asked, among other things, that Redbubble provide various information regarding Redbubble's prior sales of infringing goods and demanded that Redbubble cease and desist from all further infringement of the LTTB Mark. A true and correct copy of this letter is attached hereto as Exhibit 11.

29.     On January 13, 2017, James Toy, Assistant General Counsel at Redbubble, sent a response letter to my outside counsel. In this letter, Mr. Toy stated that Redbubble had no liability for the prior sales of infringing goods and that Redbubble could not prevent the listing of infringing goods in the future. Mr. Toy did not provide any of the information requested in my counsel's five-page letter. Mr. Toy did not offer to provide any additional assistance to me to

prevent future infringement on the Redbubble website.  A true and correct copy of Mr. Toy's letter is attached hereto as Exhibit 12.

30.     I have reviewed the declaration Mr. Toy submitted in support of Redbubble's motion for summary judgment in this case.  In that declaration, Mr. Toy claims repeatedly that Redbubble offered to work with me to proactively police its site for my trademark and that I and LTTB refused to work with Redbubble.  Mr. Toy attaches to his declaration documents purporting to support these statements.  At no time did I refuse to work with Redbubble.  I provided Redbubble with multiple takedown notices wherein I identified my trademark rights and the works on Redbubble that infringed those rights.

31.     When my counsel sent the letter in Exhibit 11 to Redbubble, he asked Redbubble to provide information about the infringement of my mark on the Redbubble site.  Mr. Toy's response letter (Exhibit 12) does not offer any additional proactive measures or seek any further input from me or my counsel.  Redbubble has at all times since May 2013 had the information necessary to police its site for infringements of my trademarks.

32.     In the 18 months since Mr. Toy sent this letter, more than 30 infringing product listings have appeared on Redbubble's website, each offering to print the infringing design on up to 60+ products, which means that Redbubble offered for sale an estimated 1,000 infringing products after Toy's response.  Based on this repeated and undiminished infringement, I made the decision that LTTB had to sue Redbubble in January 2018.  Until discovery was received from Redbubble in this case, no data was ever provided by Redbubble regarding its sales, distribution, profit, etc.  Discovery has now shown that prior to my outside counsel's communication to Redbubble in 2016, Redbubble had grossed thousands of dollars in sales of infringing LTTB products despite being on notice of my trademark rights since May 2013.

33.     Redbubble has been using the LTTB Mark in an identical manner to LTTB since at least as early as 2013, marketing and selling counterfeit LTTB goods on an e-commerce site focused on serving consumers.  Any consumer could easily assume Redbubble's use of the LTTB Mark has been licensed, especially given the quantity of famous brand counterfeits for sale on



Redbubble.com, which are also likely to be seen as genuine licensed goods by consumers. Unlike two of Redbubble's biggest competitors who openly promote their licensing agreements on their websites' main landing pages (Zazzle and Cafepress), Redbubble does not openly promote any licensing agreements or partnerships on their main page. As a result of my confusion over whether Redbubble licenses and the degree to which the public may be confused given what I perceive to be the highest level of ongoing counterfeiting of any on-demand printers, I decided to conduct an informal study after the close of discovery in this case.

34. Since March 1, 2019, I have spent hours reviewing the Redbubble website for products bearing the trademarks of more than 30 famous brands. I have contacted these brand owners' legal counsel in my confusion and asked if they were aware of the infringement and if these uses of their trademarks were pursuant to a license with Redbubble. Thirty famous brand owners' legal counsel have either responded to me to say that they have not licensed their marks to Redbubble, or they have had the infringing product listings removed following receipt of my letters. I have verified from my searches of the Redbubble site that, subsequent to my communications with these famous brand owners and/or their legal counsel, more than 1,000 counterfeit designs have been removed (representing over 50,000 counterfeit products) since March 1, 2019.

35. I am informed and believe that consumers assume that Redbubble has extensive licensing agreements given the tens of thousands of visible counterfeit goods being actively sold on Redbubble.com for years now. I retain hundreds of screenshots in my possession of the ongoing sale of famous brand goods on Redbubble.com since at least 2017. Some photos were provided to Redbubble during discovery, while others were taken after the close of discovery. Despite those images they received and knowing that they do not license from any of those brands, they still have not removed all of those products. In sum, I am not the only brand being harmed by Redbubble.

36. I have spent significant time and resources dealing with infringement and counterfeiting of the LTTB Mark on Redbubble's website. I have spent over 100 hours between

2013 and 2019 searching the Redbubble website for infringements, documenting infringements in screenshots, placing test product purchases, sending takedown notices and communicating with Redbubble regarding infringement. I have also spent over 100 hours organizing all of the related files and evidence I have gathered regarding Redbubble's infringement and communicating with third parties and outside counsel regarding this infringement prior to filing the lawsuit in this case. I have also spent more than 315 hours dealing with this lawsuit, including two trips to California from Maryland to attend a mediation and to attend depositions. These 515 hours of time have resulted in a loss of income of at least $51,500 had those hours been spent working on other areas of the LTTB business, such as designing, manufacturing, and distributing new products for the LTTB brand, strengthening the brand's reach into existing markets through various channels, etc.

37. Redbubble's offers for sale, internet advertising, and sales of infringing and counterfeit products has also cost LTTB a significant amount in lost sales. Even if a consumer did not ultimately purchase an infringing product from Redbubble, that consumer's diverted traffic likely led to lost income from potential sales to LTTB if the consumer had instead been directed to the real LTTB storefront and seen the 50+ genuine products LTTB offers. I estimate that 50% of all annual sales are from repeat customers and people who see the product on others, then ask them where they purchased it (i.e. referrals and social media). In the case of each sale made on Redbubble, that is potentially 10+ lost referrals had the consumer purchased genuine goods, worn them, and/or shared them on social media, referring friends, family, and followers to the real LTTB storefront instead of Redbubble. Thus, I estimate that LTTB would have sold an additional 1,000 items and generated an estimated $30,000 in additional gross revenue (i.e. average gross sale is $30 from LTTB times 1,000 sales) without Redbubble's ongoing infringement since 2013.

38. LTTB's annual revenues from sales of goods under the LTTB Mark reflect the impact of counterfeiting and infringement by Redbubble and other on-demand printers over the past several years. These annual revenues peaked in 2013 at $255,807, and then began to decline to $221,304 in 2014, $162,989 in 2015, $95,979 in 2016, $55,107 in 2017 and $35,884 in 2018. Given that Redbubble is by far the most egregious seller of counterfeit goods in this time frame, I

estimate that Redbubble is responsible for more than 60% of these declining revenues, i.e. an injury to LTTB in excess of $200,000. This is an alternative method to calculate the actual damage to my business. These figures were previously provided to Redbubble in discovery.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 13 day of May, 2019.

_____
Elektra Printz Gorski

DECLARATION OF ELEKTRA PRINTZ GORSKI:     13     CASE NO. 3:18-cv-509-RS