# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4 - - - - - - - - - - - - - - - - -

5 LTTB LLC, a California limited   )

6 liability company,            )

7          Plaintiff,      )  CASE NO.

8 vs.                     )  3:18-cv-00509-RS

9 REDBUBBLE, INC., a Delaware    )

10 corporation,               )

11         Defendant.      )

12 - - - - - - - - - - - - - - - - -

13

14

15                CONFIDENTIAL

16      30(b)(6) DEPOSITION OF REDBUBBLE, INC.

17  THROUGH ITS DESIGNATED REPRESENTATIVE, JAMES N. TOY

18           FRIDAY, MARCH 1, 2019

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23                160 SPEAR STREET, SUITE 300

24             SAN FRANCISCO, CALIFORNIA 94105

25                    (415) 597-5600

```
 1
 2
 3
 4
 5
 6
 7
 8        Confidential 30(b)(6) deposition of REDBUBBLE, INC.,
 9   THROUGH ITS DESIGNATED REPRESENTATIVE, JAMES N. TOY,
10   taken on behalf of PLAINTIFF, at One Embarcadero Center,
11   Suite 500, San Francisco, California, commencing at
12   10:15 A.M., FRIDAY, MARCH 1, 2019, before Suzanne I.
13   Andrade, Certified Shorthand Reporter No. 10682,
14   pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF:
 3        SKAGGS FAUCETTE LLP
 4        BY:  JEFFREY E. FAUCETTE, ATTORNEY AT LAW
 5        One Embarcadero Center, Suite 500
 6        San Francisco, California 94111
 7        Telephone:  (415) 315-1669
 8        Email:  jeff@skaggsfaucette.com
 9
10   FOR DEFENDANT:
11        COASTSIDE LEGAL
12        BY:  KENNETH B. WILSON, ATTORNEY AT LAW
13        455 1st Avenue
14        Half Moon Bay, California 94091
15        Telephone:  (650) 440-4211
16        Email:  ken@coastsidelegal.com
17
18   ALSO PRESENT:
19        ELEKTRA PRINZT GORSKI
20        JENNIFER GOLDBERG
21        KATE RICKERT
22
23
24
25
```

1  amount of paper we're dealing with.
2          So this is a document titled "Notice of
3  Deposition of Redbubble Inc."  If you would take a
4  moment to take a look at that and let me know when
5  you've had a chance to do so.
6     A.   (Examines document.)
7          Okay.
8     Q.   Have you seen Exhibit 15 before?
9     A.   Yes.
10    Q.   Is this one of the documents you reviewed in
11 preparation for your deposition?
12    A.   Yes.
13    Q.   And you understand that pursuant to this notice
14 of deposition, that you're here today testifying on
15 behalf of Redbubble?
16    A.   Yes.
17    Q.   And you agreed to do that on behalf of
18 Redbubble?
19    A.   Yes.
20    Q.   Before you came today for the deposition, did
21 you have the opportunity to review the five topics that
22 are listed in the notice of deposition?
23    A.   Yes.
24    Q.   Do you feel prepared to describe Redbubble's
25 testimony as to those five topics?

```
1      A.    Yes.
2      Q.    Was there any information you were looking for
3   in preparation for today that you were unable to find?
4      A.    No.
5      Q.    Was there anyone you wanted to talk to that you
6   didn't have a chance to talk to?
7      A.    No.
8      Q.    What's your educational background, Mr. Toy?
9      A.    JD, bachelor's.
10     Q.    Where did you obtain your JD degree?
11     A.    From Duke law school.
12     Q.    What year?
13     A.    2008.
14     Q.    And prior to attending Duke, where did you
15  obtain your bachelor's degree?
16     A.    University of Memphis.
17     Q.    In what year?
18     A.    2001.
19     Q.    What was your undergraduate degree in?
20     A.    Economics.
21     Q.    After you graduated from Duke in 2008, where
22  did you work?
23     A.    Simpson Thacher & Bartlett.
24     Q.    In what city?
25     A.    Palo Alto.
```

1 for purchase?

2     MR. WILSON:  Objection; lack of foundation, calls

3 for speculation.

4         You can answer.

5     THE WITNESS:  Marketing on behalf of the artists.

6 BY MR. FAUCETTE:

7     Q.   What sort of marketing?

8     MR. WILSON:  Could you read back the -- the -- not

9 this question but the question before.  I don't think

10 the answer corresponded to the question.

11     MR. FAUCETTE:  Well, I'm not sure it matters.  I

12 asked him a question.  There's a question pending.  What

13 sort of marketing does Redbubble perform on behalf of

14 its customers.

15     MR. WILSON:  Well, I'd still like to have that last

16 question and answer read back because I want to make

17 sure -- I may have missed it, but I didn't think the

18 answer corresponded to the question.

19         (Record read as follows:

20         "QUESTION:  And other than the search tool

21         Redbubble provides, is there any other way that

22         customers can locate items on the Redbubble

23         website that are available for purchase?")

24 BY MR. FAUCETTE:

25     Q.   So my question, Mr. Toy, is:  What sort of

1  marketing does Redbubble provide on behalf of artists?

2       A.   If an -- an ad you would see on Google.

3       Q.   And by that you mean an ad that would appear

4  on -- in response to a search term entered on Google?

5       A.   Yes.

6       Q.   Something commonly known as an ad word spy,

7  perhaps?

8       A.   Perhaps, yes.

9       Q.   So does Redbubble purchase advertising on

10 Google on behalf of the users in its marketplace?

11      A.   Redbubble doesn't do it.  It's an automated

12 system.

13      Q.   Other than buying ads on Google, does Redbubble

14 do anything else to market the availability of goods on

15 its marketplace?

16      A.   The -- similar ads could appear on Facebook or

17 other channels, Instagram.

18      Q.   Is that all part of the automated system you

19 described?

20      A.   Yes.

21      Q.   Does -- putting aside the purchase of ads on

22 Google, Facebook, Instagram, other social media type

23 channels, does Redbubble do any other kind of marketing

24 on behalf of the users who have uploaded products to its

25 marketplace?

1    design and which was taken down on January 14th, 2014.

2         So the question is:  Why is the entry listed

3    here on the document for the "Lettuce Turnip the Beets!"

4    item without any information about removal or takedown?

5    MR. WILSON:  I'm going to object to the prologue to

6    the question, but the question itself was fine.

7    THE WITNESS:  When it was removed from the

8    marketplace, whoever -- whatever MPI Team member did

9    that didn't input -- didn't input the information

10   correctly.

11   BY MR. FAUCETTE:

12       Q.   How do you know it was removed?

13       A.   We found it and confirmed it was removed.

14       Q.   And I believe your testimony earlier was that

15   the removal date information is automatically generated

16   by the system when a listing is removed.

17        So how is it that if this listing was, in fact,

18   removed there's no removal date stamp?

19       A.   The removal date field is also dependent upon

20   other fields at the event of removal.  So when a listing

21   or work is removed, what is put there is also dependent

22   upon how the MPI Team member inputs in the other

23   fields -- one or more of the other fields.

24       Q.   So now looking just one line above, the other

25   listing by David Ayala, the one for the Lettuce Turnip

1  the Beet shirt.

2       Do you see that one?

3    A.  Yes.

4    Q.  So that one shows that the listing was created

5  on September 13, 2013, and it was removed on January 14,

6  2014, right?

7    A.  Yes.

8    Q.  There were 90 orders for this listing, right?

9    A.  Yes.

10   Q.  There were 68 units sold?

11   A.  Yes.

12   Q.  Were any of those units that were sold in

13 process as of the time of the removal?

14   A.  I don't know.

15   Q.  If an order -- so this document reflects that

16 the removal date, again, was January 14 at -- it appears

17 to be around 2:40, and the rest of the time is cut off,

18 but around 2:40 p.m. on the 14th of January, Pacific

19 time.

20      If someone placed an order at 2:00 p.m. Pacific

21 time that day, was that order fulfilled?

22   MR. WILSON:  Objection; incomplete hypothetical,

23 calls for speculation.

24   THE WITNESS:  Yeah, I don't know.

25 BY MR. FAUCETTE:

1    Q.   Well, given the way your system works, what is

2  most likely the result if an order was placed before the

3  event was removed?  Would the order have been fulfilled?

4    MR. WILSON:  Same objections.

5    THE WITNESS:  Yes.

6  BY MR. FAUCETTE:

7    Q.   And that's consistent with how Redbubble

8  handles its marketplace?  When orders had been placed,

9  regardless of whether the listing is later deleted

10 before the order has been delivered to the customer,

11 nothing about your system stops that delivery from

12 happening?

13   A.   The system does not stop that from happening.

14   Q.   And the consumer who received the order in such

15 a situation where they have purchased something that is

16 removed before the order has been delivered, that

17 consumer never learns that the item they purchased was

18 taken off your website because it infringed someone

19 else's rights; isn't that right?

20   A.   Can you rephrase the question?

21   MR. FAUCETTE:  Can we have it read back?

22   THE WITNESS:  Oh, no.  I'm sorry.  I don't

23 understand the question.

24 BY MR. FAUCETTE:

25   Q.   What part don't you understand?

1      THE WITNESS:  Sorry.  Can you repeat the question?
2           (Record read as follows:
3           "QUESTION:  And the consumer who received the
4           order in such a situation where they have
5           purchased something that is removed before the
6           order has been delivered, that consumer never
7           learns that the item they purchased was taken
8           off your website because it infringed someone
9           else's rights; isn't that right?")
10     MR. WILSON:  Objection; calls for speculation,
11  incomplete hypothetical, and assumes facts not
12  established.
13          You can answer.
14     THE WITNESS:  To address the last part of the
15  question, it would have been -- if it's a takedown
16  notice, it would have been taken down because somebody
17  gave us a notice.
18  BY MR. FAUCETTE:
19     Q.   And in a case where you've received a takedown
20  notice that you've acted on by taking down the listing,
21  if purchases had been made from that listing that were
22  not yet delivered to customers, your testimony is the
23  delivery would go on and happen because your system
24  doesn't stop the delivery, right?
25     A.   Correct.

1      Q.   And in those instances, the person who receives

2   the delivery that purchased it from your marketplace

3   never learns that they bought something that you've now

4   removed because it infringes someone else's rights;

5   isn't that right?

6      MR. WILSON:   Same objections as I made to the last

7   version of this question.

8      THE WITNESS:   Because we removed it under our IP

9   policy pursuant to a valid takedown notice.

10  BY MR. FAUCETTE:

11     Q.   Right.

12          Your system does not include a feature whereby

13  when you take something down for violation of your IP

14  rights policy, you do not notify purchasers of that item

15  who previously purchased it that they have purchased

16  something that you have removed?

17     A.   Correct.

18     Q.   And you know who those people are, right?

19     A.   Which people?

20     Q.   The people who have brought something from you.

21     A.   They didn't -- I don't understand the question.

22     Q.   People who make purchases on your marketplace,

23  you have a record of who they are?

24     A.   We have a record of what they have told us,

25  yes, the shipping address.

1    <u>Exhibit 16</u> reflect that functioning of the ACE system
2    after August 2018?

3        A.   I don't know.

4        Q.   Earlier we were looking at the listing for the
5    Lettuce Turnip the Beet T-shirt that was -- that
6    resulted in the sale of approximately 68 items.

7             Do you remember looking at that listing?

8        A.   Yes.

9        Q.   And that was loaded by a user named David
10   Ayala, A-y-a-l-a, I believe --

11       A.   Yes.

12       Q.   -- is that right?

13       A.   Yes.

14       Q.   Is Mr. Ayala still a registered user on the
15   Redbubble marketplace?

16       A.   Yes.

17       Q.   Has he sold infringing items of other third
18   parties?

19       A.   I don't know.

20       Q.   But the fact that he sold more than 60
21   infringing T-shirts that said "Lettuce Turnip the Beet"
22   and then subsequently uploaded a "Lettuce Turnip the
23   Beets!" design did not result in him being removed from
24   the platform?

25       MR. WILSON:   Objection; lack of foundation.

1      THE WITNESS:  Can you repeat your question, please,

2  or Suzanne?

3           (Record read as follows:

4           "QUESTION:  But the fact that he sold more than

5                60 infringing T-shirts that said 'Lettuce

6                Turnip the Beet' and then subsequently uploaded

7                a 'Lettuce Turnip the Beets!' design did not

8                result in him being removed from the

9                platform?")

10     MR. WILSON:  Objection.  The question is vague,

11  lacks foundation, assumes facts not established.

12          You can answer.

13     THE WITNESS:  He is still an active user or a user.

14  BY MR. FAUCETTE:

15     Q.   Was there a period of time when his account was

16  disabled?

17     A.   I don't know.

18     Q.   So I just wanted to cover a couple of general

19  points with you, Mr. Toy, about the Redbubble

20  marketplace and how it functions.

21     A.   Okay.

22     Q.   For just a generic listing, when a purchaser

23  sees a listing on the website that it determines it

24  wants to buy, what is the first step in the purchase

25  process for the -- for that customer?

1    listings do not appear in ads on third-party websites

2    such as Google?

3        MR. WILSON:  Objection.  The question is vague.

4            You can answer.

5        THE WITNESS:  I would like you to clarify your

6    question, please, so we're -- I'm not sure I understand.

7    BY MR. FAUCETTE:

8        Q.   As part of Redbubble's marketing, you discussed

9    earlier today placement of ads on Google, Instagram, and

10   other places.

11           When Redbubble has an ad appear on Instagram,

12   for example, there is an image of a product that is

13   available on the Redbubble marketplace, and it's being

14   marketed through Instagram, right?

15       A.   Yes.

16       Q.   When a listing is removed from Redbubble's

17   marketplace, is there a mechanism in place that makes

18   sure that that listing doesn't appear in any of

19   Redbubble's advertising?

20       A.   Yes.

21       Q.   Is that instantaneous, or is there some lag in

22   time when that happens?

23       A.   There is a lag.

24       Q.   How long a lag?

25       A.   I don't know.

```
1      Q.   Have you seen this e-mail before?

2      A.   Yes.

3      Q.   In preparation to testify today?

4      A.   Yes.

5      Q.   Were you working at Redbubble as of October

6   2014?

7      A.   No.

8      Q.   In the e-mail wherein Ms. Printz asks for

9   Redbubble to cease and desist the sale and promotion of

10  the Lettuce Turnip the Beet market -- mark, excuse me,

11  on all products, the e-mail also asks for information

12  from Redbubble about the measures taken to comply with

13  demand, etc.

14           Did Redbubble respond to this?

15     A.   I don't know.

16     Q.   Does Redbubble have a policy internally about

17  providing rights holders with information about the

18  number and/or dollar value of the sale of infringing

19  items?

20     A.   It does now.  I don't know about October 27,

21  2014.

22     Q.   What is the current policy?

23     A.   Could you be more specific?

24     Q.   Well, you said Redbubble currently has a policy

25  about whether it will tell rights holders about the
```

```
 1  number or dollar value of the sale of infringing goods.
 2          What is that policy?
 3      A.   If a rights holder requests information about
 4  sales on the platform of works that have been moderated,
 5  we will provide that information.
 6      Q.   When did that get adopted as Redbubble's
 7  policy?
 8      MR. WILSON:  Objection; lack of foundation.
 9          You can answer.
10      THE WITNESS:  As long as I've been there.
11  BY MR. FAUCETTE:
12      Q.   And you joined the company in 2014?
13      A.   Uh... Sorry.
14      Q.   Well, regardless of when you joined, it's your
15  understanding that from the time you first joined the
16  company until the present, it has been Redbubble's
17  policy to provide rights holders with the information
18  about the sales of works moderated when rights holders
19  make a request for that information?
20      A.   It was as I stated it before.
21      Q.   And in your experience working as an employee
22  of Redbubble, have you been party to communications with
23  rights holders wherein you shared that information?
24      A.   Definitely.
25      Q.   Is there a -- some sort of internal requirement
```

1  about when you'll provide that information to a rights

2  holder?

3      A.   Yes.

4      Q.   What is that?

5      A.   It has to be -- it has to be works that have

6  actually been moderated on behalf of that rights holder.

7      Q.   So your understanding of Redbubble's policy is

8  if one or more works have been moderated by Redbubble

9  such that those listings have been removed and if there

10 were sales prior to moderation and if a rights holder

11 makes the request, Redbubble will then provide data

12 about the sales made prior to moderation?

13     A.   Yes, if it -- if it -- they -- yes, yes.

14     MR. FAUCETTE:  Mark that next, please.

15          (Deposition Exhibit 24 was marked for

16          identification.)

17 BY MR. FAUCETTE:

18     Q.   Mr. Toy, you've been handed Exhibit 24 to your

19 deposition.  It's a three-page document.  It's an e-mail

20 from Jen Goldberg at Redbubble to Elektra Printz at

21 Gmail dated October 28th, 2014, attaching correspondence

22 from Corina Maccarin.  I may have pronounced that wrong.

23          Take a look at that and let me know when you

24 have had a chance to do that.

25     A.   I've looked at it.

1    Q.    Have you seen this before?

2    A.    Yes.

3    Q.    Corina -- is it Maccarin?

4    A.    Corina Davis.

5    Q.    This was her name before she became Corina

6    Davis?

7    A.    Correct.

8    Q.    And this was a communication sent by Corina on

9    behalf of Redbubble to a rights holder, right?

10   A.    Yes.

11   Q.    Does this letter provide Ms. Gorski with

12   information about the sales of items that were moderated

13   by Redbubble?

14       THE WITNESS:  Suzanne, could you please repeat the

15   question.

16           (Record read as follows:

17           "QUESTION:  Does this letter provide Ms. Gorski

18           with information about the sales of items that

19           were moderated by Redbubble?")

20       THE WITNESS:  Can you please clarify what you mean

21   by "sales of items."

22   BY MR. FAUCETTE:

23   Q.    Well, in response to earlier questions a few

24   moments ago, you indicated that it was the policy at

25   gold -- at Redbubble to provide information to rights

1  holders regarding the sales of items that had previously
2  been moderated if the rights holder request that
3  information.
4          My question is:  Do you see anything in this
5  letter that shares with Ms. Gorski information about the
6  sales of items that had been moderated by Redbubble
7  prior to this letter being sent?
8      A.   Dollar amounts?
9      Q.   Dollar amounts, number of items sold, any
10 information --
11     A.   No.
12     Q.   -- whatsoever.
13     A.   No.
14     Q.   No?
15     A.   No dollar amounts or units sold.
16     Q.   And this letter was sent after the date on
17 which multiple listings had been moderated by Redbubble,
18 right?
19     A.   I don't know.
20     Q.   Well, you can refer back to Exhibit 16 if you
21 would like, but there were items removed and moderated.
22     MR. WILSON:  Well, if they have the exhibit, they
23 will show it.  I'm not going to instruct him not to
24 answer, but it doesn't seem like something that needs to
25 be covered with him.

1      THE WITNESS:  I can look if you want.

2   BY MR. FAUCETTE:

3      Q.   How about this:  You can look.  You can see

4   that there are items moderated before the date of that

5   letter?

6      A.   Yes.

7      Q.   Why did Redbubble not share the information?

8      A.   Were we asked for it?  I don't know.

9      MR. WILSON:  I mean, do you want him to read the

10  letter to see if they were asked for it?

11     MR. FAUCETTE:  I think I've asked my question.  I

12  think I've gotten my answer.

13     MR. WILSON:  Okay.

14     MR. FAUCETTE:  Why don't we take a short break.  Off

15  the record.

16          (Recess taken.)

17          (Deposition Exhibit 25 was marked for

18          identification.)

19     MR. FAUCETTE:  Let's go back on, and we'll mark this

20  next.

21          (Deposition Exhibit 26 was marked for

22          identification.)

23  BY MR. FAUCETTE:

24     Q.   Mr. Toy, you've been handed Exhibit 26 to your

25  deposition.  This is a letter dated December 16, 2016,

1 infringe the Lettuce Turnip the Beet mark, right?
2      MR. WILSON:  You're asking about what the document
3 says?
4      MR. FAUCETTE:  Yeah.
5 BY MR. FAUCETTE:
6      Q.   You would interpret the document that way,
7 don't you?
8      A.   Yes.  He made a series of requests.
9      Q.   Among those requests are to know how many items
10 and how much money Redbubble made selling items that had
11 the Lettuce Turnip the Beet mark on them?
12      A.   Which number are you referring to?
13      Q.   Just in general, your understanding of this
14 letter.
15           When you reviewed this letter in 2016, you knew
16 that Mr. Smith was seeking from Redbubble information
17 about the sale of infringing items by Redbubble, right?
18      A.   That's what he said, yes.
19      Q.   And you understood it that way, right?
20      A.   I -- I understood that's what he said.
21      Q.   You weren't confused about what he was seeking?
22      MR. WILSON:  In that regard or in general?
23 BY MR. FAUCETTE:
24      Q.   In regard that he wanted information about
25 Redbubble's prior sales of items that, at least

1   according to Mr. Smith, infringed the Lettuce Turnip the

2   Beet trademarks.

3       A.   It would help if you told me which -- is it

4   like 2 to 4?  Is it just 2, 3?  I mean, I can --

5       Q.   I'm just asking:  In your understanding of this

6   letter that you received in 2016 that you ultimately

7   wrote a response to, when you reviewed the letter then,

8   did you come away from that experience with the

9   understanding that Mr. Smith wanted to know how many

10  items Redbubble had sold bearing infringing marks?

11      MR. WILSON:  So he's asking you if you recall what

12  you understood in December 2016.

13      THE WITNESS:  Yeah, I don't know.

14  BY MR. FAUCETTE:

15      Q.   Reading the letter now today, do you have any

16  doubt that Mr. Smith wanted to know how many infringing

17  items Redbubble had sold as of the date of December 16,

18  2016?

19      A.   (Examines document.)

20          He asked for dollar value with respect to

21  inventory, dollar value with respect to infringing

22  products sold, and then on the last page -- the next

23  page he says -- mentions sales reports, preserve --

24  preservation of sales reports or -- yeah.  So that is my

25  answer.

```
 1        MR. FAUCETTE:  Mark that next.
 2             (Deposition Exhibit 27 was marked for
 3             identification.)
 4   BY MR. FAUCETTE:
 5        Q.   Mr. Toy, you've been handed Exhibit 27 to your
 6   deposition.  Exhibit 27 -- the first page of Exhibit 27
 7   is from the Redbubble production.  Second two pages --
 8   the second page and the third page are not.  I could not
 9   find the letter that was apparently attached to the
10   e-mail that was produced.  But we had a copy of the
11   letter in our production.
12             So if you would take a look at the exhibit and
13   let me know when you have had a chance to do that.
14        A.   (Examines document.)
15             Yes.
16        Q.   You wrote the letter that's attached in Exhibit
17   27?
18        A.   Yes.
19        Q.   That was sent back to Mr. Smith on behalf of
20   Redbubble?
21        A.   Yes.
22        Q.   Your letter does not say anything about the
23   number of infringing items moderated by Redbubble, does
24   it?
25        A.   No.
```

1    Q.   It doesn't provide any information about the
2    revenues received from Redbubble from the sale of items
3    that had previously been moderated, right?
4    A.   It does not.
5    Q.   And as of the time your letter was sent,
6    Redbubble had moderated several user listings on the
7    basis of the Lettuce Turnip the Beet trademark rights,
8    right?
9    A.   Based -- yes.
10   Q.   And you knew that you were corresponding with
11   the representative of an IP rights holder when you sent
12   this letter on January 13th, right?
13   MR. WILSON:  Objection; lack of foundation.
14       Go ahead.
15   THE WITNESS:  Yes.
16   BY MR. FAUCETTE:
17   Q.   And you knew that rights holder's
18   representative had asked Redbubble for information about
19   the sale of infringing items?
20   A.   That, I don't -- I don't remember.
21   Q.   You think you could have read Mr. Smith's
22   December 16th letter and been confused about the fact
23   that he wanted to know how many infringing items had
24   been previously sold?
25   MR. WILSON:  Objection; calls for speculation, lacks

```
 1  STATE OF CALIFORNIA          )
 2                               ) ss.
 3  COUNTY OF SAN FRANCISCO       )
 4          I hereby certify that the witness in the
 5  foregoing deposition, JAMES N. TOY, was by me duly sworn
 6  to testify to the truth, the whole truth and nothing but
 7  the truth, in the within-entitled cause; that said
 8  deposition was taken at the time and place herein named;
 9  and that the deposition is a true record of the
10  witness's testimony as reported by me, a duly certified
11  shorthand reporter and a disinterested person, and was
12  thereafter transcribed into typewriting by computer.
13          I further certify that I am not interested in
14  the outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17          IN WITNESS WHEREOF, I have hereunto set my
18  hand this 14th day of March, 2019.
19  Reading and Signing was:
20  _X_ requested    ___ waived    ___ not requested
21
22
23
24          SUZANNE I. ANDRADE, CSR NO. 10682
25
```